UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

BARLOVENTO, LLC,

    Plaintiff/Counter-Defendant,

v.    Civ. No. 18-1112 GJF/JHR

AUI, INC.,

    Defendant/Counterclaimant, and

WESTERN SURETY COMPANY,

    Defendant.

### ORDER ON DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE EVIDENCE RELATING TO AUI'S PLACEMENT OF CONCRETE TEST STRIPS

THIS MATTER is before the Court upon the above-captioned motion in limine [ECF 135] ("Motion").  The Motion is fully briefed.[1]  For the reasons that follow, the Court will **GRANT IN PART AND DENY IN PART** Defendants' Motion.

**I.  BACKGROUND**

Defendants seek two alternative forms of relief in this motion:  (1) an order excluding altogether any evidence of AUI's placement of concrete test strips; or (2) at a minimum, an order forbidding Plaintiff's expert witness, Dr. Kim Basham, from "suggesting that the Air Force should have accepted Barlovento's concrete mix proportioning study (Submittal 76 and 76a) in 2017." ECF 135 at 1.  Defendants' primary argument is that certain specifications in Plaintiff's prime contract with the Air Force forbade the placement of any concrete "until the Contracting Officer has approved the Contractor's mixture properties."  *Id.* at 2 (citation omitted).  Defendants point out that Plaintiff sought and received written confirmation from the Air Force in October 2017

---

[1] *See* ECFs 157 (response), 173 (reply).

reiterating the prohibition without first satisfying the condition precedent. *Id.* Defendants insist that no test strip could be placed – presumably by Plaintiff or any of its subcontractors – without the prior approval of the Contracting Officer ("CO") of Plaintiff's concrete mix proportioning study. *Id.* Since that approval was not issued until several weeks *after* Plaintiff terminated AUI's subcontract, AUI's performance with respect to the test strips is irrelevant because Plaintiff never had authority to direct, encourage, or allow AUI to pour them in the first place. *Id.* at 4. Defendants contend that Plaintiff cannot complain of AUI's concrete-related performance – much less use it as a basis for termination – because Plaintiff first breached its own prime contract with the Air Force by prematurely directing or authorizing the test strips to be placed at all. *Id.* This sequence of events, Defendants contend, renders any evidence of the test strips irrelevant under Federal Rule of Evidence 401 and unfairly prejudicial, misleading, and confusing under Rule 403. *Id.* at 4-5.

With respect to Dr. Basham, Defendants assert that his opinions run afoul of the same evidentiary rules. Whatever the Air Force should have done with Submittals 76 and 76a in 2017 is quite beside the point in the instant case, particularly in light of the CO withholding approval until well after AUI's termination. *Id.* at 5. Doctor Basham's intentions to revisit and criticize the Air Force's disapprovals of those submittals are irrelevant and would confuse the factfinder. *Id.*

Not surprisingly, Plaintiff views the issues quite differently. Plaintiff emphasizes that AUI's inability to satisfactorily place the test strips was among the reasons that drove Plaintiff's decision to issue a Letter of Cure and Notice of Intent to Terminate and, later, its ultimate decision to terminate AUI's subcontract. ECF 157 at 3-4. Consequently, the probative value of evidence of AUI's concrete-related performance is very high and is not outweighed by any risk of prejudice or confusion. *Id.* As to the issue of the CO's prior approval being a condition precedent to the placing of any concrete, Plaintiff asserts that the pattern of performance as between the Air Force,

Plaintiff, and AUI clearly evinced that each of them understood that test strips would be poured in September and October 2017.  Furthermore, Plaintiff continues, it was none other than the CO herself who issued in October 2017 a Deficient Performance Letter and two days later a Letter of Concern that documented the failure of the test strips placed theretofore.  ECF 157, Exhs. 1-2 (letters dated October 18 and 20, 2017, addressing failures of test strips placed on September 19 and 21 and October 19, respectively).  Those letters chronicled the causes of failure of the test strips, but never once mentioned that the strips had been poured prematurely without the CO's prior approval of the concrete mix submittal.  *Id.*  Since the Air Force itself did not consider Plaintiff to be in breach of the prime contract, it would be procedurally improper for the Court – on a motion in limine no less – to decide the question the other way, particularly when so many crucial facts are in dispute.  *Id.* at 8-9.

