UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

BARLOVENTO, LLC,

    Plaintiff/Counter-Defendant,

v.                                                       Civ. No. 18-1112 GJF/JHR

AUI, INC.,

    Defendant/Counterclaimant, and

WESTERN SURETY COMPANY,

    Defendant.

**ORDER ON BARLOVENTO'S MOTION IN LIMINE # 5**
**(OBTAINING CONSENT OF A SURETY UNDER FAR 28.106-5)**

THIS MATTER is before the Court on the above-captioned motion in limine [ECF 137] ("Motion"). The Motion is fully briefed.[1] The Court held oral argument on October 1, 2020. *See* ECF 205 (transcript or argument) at 105-10. Because the Court concludes that Western Surety waived its right to receive advance notice of, and provide consent to, even a material change to its principal's Subcontract, the Court will **GRANT** the Motion.

**I.    BACKGROUND**

On March 24, 2017, one week after Barlovento hired Defendant AUI, Inc. under a $3.7 million Subcontract to replace a 2,225-foot taxiway at Kirtland Air Force Base, AUI entered into a "Performance Bond" contract with Western Surety. *See* ECFs 85 at 3; 85-1; 88-1 at 9. The parties acknowledge that this Performance Bond "incorporated the Subcontract by reference." ECFs 98 at 8, 16; 110 at 2, 10-11; 137 at 10; 209 at 2; *see also* ECF 85-1 (Performance Bond making the Subcontract "a part hereof"). The bond's incorporation of the Subcontract was without

---

[1] *See* ECFs 154, 179 (response and reply). The Court also ordered the parties to provide additional briefing related to this Motion. *See* ECFs 204 (order), 207 (Barlovento's brief), 209 (Defendants' brief).

objection or exception.  Its wholesale adoption is crucial, for the Subcontract expressly permits Barlovento—*without discharging Western Surety or incurring any obligation to notify Western Surety*—to change the work that AUI must perform.  *See* Subcontract ¶ 9.2 (providing that Barlovento may "direct [AUI] by written order and without notice to [Western Surety] to make changes in the Subcontract Work" and that Barlovento may do so "without invalidating … any bond given" under the Subcontract), ¶ 11.4.4 (providing that "[n]o … change in the Subcontract Work … shall release or discharge to any extent whatsoever [Western Surety], nor shall [Barlovento] have any duty to notify [Western Surety]"); *see also* Subcontract, articles 1 ("Scope of Work"), 9 ("Changes").

After the construction project began, the Air Force answered Barlovento's formal "Request for Information" by stating that "[t]he pavement thickness is changed [from 12] to 16 inches."  *See* ECFs 85 at ¶ 3; 98 at ¶ 3; 85-2 at 2.  Although the parties dispute whether Barlovento *ordered* AUI to do so, it appears that Barlovento at least "sincerely urge[d]" AUI to place test lanes at this new thickness—even though the contract modification between the Air Force and Barlovento ("Mod 2") was not formally executed until after AUI was terminated.  *See* ECFs 85 at ¶ 4; 98 at ¶ 4; 85-3 at 1; 88-1 at ¶ 47; 102 at ¶ 47; 98-3 at 1-2.  AUI eventually placed three such test lanes, on September 19, September 21, and October 13, 2017, respectively, but none of these test lanes met the required specifications.  ECFs 85 at ¶ 7; 98 at ¶ 7; 85-8 at 1; 88-37 at 1; 88-39 at 1.  Consequently, when Barlovento issued its "Letter of Cure" to AUI on October 31, 2017, Barlovento specifically listed "fail[ing] at three attempts for placing concrete" as one of three "deficiencies" that could result in AUI's termination (if the deficiency was not remedied as Barlovento required).  ECFs 93-12 at 1; 93-14 at 2; Subcontract ¶ 8.1.[2]

---

[2] *See also* ECFs 93-13 at 1 (AUI responding to the Letter of Cure, stating it "accepted responsibility and made corrections for the issues for which [AUI] [was] responsible during [concrete test strip] placement"); 93-15 at 1-2