As to Dr. Basham, Plaintiff assures the Court and Defendants that his testimony will not address what the Air Force should or shouldn't have done with Submittals 76 and 76a.  Instead, Plaintiff expects the witness to confine his opinions to the "workability" of Plaintiff's concrete mixture with a slip-form paver.  *Id.* at 10.[2]

The Court quizzed counsel at some length on this motion at oral argument.  *See* ECF 205 at 137-61.  Of particular note, Defendants' counsel professed concern that the jury would struggle to apportion fault for the test strip failures as between Plaintiff's then-disapproved concrete mix and AUI's competence *vel non* with respect to the placement of the concrete.  *Id.* at 143, 148-49.  Counsel also admitted that it was the Air Force that disapproved the test strips and had not invoked

---

[2] At oral argument, Plaintiff's counsel clarified the scope of Dr. Basham's expected testimony and confirmed that the witness would not be opining on the Air Force's treatment of Submittals 76 and 76a.  ECF 205 at 150-51.  Plaintiff's counsel also forecasted that Dr. Basham's opinions would not be unchallenged but would merely represent one side in a "battle of experts."  *Id.* at 154.  Furthermore, although she maintained her primary position that the Court should forbid evidence of test strips altogether, Defendants' counsel agreed that an order restricting Dr. Basham from opining that the Air Force should have accepted and not rejected Submittals 76 and 76a would grant Defendants the alternative relief requested in the instant motion.  *Id.* at 138-39.

3

the "prior CO approval of the mix" as any part of the reason why. ECF 205 at 146. Counsel described that as "a very odd fact." *Id.* Counsel also could not explain why the alleged condition precedent was entirely absent from the Deficient Performance Letter and Letter of Concern that the Air Force issued to Barlovento in the wake of the test strip failures. *Id.* at 147.

## II. ANALYSIS

The Court begins by granting Defendants the alternative relief they specifically requested with respect to Dr. Basham: the Court will forbid him from opining or suggesting that the Air Force should have approved rather than disapproved the concrete mixtures encompassed in Submittals 76 or 76a. The Court observes that Plaintiff did not object to this relief either in its brief or at oral argument.

The Court reaches a different decision, however, on the larger issue of whether to grant Defendants' request to exclude altogether any evidence of AUI's performance with respect to the concrete test strip failures. The Court agrees with Plaintiff that such evidence is highly relevant, forming as it does one of the primary bases on which Plaintiff issued its Letter of Cure and Notice of Intent to Terminate and, later, its ultimate decision to terminate AUI's subcontract. As to Defendants' principal argument that all of this evidence is irrelevant under Rule 401 because of Plaintiff's failure to comply with a condition precedent in its prime contract with the Air Force, the Court is unpersuaded. There is substantial evidence in the record that the Air Force itself – which included the very specifications in its prime contract that Defendants now seek to invoke – knew of and at least implicitly approved the concrete test strips. For example, a senior Barlovento official wrote to AUI's project manager, Marshall Vickers, that "Barlovento, LLC has made a commitment to the government to complete a 400' test lane on 18 September 2017." ECF 85, Exh. 3 (Sep. 11, 2017 letter from David Beuzekom). On October 18, 2017, the Air Force CO