It appears that AUI, at a minimum through a November 9, 2017 letter, made Western Surety aware of this increase in concrete thickness (or at least of the "Mod 2" that was to include this change)—and AUI's belief that its scope of work "had completely changed" due to the two contract modifications.[3]  The record before the Court does not show that Western Surety ever objected to any of these actual or forthcoming modifications, particularly the increase in concrete thickness.  *See*, *e.g.*, ECF 85s at 1-7; 98-11 at 2-4.  On December 5, 2017, upon being informed of AUI's impending termination for failing to "provide an[] acceptable base mix design," Western Surety offered, albeit unsuccessfully, to "tender a completion contractor to [Barlovento]" once Barlovento "obtain[ed] a few competitive bids for completion of AUI's contract."  ECF 85-22.  Western Surety later claimed that its Performance Bond obligations were discharged because this four-inch increase in concrete thickness "materially" changed the Subcontract without Western Surety's "knowledge or consent."  ECF 85 at 2, 7-11 (citing *Nat'l Sur. Corp. v. United States*, 118 F.3d 1542, 1546 (Fed. Cir. 1997)).

## II.   PARTIES' PRIMARY ARGUMENTS

Barlovento contends that Western Surety's Performance Bond obligations were not discharged because, *inter alia*, Western Surety consented to (i.e., waived) any such change.  *See*

---

(AUI subsequently memorializing the parties' agreement that they would cooperate to obtain "a central [concrete] mix batch plant on site" and that AUI could use a fixed form concrete placement method).

[3] *See* ECF 85-18 at 2 (AUI informing Western Surety that "[t]wo contract modifications have been issued that have completely changed the scope from the original" and that "the latest [modification] was received on October 19th"); *see also* ECF 167 (parties' stipulated exhibit list; the physical copies of these listed exhibits were mailed to the Court) at Ex. No. 92 (AUI's enclosures to this letter, one of which was AUI's October 23, 2017 letter to Barlovento, which similarly stated "on October 19, 2017, AUI received contract Modification No. 2 (Mod 2)" and that "the original contract scope compared to the new scope incorporating Mod 1 and Mod 2 has completely changed");  ECF 88-36 at 1-4 (excerpt from the Air Force's October 19, 2017 "Request for Proposal" for "Mod 2," seeking proposals to address the work identified in a draft "Revised Statement of Work," which in turn states, *inter alia*, "[a]s a result of [the request for information,] [t]he concrete pavement for the Taxiway and the turnaround is to be 16 inches" and "[c]onstruct an additional 4 inches of concrete pavement"); ECF 167 at Ex. No. 354 (Air Force stating in its Request for Proposal Memorandum that, although "[t]his modification has been certified as a valid requirement," "[t]he Government reserves the right to cancel this modification").

3

ECFs 98 at 16-18, 20; 137 at 10; 207 at 1-4.  Consequently, Barlovento asserts, "any alleged contractual obligations or duties … that stem from [Federal Acquisition Regulation ("FAR") 28.106-5 – Consent of Surety] [are] *irrelevant*"—and thus cannot impose upon Barlovento a duty to obtain consent from, or even provide notice to, Western Surety for material changes to the Subcontract.  ECF 137 at 1-11 (emphasis added); *see* FAR 28.106-5 (establishing the conditions for when a government contracting officer must obtain a surety's consent).  Barlovento therefore seeks to exclude "evidence, testimony, and argument relating to alleged contractual obligations and duties arising under [FAR] 28.106-5."  ECFs 137 at 10; 207 at 1-2, 5-6.

Defendants, on the other hand, have affirmed that "[t]he FAR is not something that will be included in [their] evidence, testimony or argument"—but argue that this FAR provision is "appropriate as part of a jury instruction."  ECF 154 at 3-6.