4

issued a Deficient Performance Letter in which she criticized two of Barlovento's concrete test strips that were poured the previous month: "The first test strip was rejected due to equipment operator errors. The second was rejected because of improper string line placement, variable concrete properties, insufficient trucking and unacceptable plastic concrete response." ECF 157, Exh. 1. Later that week, the CO issued a Letter of Concern that described a host of technical shortcomings that led to the failure of the third test strip. *See* ECF 157, Exh. 2. Crucially, the CO didn't criticize the test strips because they were poured before the Air Force approved a final mix design – indeed, the letters were entirely silent on that point. For the purposes of the instant motion, the Court considers the Air Force's silence in this regard to be thunderous.[3]

There are still more references in the record showing that the Air Force was expecting and allowing the placement of contract test strips well before it issued approval for a final mix design. For now, it is enough for the Court to say that – during the performance period – all three legs of this contractual triangle understood that concrete test strips would be placed *before* the Air Force issued a final mix design. AUI's request that the Court surgically extract from this case all evidence of its performance with the concrete test strips is contrary to and belied by how the parties acted during the performance period. Given that the Air Force never found, threatened, or even hinted that Plaintiff breached the prime contract by directing or allowing its sub to pour the test strips, the Court is beyond reluctant to decide that question the other way on an evidentiary record as hotly-contested as this one.

---

[3] Yet another document on which the Court places considerable weight is AUI's November 6, 2017, letter to its own surety in which it wrote: "[T]he government requires we pour a test strip that meets approval before the PCCP paving operation can take place." ECF 85, Exh. 18 at 2 (emphasis added). In the same letter, AUI adverted to sharing responsibility for the test strip failures with Barlovento, which had "[taken] ownership of the mix design and is responsible for making corrections to the slump characteristics." *Id.* (parenthetical omitted).

Having decided the Rule 401 question, the Court turns next to Defendants' concerns that evidence of AUI's concrete-related performance might mislead or confuse the jury. The Court does not share those concerns. Litigants ask juries all the time to apportion fault in civil lawsuits. The classic example, of course, is one that features multiple possible tortfeasors with perhaps a question of comparative negligence to spice things up. Juries listen to and evaluate the evidence – including often dueling expert opinions – benefit from the guidance they receive from counsels' summations and the Court's instructions, and then deliberate on and reach a decision about causation and fault apportionment. This is a familiar process to all of us, and the Court views this case as no different. With respect to the test strip failures, the parties will offer their respective lay and expert evidence as to how much fault, if any, to assign to the then-disapproved mixture versus the equipment, methodology, and competence of the placement crew. To that end, the jury will consider evidence about which party actually controlled the mix design and whether an on-site batch plant was or was not essential to minimum forward progress with the slip-form paver. Counsel will spar about the meaning of all of this evidence, the inferences to be derived therefrom, and the mathematical equation the jury should employ to apportion fault. Then the properly-instructed jury will retreat to do what its causation-apportioning counterparts are doing in deliberation rooms in courthouses across the country. This process takes time and it necessarily entails substantial litigation risk, but the Court trusts this process to resolve this dispute.

The Court concludes with an observation about the procedural mechanism by which Defendants chose to advance their "failure-of-condition-precedent" argument. Rather than addressing an issue as important as this in a summary judgment motion, which would have required them to demonstrate that *all* of the material facts are so settled as to be indisputable, Defendants instead waited to do so by way of motion in limine. The Court is puzzled, for a motion in limine

– bouncing along the surface of an evidentiary record as unsettled and subject to dispute as the one relevant to this issue – seems hardly the right vehicle to decide as a matter of law that Plaintiff can no longer proceed on one of the primary theories that it claims caused it to terminate the subcontract and sue its subcontractor.

## III. CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' Motion is **GRANTED IN PART AND DENIED IN PART** as follows:

(1) The Court **GRANTS** Defendants' request to preclude Mr. Basham from testifying that "the Air Force should have accepted [Plaintiff's] concrete mix proportioning study (Submittal 76 and 76a) in 2017." ECF 135 at 1, 3, 5.

(2) The Court **DENIES** the remainder of Defendants' motion.

**SO ORDERED.**

_____
THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE
*Presiding by Consent*