### III.  LAW

#### A.  Applicable Contract Law

"In cases arising under diversity jurisdiction, the federal court's task is . . . simply to 'ascertain and apply the state law.'"  *Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 665 (10th Cir. 2007) (quoting *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003)) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)).  Specifically, the federal court must "apply the substantive laws of the forum state," *New York Life Ins. Co. v. K N Energy, Inc.*, 80 F.3d 405, 409 (10th Cir. 1996), by "follow[ing] the most recent decisions of the state's highest court."  *Wade*, 483 F.3d at 665-66 (citing *Wankier*, 353 F.3d at 866).  And "[w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do."  *Id.* at 666 (quoting *Wankier*, 353 F.3d at 866).

The New Mexico Supreme Court requires courts to "interpret the meaning [of a contract] as a matter of law when the evidence presented is so plain that it is only reasonably open to one interpretation." *ConocoPhillips Co. v. Lyons*, 299 P.3d 844, 849 (N.M. 2012) (internal quotations omitted).[4]  In addition, under New Mexico Law, a surety is "entitled to a strict construction of his agreement, and 'his liability is not to be extended by implication beyond the express limits or terms of the instrument, or its plain intent.'" *Levenson v. Haynes*, 934 P.2d 300, 306 (N.M. Ct. App. 1997) (quoting *Shirley v. Venaglia*, 527 P.2d 316, 319 (N.M. 1974)) (citing *Federal Deposit Ins. Corp. v. Moore*, 879 P.2d 78, 82 (N.M. 1994)).  Lastly, the New Mexico Supreme Court has emphasized that "New Mexico respects party autonomy" and that "the law to be applied to a particular dispute may be chosen by the parties through a contractual choice-of-law provision." *Strausberg v. Laurel Healthcare Providers*, LLC, 304 P.3d 409, 416 (N.M. 2013) (quoting *Fiser v. Dell Comput. Corp.*, 188 P.3d 1215, 1218 (N.M. 2008)).

The Subcontract in the instant case provides that its "validity, interpretation and performance . . . shall be governed in accordance with the federal law of government contracts including, but not limited to, decisions enunciated by federal judicial bodies, boards of contract appeals and quasi-judicial agencies of the federal government." ECF 88-3 at 22 (also stating that "[t]o the extent that the federal law of government contracts is not dispositive, the laws of the State of New Mexico shall apply").  Under the federal law of government contracts,[5] "[c]ontract

---

[4] "If, however, a court determines that the contract is reasonably and fairly open to multiple constructions, then an ambiguity exists … and the jury should resolve all factual issues presented by the ambiguity." *Id.* (also noting that "[w]hether contractual terms are ambiguous is a question of law"); *see also Mark V, Inc. v. Mellekas*, 845 P.2d 1232, 1236 (N.M. 1993) (observing that "in the event the parties do not offer evidence of the facts and circumstances *surrounding execution of the agreement* [that] lead[] to conflicting interpretations as to its meaning, the court may resolve *any* ambiguity as a matter of law" (emphasis added)).

[5] *See MACTEC, Inc. v. Bechtel Jacobs Co., LLC*, 346 F. App'x. 59, 83 (6th Cir. 2009) (unpublished) (citing cases from the United States Court of Appeals for the Federal Circuit and the United States Court of Federal Claims as sources for "the federal law of government contracts"); *Solitron Devices, Inc. v. Honeywell, Inc.*, 842 F.2d 274, 277

5

interpretation begins with the plain language of the written agreement," and "the plain and unambiguous meaning of a written agreement controls." *Hercules Inc. v. United States*, 292 F.3d 1378, 1380 (Fed. Cir. 2002) (citations and internal quotation marks omitted). In addition, "[t]he contract must be construed to effectuate its spirit and purpose giving reasonable meaning to all parts of the contract." *Id.* (citation omitted). Finally, "[c]ontract interpretation is a question of law." *Teg-Paradigm Envtl., Inc. v. United States*, 465 F.3d 1329, 1336 (Fed. Cir. 2006).

### B. Discharge of a Surety

Under the federal law of government contracts,[6] "[w]here, without the surety's consent, the principal and the [obligee] modify their contract otherwise than by extension of time for payment . . . . [the] surety is (i) discharged if the modification materially increases his risk, and (ii) not discharged if the risk is not materially increased, but his obligation is reduced to the extent of loss due to the modification." *Nat'l Sur. Corp.*, 118 F.3d at 1544 (quoting *Gritz Harvestore, Inc. v. A.O. Smith Harvestore Prods., Inc.*, 769 F.2d 1225, 1230 n.7 (7th Cir. 1985)) (citing Restatement (First) of Security § 128 (1941)). But "[t]he [surety] is not discharged … to the extent that, in the contract creating the [suretyship], the [surety] consents to acts that would otherwise be the basis of the discharge, agrees that such discharges are unavailable to the [surety], or waives such discharges." Restatement (Third) of Suretyship & Guaranty § 48 (1996) (also observing that "[s]uch consent, agreement, or waiver, if express, may be effectuated by specific language or by

---

& n.3 (11th Cir. 1988) (citing to what is now the United States Court of Federal Claims as a source of "the federal law of government contracts").

[6] As explained in Section IV below, the Court, in applying applicable New Mexico Supreme Court precedent, holds that the Performance Bond incorporates the Subcontract. Consequently, the Performance Bond must also be "governed in accordance with the federal law of government contracts" (and, "[t]o the extent that the federal law of government contracts is not dispositive, the laws of the State of New Mexico"). Subcontract at ¶ 10.8; *see also* ECFs 85 at 8-10; 98 at 2, 8, 12-19; 110 at 2, 10-11; 137 at 10; 209 at 2 (parties, in their briefing, generally, though not exclusively, applying the federal law of government contracts to their interpretations of the Performance Bond).

general language indicating that the [surety] waives defenses based on suretyship"). "Consent may be express or implied from the circumstances." *Id.*; *see also Hartford Fire Ins. Co. v. United States*, 254 F. Supp. 3d 1333, 1361-66 (Ct. Intl. Trade 2017) (observing that "the Federal law of Government contracts dovetails precisely with general principles of contract law" and that consent may be "implied from the circumstances," such as when a party "manifests assent to the altered terms" (brackets omitted) (quoting *NRM Corp. v. Hercules, Inc.*, 758 F.2d 676, 681 (D.C. Cir. 1985); Restatement (Third) of Suretyship & Guaranty § 48; Restatement of Contracts § 287)).

## IV. ANALYSIS

Because the Court concludes that Western Surety waived its right to receive advance notice of, and provide consent to, the change in concrete thickness, the Court will exclude as irrelevant any evidence, testimony, or argument related to this FAR provision—including any suggestion that Barlovento had a legal duty to provide notice to, or obtain consent from, Western Surety for changes to AUI's Subcontract obligations. *See also* ECF 154 at 3 (Defendants affirming that "[t]he FAR is not something that will be included in [their] evidence, testimony or argument").[7]

### A. Western Surety Consented to Subcontract Modifications

As a preliminary matter, the Court addresses Barlovento's assertion that, because "Mod 2" was not implemented until after AUI's termination, the Subcontract was not *modified* to require a changed concrete thickness—thus precluding any discharge of Western Surety based on "[AUI] and [Barlovento] *modify[ing]* their contract," *Nat'l Sur. Corp.*, 118 F.3d at 1544 (emphasis added), without Western Surety's consent. ECF 207 at 2-3. The Court nevertheless observes that, although the prime contract between the Air Force and Barlovento may not yet have been formally modified through "Mod 2," the Subcontract between Barlovento and AUI appears to have been modified—

---

[7] The Court will conform its jury instructions to today's decision.

at least to the extent that AUI and Barlovento agreed to perform the Subcontract work with a changed concrete thickness of 16 inches. *See* ECFs 85-4 at 5-6; 88-6 at 5, 13; 88-39 at 2. For instance, AUI expressly agreed to be "bound by *all* Subcontract Documents," which included nearly *any* document that was pertinent to the project—and almost certainly a formal written response from the Air Force that "[t]he pavement thickness is changed [from 12] to 16 inches." ECF 85-2 at 2.[8] Furthermore, AUI actually placed three concrete test lanes—all at 16 inches; Barlovento then threatened to terminate AUI for not successfully placing these test lanes—at 16 inches; and AUI then collaborated with Barlovento to revise AUI's plan for placing the concrete—at 16 inches. *See* ECFs 85 at ¶¶ 4,7; 98 at ¶ 4, 7; 88-37; 88-39; 88-40; 88-41.[9]

To the extent that the Subcontract was modified, however, the Court holds that Western Surety consented to any such modification.[10] In reaching this holding, the Court first concludes that under a "strict construction," *Levenson*, 934 P.2d at 306, of the applicable language, the Performance Bond incorporated the Subcontract, and it did so *in toto* without objection or exception. Indeed, the operative language is "so plain that it is only reasonably open to one interpretation." *ConocoPhillips Co.*, 299 P.3d at 849. *Both* parties agreed that—by expressly

---

[8] *See* Subcontract ¶ 1.4 (AUI agreeing to be bound by, *inter alia*, "any and all Project design and construction submissions documents, the [Air Force's] project criteria, … special conditions, general conditions, specifications, drawings, addenda, [and] amendments").

[9] *See also Omni Corp. v. United States*, 41 Fed. Cl. 585, 591 (Fed. Cl. 1998) (observing that "[i]t is a familiar principle of contract law that the parties' contemporaneous construction of an agreement, before it has become the subject of a dispute, is entitled to great weight in its interpretation" because "how the parties act under the arrangement, before the advent of controversy, is often more revealing than the dry language of the written agreement by itself" (citations and internal quotation marks omitted)).

[10] It is of no import whether, by incorporating into its Performance Bond the entire Subcontract, Western Surety should be deemed to have either (1) consented to the modification or (2) waived its right to receive advance notice of, and provide consent to, the modification. The Court views those alternatives as two sides of the same coin. Furthermore, for the purpose of today's decision, the Court assumes without deciding that Western Surety's risk under the Performance Bond *materially* increased contemporaneous with AUI beginning to perform the concrete portion of the Subcontract at the thickness of 16 inches.

making the Subcontract "a part hereof," ECF 85-1—the Performance Bond incorporated the Subcontract.  ECFs 98 at 8, 16; 110 at 2, 10-11; 137 at 10; 209 at 2.[11]

Because the Subcontract incorporated by the Performance Bond expressly provided that *any* changes could be made to the Subcontract work without discharging its surety obligations, Western Surety consented to (i.e., waived its right to receive advance notice of and provide consent to) *any* future changes to the Subcontract work.  *See* Subcontract ¶¶ 9.2, 11.4.4 (also establishing that Barlovento had no duty to even notify Western Surety of any changes).  In other words, Western Surety expressly agreed to incorporate and guarantee the performance of a Subcontract that—by its *own* terms—permitted *any* changes to its own scope of work, all without "releas[ing] or discharg[ing] *to any extent whatsoever* [Western Surety]."  ¶ 11.4.4 (emphasis added); *see also* Subcontract, articles 1, 9; ¶ 11.4.

The Court cannot hold, despite Western Surety's urging, that by incorporating and guaranteeing such express conditions, Western Surety really only consented to *non-material* changes.  *See* ECF 110 at 10-11.  The law prevents the Court from rewriting the Performance Bond or the Subcontract in that manner.  *See Kiewit Infrastructure West Co. v. United States*, 972 F.3d 1322, 1330 (Fed. Cir. 2020) (observing that courts "cannot rewrite a contract or insert words to which a party has never agreed" (quotations omitted)); *see also* ECF 140 at 220-22 (confirming Western Surety's position that the Court should rewrite ¶ 9.2 by inserting into it the following italicized language: "[Barlovento] may, "without invalidating … any bond given [under the Subcontract], direct [AUI] by written order and without notice to [Western Surety] to make *nonmaterial, routine, normal, and ordinary* changes in the Subcontract Work"); ECF 205 at 105-

---

[11] The Court further observes that Western Surety has never argued that such language incorporating the Subcontract (or the Subcontract language in ¶¶ 9.2.2 or 11.4.4) is ambiguous—nor has Western Surety ever submitted extrinsic evidence suggesting that the Performance Bond or the Subcontract might mean anything other than what their plain language reflects.  *See* ECFs 84, 110, 140, 205, 209.

08 (similarly confirming Western Surety's position that the Court should rewrite ¶ 11.4.4 by inserting into it the following italicized language: "nor shall the Contractor have any duty to notify subcontractor's surety of any action or inaction *unless it is a material change to the surety's exposure*").

In sum, under the "plain language of the written agreement[s]," *Hercules Inc.*, 292 F.3d at 1380, Western Surety was not discharged due to the changed concrete thickness. To the contrary, Western Surety had already consented to or waived its right to consent to any such changes by incorporating into its Performance Bond and guaranteeing this freely-changeable Subcontract. *See also* Restatement (Third) of Suretyship & Guaranty § 48 (stating that a surety is not discharged when "in the contract creating the [suretyship], the [surety] consents to acts that would otherwise be the basis of the discharge … or waives such discharges").[12] Whether in retrospect such a sweeping and unconditional incorporation was a good idea or whether Western Surety should have included into its Performance Bond additional language making clear that it was not waiving its traditional rights to receive advance notice of, and provide consent to, material changes to its principle's Subcontract are questions for another day.

---

[12] Defendants argue that a particular clause in the Performance Bond (i.e., "[Western Surety] hereby waives notice of any alteration or extension of time made by [Plaintiff]") implies that it could not have agreed or consented to material changes to the Subcontract's scope of work. *See* ECF 110 at 10-11 (Western Surety's reply in support of its motion for summary judgment). But such language—regardless of whether it waived notice of "any alteration" or merely "any alteration . . . of time"—did not preclude Western Surety from agreeing to *additional* terms, particularly by guaranteeing and incorporating into its Performance Bond a Subcontract that freely permitted changes without Western Surety's consent. In support of their argument, Defendants also cite to *Equitable Sur. Co. v. McMillan*, 234 U.S. 448, 457-58 (1914), a case in which, pursuant to the surety's "bond given under a statute [entitled] the act of February 28, 1899 [c. 218, 30 Stat. 906]," a surety's liability to materialmen for a minor change ("to which the … materialmen were not parties") was not discharged—but presumably might have been "[i]f the change were so great as to amount to an abandonment of the contract and the substitution of a substantially different one." ECF 110 at 11. But such a case—where "the contract … in question contained *no* clause permitting changes"—is inapplicable to the instant case where the surety expressly consented via contract to changes. *Equitable Sur. Co.*, 234 U.S. at 457-58 (emphasis added) (also observing that "the surety becomes bound … *in accordance with the stipulations of the contract*" (emphasis added)).

### B. Conclusion

The Court recognizes that its construction of the Performance Bond and Subcontract effectively deprives Western Surety of one of its defenses to Barlovento's claim against it. The Court notes, however, that Western Surety's defenses still include that (1) Barlovento failed to "faithfully perform [the Subcontract]," ECF 85-1 at 1; and/or (2) Western Surety's obligations were discharged because Barlovento refused to permit it to locate a substitute Subcontractor to complete the project, thereby "preclud[ing] Western Surety from performing its bond obligations." ECF 85 at 2, 6-7, 11-13. Nevertheless, because Western Surety consented in advance to the change in concrete thickness, the Court will exclude evidence or argument related to FAR 28.106-5—including any suggestion that Barlovento had a legal duty to provide notice to, or obtain consent from, Western Surety for changes to AUI's Subcontract obligations, material or otherwise.

**IT IS THEREFORE ORDERED** that Barlovento's Motion is **GRANTED**.

**SO ORDERED.**

_____
THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE
*Presiding by Consent*