## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

BARLOVENTO, LLC,

      Plaintiff,

v.                                       Civ. No. 18-1112 GJF/JHR

AUI, INC., *et al.*,

        Defendants.

## MEMORANDUM OPINION AND ORDER ON BARLOVENTO'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT AND AUI'S MOTION
## FOR SUMMARY JUDGMENT ON COUNT I OF BARLOVENTO'S COMPLAINT

THIS MATTER is before the Court on Barlovento's Motion for Partial Summary Judgment on Count I (and on the counterclaims by Defendant AUI, Inc.) [ECF 93] and AUI's Motion for Summary Judgment on Count I [ECF 88].  The Motions are fully briefed.[1]  The Court heard extensive argument on the motions on February 12, 2020.  *See* Tr. of Mtns. Hrg, ECF 140.  As the Court indicated on the record at the hearing, *see* Tr. at 303-06, the parties' evidentiary submissions leave multiple material fact questions unanswered or subject to genuine debate.  Consequently, for the reasons stated on the record at the hearing and as further explained below, the Court **DENIES IN PART AND GRANTS IN PART** Barlovento's motion, **DENIES** AUI's motion, and **DISMISSES WITH PREJUDICE** Count III of AUI's Counterclaim.

## I.    BACKGROUND

In March 2017, the United States Air Force hired Barlovento, under a $5.5 million construction contract, to replace a 2,225-foot taxiway at Kirtland Air Force Base, New Mexico.  ECF 88-1 at 9.  One week later, Barlovento hired AUI, under a $3.7 million Subcontract, to perform the "lion's share" of this taxiway replacement work.  *Id.*  On July 7, 2017, after an

---

[1] *See* ECFs 104, 114 (response and reply to ECF 93); ECFs 102, 109 (response and reply to ECF 88).

unexpected delay,[2] the Air Force authorized the commencement of the work and required its completion by December 12, 2017.  *Id.* at 10; ECF 93 at 9.  After removing the existing taxiway and its underlying "base course,"[3] AUI encountered certain unsuitable soils in the subgrade.  ECF 88-1 at 10.  According to AUI, this "unexpected" discovery delayed the project's completion by approximately one month.  ECF 88-1 at 9.[4]

Around September 13, 2017, AUI began placing the new base course, expecting this phase to be completed in two weeks.  ECF 93 at 10.  AUI, however, ran into difficulties meeting the "compaction and density requirements" and tried for over a month to meet these requirements.  ECF 88-1 at 11; ECF 93 at 10.  On October 27, 2017, AUI began trying a new approach that involved blending "crushed aggregate" into some of the existing materials an approach explicitly disapproved by Barlovento.  *Id.* at 10-11.[5]  This new approach ultimately failed to meet the required specifications, and on October 31, 2017, the Air Force instructed Barlovento to (1) remove "all unsatisfactory [base course] material" and (2) "provide acceptable test reports" of the new base course material to be used.  *Id.* at 11; ECF 93-11 at 1.  Barlovento then immediately sent AUI a "Letter of Cure," stating that AUI had delayed the project due to three "deficiencies:"

[1] fail[ing] to place acceptable base course due to the base course being out of specification[,]

[2] fail[ing] at three attempts for placing concrete that met specification[,] . . . [and]

---

[2] The parties dispute who is responsible for this delay.  *See id.*; ECF 102 at 4.

[3] The base course, as described by AUI, is "a layer of crushed rock of varying sizes dictated by the Project Specification."  ECF 93 at 5.

[4] Barlovento claims that AUI was "responsible for concurrent delays during that period" and disputes the implication that AUI was entitled to "relief" for any such delay.  ECF 102 at 5.

[5] On October 27, 2017, Barlovento informed AUI that its new approach relied on "non-approved materials and unapproved blending" and was therefore "unapproved" and "[could] not be allowed to continue."  ECF 93-9 at 2.  Instead, Barlovento insisted that, consistent with the approved method that AUI began with, "AUI should remove all the substandard base [course] [and] [s]upply new base [course] directly from the supplier."  *Id.*

[3] [t]he above [two deficiencies] [have] prevented the project from meeting AUI,
Inc's provided recovery schedule; further delaying the project.

ECFs 93-12 at 1; 93-14 at 2.  Barlovento also reminded AUI that AUI was required to "remedy the default in such a manner . . . as may be required by [Barlovento]."  *Id.*  (citing Subcontract).

Two days later, AUI responded that it was "purchasing alternative material from another supplier" and that, "if the approval process for the base course [went] well," the delivery and placement could possibly be "completed by early-December."  ECF 93-13 at 1.[6]  In response, Barlovento sent AUI on November 6th a "Notice of Intent to Terminate," which further discussed the three alleged deficiencies and required AUI to "provide a *substantive* plan for curing these deficiencies and recovering the project schedule for completion on December 12, 2017."  ECF 93-14 at 1-3 (emphasis added).  AUI and Barlovento then met over the next two days, and on November 9th, AUI formally responded, summarizing its understanding from these meetings and emphasizing that both parties were "in agreement that the December 12th completion date [was] unachievable" and that they would "jointly create a recovery schedule that [was] realistic."  ECF 93-15 at 1.  AUI also stated that it had "submitted the [base course] product for testing and [would] have results and a submittal by Friday, November 17" and that "[u]pon approval, AUI [would] immediately start placing [the] base course and preparing for a concrete test strip."  *Id.*[7]

---

[6] AUI also emphasized its view that, "[a]s stated in previous letters, … many of the challenges … ha[d] been generated by … the government's redesign and associated delays."  *Id.* at 2.  Consequently, given (1) AUI's "previously submitted claims for additional time," (2) "the initial delayed release of an approved design," (3) "the recent release of Mod[ification] 2," and (4) "the [upcoming] cold-weather months," AUI asked Barlovento for "a realistic idea of the government's timeframe for a revised completion date."  *Id.*  AUI also expressed its view that the Subcontract required the granting of additional time.  *Id.*

[7] Regarding the subsequent concrete placement, AUI noted that the parties agreed to work together to obtain approval for "a central [concrete] mix batch plant on site" and that AUI was authorized to use a particular fixed form "method of [concrete] placement."  *Id.* at 1-2.

AUI failed to meet its self-imposed November 17th deadline for a new base course submittal. ECF 93 at 13-14.  Nonetheless, Barlovento "agreed to extend that deadline to December 4, 2017."  ECFs 88-1 at 15; 88-42 at 2; 102 at 13; 114 at 10.[8]  On December 4th, AUI emailed Barlovento part of the base course submittal and stated that "AUI will have [the] combined 02 mm test tomorrow 12/5/17."  ECFs 88-1 at 16; 88-44 at 1; 102 at 14-15.  At 1:20 p.m. the following day, AUI emailed Barlovento this test report, which AUI contends completed its new base course submittal.  ECFs 88-1 at 16; 88-45 at 1; 102 at 14.  Nevertheless, at 4:50 p.m. that same day,[9] Barlovento "terminated AUI's Subcontract for default" for AUI's apparent failure to "cure material[] defects in its performance."  ECFs 88-1 at 17; 88-42 at 1; 102 at 15.  After generally alleging that AUI failed to "complete the Subcontract scope of work" and "adhere to recovery schedules," Barlovento specifically stated that "AUI was required to provide a revised base course submittal no later than yesterday, December 4, but failed to do so. . . . *and we still do not have a proper base course submittal*."  ECF 88-42 at 1-2 (emphasis added).[10]  Approximately one week

---

[8] Although the parties do not dispute that Barlovento gave AUI until December 4, 2017, to provide a "base course submittal," *see* ECFs 88-1 at 15; 102 at 13, the record does not clarify what conditions, if any, Barlovento may have attached to this presumably verbal "deadline" – e.g., what a "base course submittal" consisted of or whether, upon AUI's failure to strictly satisfy this deadline, Barlovento would *automatically* terminate the Subcontract or instead pursue another course of action (such as providing another opportunity to remedy).  *See generally* ECFs 88-1, 93.

[9] Although Barlovento's Notice of Termination included no sort of time stamp, *see* ECF 88-42, and although the parties never clarify whether the alleged times might represent different time zones (e.g., MDT or CDT), Barlovento nonetheless does not dispute that it sent the Notice of Termination sometime after it received AUI's completed submission.  *See* ECF 102 at 14-15.

[10] The Barlovento representatives who received AUI's 1:20 p.m. email submission (i.e., Mr. Axford, the Construction Quality Control Manager and Mr. Beuzekom, the Project Manager) were different from its representative who three-and-a-half hours later terminated AUI (i.e., Mr. Herndon, the General Construction Manager).  Barlovento has never clarified whether, *prior* to the issuance of the termination, its personnel simply overlooked AUI's submission or instead reviewed the submission but nevertheless deemed it to be improper.  *See* ECFs 88-42; 88-45; 93; 102; *see also* ECFs 88-6 at 21 (Mr. Herndon stating in his deposition that he (1) "[could] not answer" whether "the submittal [was] turned in by AUI" and (2) "[did] not recall" whether he was ever "told from the site that a submittal was or was not turned in" but nevertheless affirming that "it [was] [his] best memory that a submittal was not turned in and that's why the termination happened"); 93-17 at 1 (Barlovento stating in a December 6th email that "[it] still ha[d] not received a complete formal plan to submit telling the government in detail how AUI was planning to process, place and control the quality of the base co[u]rse").

later, Barlovento hired a replacement Subcontractor, which then completed the project in late June 2018.  ECF 88-1 at 18-19.

Barlovento filed this lawsuit in November 2018, alleging that AUI breached the Subcontract and that AUI and its surety, Western Surety Company, were therefore liable for Barlovento's resulting damages.  ECF 1 at 6-7.  AUI counterclaimed, alleging that Barlovento breached the Subcontract, including its duty of good faith and fair dealing, and wrongfully "terminate[d] [AUI] for default."  ECF 32 at 16-20.  As set forth more fully *infra*, Barlovento and AUI each seek summary judgment on Barlovento's initial breach of contract claim (Count I of Barlovento's Complaint).  ECFs 88, 88-1, 93.  In addition, Barlovento asks for summary judgment on AUI's entire Counterclaim, ECF 93, and AUI requests summary judgment on Count II of its Counterclaim along with an order overturning the default termination and converting it as a matter of law to one for convenience.  ECF 88-1 at 9.

## II.  SUBCONTRACT'S DEFAULT TERMINATION PROVISION

In terminating the Subcontract, Barlovento relied exclusively on the Subcontract's "termination for default" provision.  That provision lists several "grounds for default" and states that AUI may be "deemed in default" if – in Barlovento's opinion – any such grounds are met:

> [AUI] shall be deemed in default, if at any time, [AUI] shall, in the opinion of [Barlovento]: [1] refuse or for any reason fail at any time to prosecute the Subcontract Work in a diligent, timely, workmanlike, skillful, cooperative, safe or careful manner, [2] fail to supply a sufficient, skilled workforce or necessary materials, . . . [3] fail to abide by the terms of this [Subcontract]; or, [4] delay [Barlovento's] work or work of other Subcontractors.  [Barlovento] and [AUI] agree that each of the foregoing is a material breach of this [Subcontract].

Subcontract, § 8.1.1.[11]  In the event of such default, however, the Subcontract required Barlovento to give AUI notice and a three-day opportunity to "remedy the default" before terminating:

---

[11] Although there are eight enumerated "grounds for default," only four are applicable to the instant case.  *See id.*; ECF 93-18 at 1 (Notice of Termination letter).

> After notice to [AUI] to remedy such default, [AUI] shall immediately, and in no
> event longer than three (3) days, remedy the default in such manner and with such
> diligence and promptness as may be required by [Barlovento].   Upon [AUI's]
> failure to do so, [Barlovento] may terminate this [Subcontract].

Subcontract, § 8.1.2.   And in the event of such termination, AUI is "liable for all expenses of

completing the Subcontract Work," § 8.1.3, unless "it is determined for any reason that [AUI] was

not actually in default under this [Subcontract] at the time of termination[.]"  Subcontract § 8.2.2.[12]

## III. PARTIES' PRIMARY ARGUMENTS

The Court will address Barlovento's motion before turning to AUI's motion.

### A. Barlovento's Motion for Partial Summary Judgment

Barlovento is seeking affirmative summary judgment against AUI with respect to its breach

of contract claim in Count I of the Complaint, while also seeking defensive summary judgment as

to all three claims in AUI's Counterclaim.   Barlovento has limited the scope of its affirmative

request for summary judgment solely to AUI's alleged failures with respect to the base course

phase of the Subcontract.   *See* ECF 93 at 16-20; ECF 140 at 18.   Barlovento contends that the

undisputed evidence establishes as a matter of law that AUI defaulted on its base course

responsibilities in three ways:  (1) by failing "to prosecute the [base course] in a diligent, timely,

workmanlike, skillful, cooperative, safe or careful manner," as required by § 8.1.1(1); (2) by

failing "to supply a sufficient, skilled workforce or necessary materials," as required by § 8.1.1(2);

and (3) by causing delay in completion of the overall project, in violation of § 8.1.1(8).   ECF 93

at 18-19.   Barlovento asserts that AUI acknowledged its base course failure and then failed to

---

[12] If the determination is made that no actual default occurred or that AUI "was not actually in default at the time of
termination," then AUI is no longer *liable* for such expenses but rather "*entitled* to payment [for] the actual value of
the Subcontract Work satisfactorily performed."  Subcontract § 8.2.2 (emphasis added).

sufficiently and timely cure its default, which triggered a proper termination under the Subcontract. *Id.* at 19-20.

As for its defensive request for summary judgment as to Count I of AUI's Counterclaim, Barlovento argues that the undisputed evidence establishes as a matter of law that it breached neither the plain language of the Subcontract nor its duty of good faith and fair dealing. *Id.* at 21-24. To AUI's allegation that Barlovento failed to provide AUI with schedule updates and as-built drawings showing the location of underground utilities, Barlovento responds that it had no contractual obligation to do either. *Id.* at 21. To AUI's argument that Barlovento failed to grant or seek additional time to complete the project and reimbursement for additional costs incurred by AUI, Barlovento invokes § 5.2 of the Subcontract and insists that AUI waived its entitlements to any such relief when it "failed to follow the exclusive procedure outlined in the Subcontract for claiming purported entitlement to additional time or costs." *Id.* Barlovento further contends that the record is devoid of any evidence of "properly submitted claims for time and/or costs that Barlovento did not pass through to the Air Force." *Id.* at 23. Finally, to AUI's claim that Barlovento breached the Subcontract by failing to pay for AUI's original scope of work, Barlovento counters that, under § 8.1.3 of the Subcontract, AUI waived its entitlement to such payment by its own material breach of the Subcontract. *Id.* at 23-24. Barlovento represents that a trial is required to determine whether AUI can recover any offset-of-completion costs under § 8.1.3. *Id.* at 24.

Turning to Count II of the Counterclaim, in which AUI seeks a judicial conversion of the termination of the Subcontract from one for default to one for convenience, Barlovento posits that the "exclusive basis" on which AUI relies for its claim is that Barlovento did not perform a time-impact analysis and did not credit AUI for excusable delays. *Id.* at 25 (citing Counterclaim, ECF

32, at ¶ 62).  Barlovento contends that the formula for terminating the Subcontract for default is governed solely by the plain language of the Subcontract's default termination provision (§ 8.1), rather than the default termination provision of the Federal Acquisition Regulation codified at 48 C.F.R. § 52.249-10 (hereafter "FAR 52.249-10).  *Id.* at 26.  Since § 8.1 does not require a time-impact analysis, Barlovento asserts that AUI's claim for conversion of the termination fails as a matter of law. [13]

In opposing Barlovento's motion, AUI makes six primary arguments, the first of which is that Barlovento is relying on the wrong legal standard.  AUI insists that the proper legal standard for the Court to apply in evaluating the default termination in this case is set forth in FAR 52.249-10.  ECF 104 at 3-6.  AUI contends that the Prime Contract between the Air Force and Barlovento included this FAR provision and the Subcontract thereafter incorporated the Prime Contract, resulting in the implication that the FAR provision applies equally to the Subcontract.  *Id.* at 5.  Under FAR 52.249-10, says AUI, Barlovento could not terminate the Subcontract for default unless it first conducted a schedule analysis (aka time-impact analysis), credited AUI additional time for delays not occasioned by AUI, and still concluded that AUI was responsible for the "critical path delay."  *Id.* at 2.  AUI contends that it could have completed its scope of work under the Subcontract by a properly-adjusted completion date and, moreover, that Barlovento never determined whether AUI could have completed the scope of work before Barlovento's replacement subcontractor could have.  *Id.* at 3, 6.  All of this, AUI alleges, is sufficient as a matter

---

[13] Barlovento also moved for summary judgment as to Count III of the Counterclaim, which alleged that Barlovento somehow wrought a "cardinal change" to its Subcontract with AUI *after terminating* the Subcontract.  *See* ECF 93 at 27; *see also* Counterclaim [ECF 32] at ¶¶ 66-69.  At oral argument, the Court granted Barlovento's motion as to this count.  ECF 140 at 304 (Court granting Barlovento's motion for summary judgment as to Count III of Counterclaim).  AUI cited no authority for its post-termination cardinal change proposition, and the Court was and remains aware of none.  Consequently, the Court will simply memorialize without further discussion its dismissal with prejudice of Count III of the Counterclaim.

of law to show that "the termination for default was wrongful and must be converted to a termination for convenience." *Id.* at 6.

AUI next argues that § 8.2.2 of the Subcontract requires a judicial determination whether, "at the time of termination," AUI remained in default. *Id.* at 6-7. AUI points to evidence that Barlovento's decision to terminate AUI was pretextual, that Barlovento failed to pursue time extensions on AUI's behalf, that Barlovento failed to submit AUI's most recent base course proposal to the Air Force, and that Barlovento itself failed to obtain approval for a concrete proportioning study. The sum of all of this, AUI offers, is sufficient to show as a matter of law that the termination was wrongful. *Id.* at 7.

AUI's next contention surrounds what it claims was Barlovento's disregard of AUI's requests for time extension and Barlovento's failure to protect AUI's rights to request the same from the Air Force. *Id.* at 8-17. AUI argues that Barlovento's termination prevented AUI from perfecting its claim for time extensions under § 9.3 of the Subcontract for changes to the Subcontract work directed either by the Air Force or by Barlovento. *Id.* at 10-11. AUI further criticizes Barlovento for failing to do what was necessary to credit AUI for a substantial amount of delay caused by "acts, omissions, conditions, events or circumstances beyond [AUI's] control and due to no fault or responsibility of [AUI]." *Id.* at 9 (quoting Subcontract, § 5.2). AUI also asserts that Barlovento improperly waived – without AUI's permission – any extension of time that AUI could otherwise have sought for Modification 1 to the Subcontract. *Id.* at 10, 11-17.

For its fourth argument, AUI characterizes as undisputed that Barlovento had assumed the responsibility to obtain Air Force approval of a concrete mix proportioning study and that Barlovento's failure to do so "was endangering completion of the project by December 12, 2017, not AUI's base course work." *Id.* at 18. AUI insists that the default termination was wrongful

9

when the undisputed evidence demonstrates that it was Barlovento's failure that was "driving critical path delay at the time of the default termination." *Id.* at 19.

AUI next objects to Barlovento's contention that the Subcontract does not require a pre-termination time-impact analysis. *Id.* at 19-20.  Citing to the first half of § 5.2 of the Subcontract, AUI asserts that Barlovento violated an express duty to pass on to the Air Force requests for additional time that AUI sought for project delays it did not cause. *Id.*[14]

Finally, AUI argues that it had provided a new base course submittal prior to the time at which Barlovento terminated the Subcontract.  *Id.* at 21-23.  Barlovento's decision to enforce an arbitrary deadline it had previously forebore – and one with which AUI had substantially complied – and then to terminate the Subcontract instead of submitting AUI's base course submittal to the Air Force effectively stymied AUI from curing its alleged default.  *Id.*

### B.  AUI's Motion for Summary Judgment on Count I of Barlovento's Complaint

Not surprisingly, given that each party to the Subcontract has accused the other of materially breaching it, there is substantial overlap between the motions that are the subject of this decision.  For its part, AUI seeks an order "overturn[ing] the default termination and convert[ing] it to a termination for convenience as a matter of law."  ECF 88-1 at 9.  AUI cites six reasons that it says independently entitle it to this relief.  *Id.* at 3-7, 9.  The first three arguments are all anchored to AUI's assertion that FAR 52.249-10 supplied the standard for default termination under the Subcontract.  *Id.* at 9 (alleged undisputed material fact #3), 19-22.  According to AUI, that provision required Barlovento to perform a contemporaneous schedule or "time-impact" analysis

---

[14] This is the second time in AUI's opposition brief that it cited only the first half of § 5.2.  *See also id.* at 9.  The Court finds it at least curious why AUI elected *twice* to omit any reference to the second half of § 5.2.  After all, it is the second half of that provision that Barlovento cited in its motion as support for its argument that AUI *waived* its requests for additional time.  *See* ECF 93 at 21-23.  Yet, despite consuming 24 pages, AUI's opposition brief points to no evidence that AUI actually complied with the second half of § 5.2 (or with § 10.2 to which it refers) or was excused from doing so.  Indeed, the brief is completely, and conspicuously, silent on the topic altogether.

prior to termination and forbade a default termination unless Barlovento concluded that AUI could not complete its scope of work by the properly-adjusted completion date after crediting AUI for all excusable delays that were not attributable to it. *Id.* at 20-21. AUI argues that the evidence demonstrates beyond any dispute that Barlovento failed to comply with FAR 52.249-10 because it performed no schedule analysis at all. *Id.* at 4, 6, 21-22. AUI further contends that Barlovento's own failure with respect to obtaining Air Force approval for the concrete mix design was truly driving the delay in project completion. *Id.* at 5.[15]

For its last three arguments, AUI asserts (1) that the default termination should be overturned because Barlovento relied on unreliable testing in concluding that AUI defaulted on its original base course submission, *id.* at 6-7; (2) that Barlovento did not adequately consider AUI's request to place the concrete using fixed forms as opposed to a slip-form paver, when the project's specifications permitted either, *id.* at 7, 23; and (3) that the default termination was pretextual (and preordained) because Barlovento had already decided to terminate AUI and partner with a replacement subcontractor. *Id.* at 7-9, 23-24.

In opposing AUI's motion, Barlovento begins by disputing the vast majority of the allegedly undisputed material facts on which AUI premised its requested relief. ECF 102 at 3-17. Barlovento also takes dead aim at AUI's theory that it was FAR 52.249-10 – and not the separately-negotiated default termination provision in § 8.1 – that should govern the lawfulness by which the default termination at issue here is measured. *Id.* at 1-2, 17-19. In addition to emphasizing the primacy of the plain language of § 8.1, Barlovento contends that FAR 52.249-10 is neither

---

[15] The Court notes that AUI's opening motion is altogether silent on the default termination provision in the Subcontract (§ 8.1) or Barlovento's exclusive reliance on that provision in carrying out the termination. AUI instead waited until its reply brief to address § 8.1 for the very first time. *See* ECF 109, *passim.*

expressly, by implication, nor by "flow-down" incorporated into the Subcontract.  *Id.* at 17-19.[16]

Barlovento also points out that the Subcontract vested it with complete discretion to resolve any

disputes as to which terms should govern and Barlovento manifestly exercised that discretion by

citing only § 8.1 in all of its termination-related correspondence to AUI.  *Id.* at 19 (citing

Subcontract, § 1.6, which provides "[i]n the event of any inconsistency, conflict or ambiguity

between or among the Subcontract Documents, [AUI] shall be bound by the more stringent

interpretation of any such inconsistency, conflict or ambiguity that requires the highest duty to be

undertaken by [AUI], recognizing that [Barlovento] *maintains sole discretion* as to what

interpretation shall govern.") (emphasis added).  With the Subcontract undisturbed by the FAR

provision, Barlovento asserts that no pre-termination scheduling analysis of any kind was required

and the undisputed evidence demonstrates that the default termination complied entirely with §

8.1.  *Id.* at 19-20.  As to the allegations of unreliable testing, fixed concrete forms, and pretext,

Barlovento refutes each of them for various reasons.  *Id.* at 8 (disputing material fact #14), 22-24.

## IV.  APPLICABLE LAW

### A.  Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a).  A fact is material when it "might affect the outcome of the suit under the governing

[substantive] law," and a dispute is genuine when "the evidence is such that a reasonable jury could

return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986).

---

[16] Barlovento later argues in the alternative that, even if the Court were to hold the FAR provision applicable to the Subcontract, the default termination satisfied that standard too. ECF 102 at 20-21. Because the Court holds that FAR 52.249-10 is not applicable to the Subcontract, the Court does not reach this question.

"The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "If the movant meets this initial burden, the burden then shifts to the nonmovant to set forth specific facts from which a rational trier of fact could find for the nonmovant." *Id.* (quotations omitted). To satisfy this burden, the nonmovant must identify facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.* (citation omitted). Furthermore, all "material facts set forth in the [motions and responses] will be deemed undisputed unless specifically controverted." D.N.M.LR-Civ. 56.1(b).

"A 'judge's function' in evaluating a motion for summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Salazar-Limon v. City of Houston*, 137 S. Ct. 1277, 1280 (2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 249 (1986)); *see also First Nat. Bank of Ariz. v. Cities Service Co.*, 391 U. S. 253, 289 (1968) (the question at summary judgment is whether a jury should "resolve the parties' differing versions of the truth at trial"). In evaluating such a motion, the Court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the . . . motion.'" *Scott v. Harris*, 550 U. S. 372, 378 (2007) (quoting *United States v. Diebold, Inc.*, 369 U. S. 654, 655 (1962)).

### B. Applicable Contract Laws

#### 1. General Principles

"In cases arising under diversity jurisdiction, the federal court's task is . . . simply to 'ascertain and apply the state law.'" *Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 665 (10th Cir. 2007) (quoting *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003)) (citing *Erie*

*R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)). Specifically, the federal court must "apply the substantive laws of the forum state," *New York Life Ins. Co. v. K N Energy, Inc.*, 80 F.3d 405, 409 (10th Cir. 1996), by "follow[ing] the most recent decisions of the state's highest court." *Wade*, 483 F.3d at 665-66 (citing *Wankier*, 353 F.3d at 866).

The New Mexico Supreme Court has emphasized, however, that "New Mexico respects party autonomy" and that "the law to be applied to a particular dispute may be chosen by the parties through a contractual choice-of-law provision." *Strausberg v. Laurel Healthcare Providers*, LLC, 304 P.3d 409, 416 (N.M. 2013) (quoting *Fiser v. Dell Computer Corp.*, 188 P.3d 1215, 1218 (N.M. 2008)). The Subcontract in the instant case provides that its "validity, interpretation and performance . . . shall be governed in accordance with the federal law of government contracts including, but not limited to, decisions enunciated by federal judicial bodies, boards of contract appeals and quasi-judicial agencies of the federal government." Subcontract, § 10.8. But "[t]o the extent that the federal law of government contracts is not dispositive, the laws of the State of New Mexico shall apply." *Id.*

Under the federal law of government contracts,[17] "[c]ontract interpretation begins with the plain language of the written agreement," and "the plain and unambiguous meaning of a written agreement controls." *Hercules Inc. v. United States*, 292 F.3d 1378, 1380 (Fed. Cir. 2002) (citations and internal quotation marks omitted). In addition, "[t]he contract must be construed to effectuate its spirit and purpose giving reasonable meaning to all parts of the contract." *Id.* (citation omitted). Thus, "[t]he purpose of contract interpretation is to crystalize the parties' objectively

---

[17] *See MACTEC, Inc. v. Bechtel Jacobs Co., LLC*, 346 Fed. Appx. 59, 83 (6th Cir. 2009) (unpublished) (citing cases from the United States Court of Appeals for the Federal Circuit and the United States Court of Federal Claims as sources for "the federal law of government contracts"); *Solitron Devices, Inc. v. Honeywell, Inc.*, 842 F.2d 274, 277 & n.3 (11th Cir. 1988) (citing to what is now the United States Court of Federal Claims as a source of "the federal law of government contracts").

manifested intent, and this may involve the interpretation of specific language or terms, explanation of ambiguities, risk allocation, and sometimes the consideration of extrinsic evidence for limited purposes." *Conoco, Inc. v. United States*, 35 Fed. Cl. 309, 321 (Fed. Cl. 1996).[18] Finally, "[t]he proper construction of a contract . . . is a question of law." *SOLIDFX, LLC v. Jeppesen Sanderson, Inc.*, 841 F.3d 827, 833 (10th Cir. 2016); *Teg-Paradigm Envtl., Inc. v. United States*, 465 F.3d 1329, 1336 (Fed. Cir. 2006).

Under both the federal law of government contracts and New Mexico law, the elements of breach of contract claim are: "(1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." *Oliva v. United States*, 961 F.3d 1359, 1362 (Fed. Cir. 2020) (quoting *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989)); *Flemma v. Halliburton Energy Servs.*, 303 P.3d 814, 822-23 (N.M. 2013).

## 2. Duty of Good Faith and Fair Dealing

The federal law of government contracts and New Mexico law again are in agreement that, "[w]hether express or not," *Salas v. Mt. States Mut. Cas. Co.*, 202 P.3d 801, 805 (N.M. 2009), "[e]very contract … imposes upon each party … [a] duty of good faith and fair dealing in its performance and enforcement." *Dobyns v. United States*, 915 F.3d 733, 739 (Fed. Cir. 2019) (quoting *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014)).  "A party breaches the contract when it fails to abide by this … duty, which includes 'the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of

---

[18] *See also Omni Corp. v. United States*, 41 Fed. Cl. 585, 591 (Fed. Cl. 1998) (observing that "[i]t is a familiar principle of contract law that the parties' contemporaneous construction of an agreement, before it has become the subject of a dispute, is entitled to great weight in its interpretation" because "how the parties act under the arrangement, before the advent of controversy, is often more revealing than the dry language of the written agreement by itself" (citations and internal quotation marks omitted)).

the other party regarding the fruits of the contract.'" *Id.* (quoting *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005)).  This duty is thus "limited by the original bargain; it prevents a party's acts or omissions that, though not proscribed by the contract expressly, are inconsistent with the contract's purpose and deprive the other party of the contemplated value." *Id.* (quoting *Metcalf*, 742 F.3d at 991); *see also Bradley v. Chiron Corp.*, 136 F.3d 1317, 1326 (Fed. Cir. 1998) (noting that the duty is "limited to assuring compliance with the express terms of the contract and cannot be extended to create obligations not contemplated in the contract").[19]

### 3.  First Material Breach

"When a party to a contract is sued for its breach it may ordinarily defend on the ground that there existed, at the time of the breach, a legal excuse for nonperformance." *Christopher Village, L.P. v. United States*, 360 F.3d 1319, 1334 (Fed. Cir. 2004) (alterations omitted) (quoting *Coll. Point Boat Corp. v. United States*, 267 U.S. 12, 15 (1925)).  "Faced with two parties to a contract, each of whom claims breach by the other, courts will often impose liability on the party that committed the first material breach." *Long Island Sav. Bank, FSB v. United States*, 503 F.3d 1234, 1251 (Fed. Cir. 2007) (alterations omitted) (quoting *Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1380 (Fed. Cir. 2004)) (citing *Christopher Village*, 360 F.3d at 1334; Restatement (Second) of Contracts § 237 cmt. b); *see also Kidskare, P.C. v. Mann*, 350 P.3d 1228, 1234 (N.M. Ct. App. 2015) (observing that "[a] material breach of a contract excuses the non-breaching party from further performance under the contract" (citation omitted)); *but see Westfed Holdings, Inc. v. United States*, 407 F.3d 1352, 1360 (Fed. Cir. 2005) (observing that "[a] party to

---

[19] New Mexico law describes this duty of good faith and fair dealing in a similar fashion.  *See Gilmore v. Duderstadt*, 961 P.2d 175, 182 (N.M. 1998) (describing a duty not to "interfere[] or fail[] to cooperate in the other party's performance" or "do anything that will injure the rights of the other to receive the benefit of their agreement"); *Bourgeous v. Horizon Healthcare Corp.*, 872 P.2d 852, 856 (N.M. 1994) (observing that this duty does not "override express provisions addressed by the terms of an integrated, written contract" (internal quotation marks omitted)).

a contract may waive the [material] breach of an agreement by the continued acceptance of performance by the breaching party without reservation of rights").

## V.   ANALYSIS OF BARLOVENTO'S MOTION

At the conclusion of oral argument, the Court indicated that it was denying Barlovento's motion except to the extent that it sought dismissal of Count III of AUI's Counterclaim.  ECF 140 at 304-05.  In further support of its ruling from the bench, the Court offers the following rationale.

### A.  Motion for Affirmative Summary Judgment as to Count I of Complaint

It is axiomatic that the Court cannot grant summary judgment on any claim unless the admissible evidence, when viewed in the light most favorable to the non-moving party, leaves no genuine issues of material fact as to any of the claim's essential elements.  Construing the evidence and indulging all reasonable inferences in the light most favorable to AUI as the non-moving party, the Court discerns genuine disputes of fact on *at least* the following material issues that prevent the Court from awarding judgment to Barlovento on its affirmative claim:[20]

> (1) Whether AUI was actually in default with respect to its base course responsibility under the Subcontract at the time of termination;[21]
>
> (2) Whether AUI was *ever* in default on its original base course submission;[22]
>
> (3) Whether, even if AUI was in default with respect to the original base course submission, AUI had cured the default by submitting an alternative and suitable

---

[20] Because the Court is denying the lion's share of Barlovento's motion, this opinion need not include an exhaustive inventory of every material factual issue generated by the Court's review of the parties' evidence.  This opinion includes a few of the undecided factual questions purely for illustrative purposes.

[21] An essential element of Barlovento's Count I breach of contract claim is that – per the Subcontract – AUI must have "actually [been] in default under [the Subcontract] at the time of termination."  Subcontract § 8.2.

[22] On this point, the Court has already ruled that AUI will be permitted to introduce evidence in support of its request that the jury find that the original base course was suitable and should not have been deemed to the contrary.  *See* ECFs 216 (Court's order on Barlovento's second motion *in limine* (allegedly improper base course testing)) at 4-10; 217 (Court's order in Barlovento's motion *in limine* to exclude the expert opinions, reports, and testimony of Robert W. Prindle) at 4-5.

base course proposal prior to the time at which Barlovento terminated the Subcontract;[23]

(4) Whether the parties agreed that the December 4, 2017 date by which AUI was to submit a revised base course proposal was a final and enforceable deadline, particularly considering that AUI submitted the vast majority of its proposal by that deadline and completed its submission less than twelve hours later;[24] and

(5) Whether, as contemplated in § 8.2.2, AUI was "actually in default" at 4:50 p.m. on December 5, 2017, which the parties agree was the time of termination.[25]

## B. Motion for Summary Judgment as to Counts I-II of Counterclaim

Again construing the evidence and indulging all reasonable inferences in the light most favorable to AUI as the non-moving party, the Court reaches a similar result on Barlovento's claim that it is entitled to judgment as a matter of law on the first two counts of AUI's Counterclaim. Although Barlovento insists that the undisputed evidence demonstrates that it did not breach the terms of the Subcontract including its duty of good faith and fair dealing, the Court concludes that the evidence is not that settled. Likewise, with respect to whether the default termination should be upheld or converted to one for convenience, as pled in Count II of the Counterclaim, the Court concludes that the parties' evidence is in sufficient tension that a jury is required to decide the

---

[23] The Court emphasizes that Barlovento moved for summary judgment solely on the ground that AUI materially breached the Subcontract by failing to timely provide an acceptable base course. Since Barlovento's Motion did not address AUI's alleged breaches related to concrete or schedule, the Court has no occasion to address them either.

[24] At oral argument, Barlovento's counsel invoked § 12.6 of the Subcontract, entitled "Waiver," to support its theory that a previous relaxation of a deadline did not waive Barlovento's authority to enforce a new one. ECF 140 at 196. Barlovento conceded this was not an argument made in its briefs, *id.*, and therefore the Court will not consider it. *See Dodds v. Richardson*, 614 F.3d 1185, 1208 (10th Cir. 2010) (observing that "issues may not be raised for the first time at oral argument" (internal quotation omitted)); *Gaines-Tabb v. ICI Explosives, USA, Inc.*, 160 F.3d 613, 624 (10th Cir. 1998) (holding that arguments not raised in the opening brief are waived).

[25] *See* Subcontract, § 8.2.2 (requiring by implication a judicial decision whether AUI was "actually in default" at the time of termination).

question.  For illustrative purposes only, the Court discerns at least the following genuine issues

of material fact as to Counts I-II of the Counterclaim:[26]

> (1) Whether Barlovento's default termination of the Subcontract for AUI's alleged failure to comply with the December 4th deadline was pretextual (and therefore a breach of the Subcontract), in light of the evidence that Barlovento may have already arranged to replace AUI with another subcontractor, irrespective of the outcome of AUI's revised base course proposal;

> (2) Whether Barlovento breached the Subcontract by failing timely to submit to the Air Force one or more requests for additional time submitted by AUI;

> (3) Whether Barlovento breached the Subcontract by terminating AUI for default without submitting for approval AUI's most recent base course proposal;

> (4) Whether Barlovento breached the Subcontract by issuing a default termination for AUI's alleged failure to submit a technically complete base course proposal by the December 4th "deadline," particularly considering that AUI submitted the vast majority of its proposal by that deadline, completed its submission less than twelve hours later, and Barlovento and AUI had agreed a month earlier that the December 12th project completion date was no longer achievable;

> (5) Whether Barlovento breached the Subcontract by not providing AUI with schedule updates and as-built drawings showing the location of underground utilities;

> (6) Whether Barlovento breached the Subcontract by interfering with AUI's concrete supplier, Vulcan, and refusing to permit AUI to participate in calls and meetings with Vulcan regarding the concrete mix design;[27] and

> (7) Whether AUI was "actually in default" at the time of termination as contemplated by § 8.2.2 of the Subcontract.

For the foregoing reasons, the Court denies Barlovento's motion except to the extent that

it seeks dismissal of Count III of AUI's Counterclaim.

---

[26] When in these illustrative questions the Court uses the phrase "[w]hether Barlovento breached the Subcontract," the parties should read that to include "or the Subcontract's duty of good faith and fair dealing."

[27] AUI's Counterclaim pled these bases as independent breaches.  *See* ECF 32 at ¶ 55.  Because Barlovento's motion did not address them, they remain ostensibly viable claims for trial.

## VI.  ANALYSIS OF AUI'S MOTION

At the conclusion of oral argument, the Court similarly indicated that it was denying AUI's motion.  ECF 140 at 305.  In further support of its ruling from the bench, the Court begins by addressing the primary argument around which AUI has anchored both its opposition to Barlovento's motion and the relief it requests in its own motion.  Specifically, AUI contends that – as a matter of law – the default termination in this case must be overturned and converted to one for convenience because it did not comply with the default termination provision found in FAR 52.249-10.  AUI urges this Court to hold that the Subcontract incorporated by reference the default termination provision from the FAR, a provision that permits a default termination *only* when the contractor does not "prosecute the work . . . with the diligence that will insure its completion within the time specified in th[e] contract including any extension."  FAR 52.249-10. Since Barlovento admits that it never undertook a schedule analysis to determine whether AUI could or could not complete the project by the properly-adjusted completion date, AUI requests that the Court conclude that the termination for default was improper as a matter of law.

### A.  Which Default Termination Provision Controls?

The legal issue of whether FAR 52.249-10 applies to the Subcontract presents the Court with perhaps its starkest and most consequential decision thus far in this litigation.  For its part, Barlovento endorses a position that is facially logical and pristine:  the two parties jointly drafted the Subcontract and expressly agreed to a termination methodology that is set forth in §§ 8.1-8.2. According to Barlovento, these sections alone govern whether a termination of the Subcontract should be characterized as for default or for convenience, and the rival default termination provision in the FAR is a stranger to the Subcontract.

20

AUI, on the other hand, endorses the theory that the default termination provision of the Subcontract is actually supplied by FAR 52.249-10.  This theory is less facially plausible and, as a result, more difficult to follow.  Having pored again and again over AUI's briefs and its arguments at the hearing, *see* ECF 109 at 4-7 and ECF 140 at 79-80, 97-100, 110, the Court understands AUI's theory of contractual interpretation to instruct the reader of the Subcontract as follows:  Begin by minimizing, if not altogether ignoring, § 8.1 and AUI's role in drafting it.[28] Notice instead that the parties agreed in § 10.8 that the federal law of government contracts governed the "validity, interpretation, and performance" of the Subcontract and that the Federal Acquisition Regulation is an important component of that very law.  Then pivot to § 1.4, which required AUI to (1) "[be] bound by all Subcontract Documents" (a list including at least fourteen documents or categories of documents, including the "Prime Agreement" between Barlovento and the Air Force, the "Project Schedule," "specifications," and any other "documents listed or referenced in [the Subcontract]").  Pay attention next to § 1.4.2, which obliged AUI to "abide by the provisions of the Federal Acquisition Regulation . . . that are applicable to [the Subcontract] in accordance with the Prime Agreement" (with such provisions being "incorporated into [the Subcontract] by reference").  Look past the fact that Exhibit E to the Subcontract lists more than 80 FAR-related provisions that "flow down" to and are explicitly incorporated into the Subcontract yet does not mention FAR 52.249-10.  Focus instead on the exhibit's "including but not limited to" clause, which necessarily means that the *sub silentio* incorporation of FAR 52.249-10 cannot be foreclosed.  Then pause to consider § 2.1, which compelled AUI to "assume toward

---

[28] The Court emphasizes again that AUI's Motion for Summary Judgment is completely devoid of any citation or reference to § 8.1.  The Court finds that omission both curious and conspicuous, considering that Barlovento's Notice of Intent to Terminate and subsequent Notice of Termination expressly invoked *only* that provision.  That AUI waited until its reply brief before acknowledging the existence, much less the potentially dispositive impact, of § 8.1 is a choice the Court continues to find puzzling.

[Barlovento] all of the obligations and responsibilities that [Barlovento] by the Prime Agreement assumes toward the [Air Force]."  Finally, be sure to understand that the Prime Contract between the Air Force and Barlovento referred to a project specification that included a cite to the invocation of FAR 52.249-10 in the event that Barlovento failed to perform.

Implicit in AUI's theory is that, once the reader has bounced back and forth between each of these references and stitched together the textual clues that AUI insists are present in them, he or she will arrive at the conclusion that the Subcontract incorporated FAR 52.249-10 by reference.

It is enough to say that AUI's theory of contract interpretation leaves the Court unpersuaded.  For the following reasons, the Court holds that the default termination in this case is governed by § 8.1 of the Subcontract, *not* by FAR 52.249-10.[29]  First, none of the provisions of the Subcontract or the documents to which it refers, whether considered individually or collectively, caused FAR 52.249-10 to become part of the Subcontract or to somehow alter § 8.1. Although the Air Force in a "specification" document reminded Barlovento that its "[f]ailure to perform work" on time "may result in [the Air Force taking] corrective action" against Barlovento "pursuant to … § 52.249-10 … and other contract provisions," ECF 109 at 6-7 (AUI quoting specification), the Court holds that such a remote and incidental reference in the Prime Contract to a regulation governing *the Air Force's* conduct does not cause FAR 52.249-10 to somehow migrate to the Subcontract.  Second, FAR 52.249-10 is neither mentioned nor cited anywhere in the provided copy of the Prime Agreement, the more than 80 FAR provisions the parties expressly incorporated into their Subcontract via Exhibit E, or in the more than 500 pages of exhibits attached to AUI's motion.  *See* ECF 88-2 (Prime Contract), ECF 88-3 at 30-33 (Exhibit E to Subcontract), ECF 88-1 to 88-56.

---

[29] The Court will conform its jury instructions accordingly.

Furthermore, FAR 52.249-10 itself contains no express requirement that it be considered part of the Subcontract, in stark contrast to the majority of the more than 80 listed regulations that were incorporated (or "flow[ed]-down") into the Subcontract "in accordance with the Prime Agreement."  ECF 88-3 at 30.  Consequently, the Court concludes that FAR 52.249-10 is not "applicable to [the Subcontract] in accordance with the Prime Agreement" in the language of § 1.4.2.  What is more, although AUI's obligations to Barlovento under § 2.1 must mirror Barlovento's obligations to the Air Force, such obligations do not "support [the] sweeping flow down of federal regulations" that AUI seeks, especially as doing so would essentially render meaningless many of the eight express grounds for default in § 8.1, so long as AUI was reasonably likely to complete its work within the properly adjusted time.  *United States ex rel. Quality Trust, Inc. v. Cajun Contrs., Inc.*, 486 F.Supp.2d 1255, 1263 (D. Kan. 2007).[30]

A final point:  AUI's theory of contract interpretation disregards *another* provision in the Subcontract in which the parties agreed that, "[i]n the event of any inconsistency, conflict or ambiguity between or among the Subcontract Documents, [AUI] shall be bound by the more stringent interpretation of any such inconsistency, conflict or ambiguity that requires the highest duty to be undertaken by [AUI], recognizing that [Barlovento] *maintains sole discretion as to what interpretation shall govern*."  Subcontract, § 1.6 (captioned "Interpretation") (emphasis added).  With AUI having consigned to Barlovento the power to resolve conflicts between the specifically-negotiated default termination in the Subcontract and its rival FAR provision that AUI insists is in

---

[30] *See also id.* at 1263-65 (holding that FAR 52.249-10 did not apply to the Subcontract – upon finding that a *nearly identical* mirror obligation clause neither "support[ed] such a sweeping flow down of federal regulations" nor "resemble[d] the broader flow down provisions more often seen and discussed in other cases" and that "the parties did not intend [such a clause] to accomplish a general incorporation of all rights and responsibilities given all parties to the prime contract" (citations omitted)); *Blinderman Constr. Co. v. United States*, 17 Cl. Ct. 860, 865 (Fed. Cl. 1989) (declining to interpret a contract in a manner that would render portions of the contract "pointless"); *Mayfield Smithson Enters. v. Com-Quip, Inc.*, 896 P.2d 1156, 1161 (N.M. 1995) (same).

the associated Subcontract Documents, the Court finds that Barlovento exercised that discretion when it relied exclusively on § 8.1.1 in terminating the Subcontract for default.

Whether in retrospect it was a good idea for AUI – in apparently its very first business venture with Barlovento – to agree to a Subcontract with terms as unfavorable and imbalanced as AUI now suggests they are is a question for a different audience on a different day.  No doubt the friction between the parties during the performance period, the noisy parting of ways, and the extensive and expensive litigation that followed all have much to teach for those negotiating such contracts in the future.  For the purposes of deciding AUI's motion, however, the Court is required to hold the parties to the plain language of the Subcontract that they *jointly* drafted and agreed to at arm's length.  In doing so, the Court is mindful that the two parties to the Subcontract were in 2017 and are today sophisticated business entities well-used to negotiating complex and high-value contracts and then performing in accordance with them.

As charted out above, AUI's contractual interpretation theory is certainly an ambitious one, but it ultimately requires too much imagination for the Court's comfort and too great a departure from its common sense.  AUI's theory suffers from another disabling infirmity too, for it all but ignores – and essentially invites the Court to ignore – the *very different* default termination provision the parties specifically negotiated in the Subcontract.  The Court certainly understands why AUI prefers the FAR provision, for the showing that a terminating party (i.e., the Government) must make under the FAR is substantially more onerous than the showing required by § 8.1 of the Subcontract.  Indeed, laid alongside each other, FAR 52.249-10 and § 8.1 don't have much in common besides their end result.[31]

---

[31] *See* ECFs 88-1 at 19-20; 109 at 2-10; *compare* § 52.249-10(a) (establishing one ground for termination, which requires a sufficient showing that the government contract work could not be completed within the applicable time) *with* § 8.1 (establishing *eight* grounds for termination *none* of which require such a showing); *see also Alutiiq Mfg. Contrs., LLC v. United States*, 143 Fed. Cl. 689, 697-98  (Fed. Cl. 2019) (interpreting § 52.249-10 to authorize the

Yet § 8.1 is *what the parties expressly agreed to* when it came to contemplating a result that neither desired at the time they were negotiating the Subcontract.  Section 8.1 is the best evidence of the parties' "meeting of the minds" as to the protocol Barlovento would follow in the event that it would need to contemplate terminating the Subcontract for default.  To adopt AUI's theory of contract interpretation, the Court would essentially have to conclude that the parties meant *nothing* by including § 8.1.  But casting aside such a consequential provision of a Subcontract as if it were precatory, hortatory, or superfluous would be to commit legal error.  The bottom line is that the law does not permit AUI to now smuggle into the Subcontract through the back door the FAR default termination provision that AUI could have *insisted* on coming through the front door during the formation of the Subcontract.  Nothing prevented AUI during the negotiation of the Subcontract from rejecting § 8.1 and insisting that the termination provision either mirror the FAR or expressly incorporate it by reference, *without* including a conflicting termination provision elsewhere.  To accept AUI's theory is to render § 8.1 dead-letter and fundamentally rewrite the Subcontract.  This the law does not permit the Court to do.[32]

---

termination of a government contract only when "there was a 'reasonable belief on the part of the [government] contracting officer that there was no reasonable likelihood that the contractor could perform the entire contract within the time remaining for contract performance'" (quoting *Lisbon Contractors, Inc., v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1997))).  The Court also notes that none of the *eight* cases cited by AUI as applicable to this point involved a contractual termination provision like that of § 8.1.  Instead, they all expressly applied § 52.249-10.  *See* ECF 88-1 at 3-4, 6, 19-21.

[32] In its Reply, AUI argued for the first time that FAR 52.249-10 and § 8.1 can be "harmonized" because they are sufficiently similar in operation and effect.  *See* ECF 109 at 7-10.  AUI doubled down on this claim at oral argument when its counsel affirmed that AUI saw no difference between the two provisions.  *See* ECF 140 at 110 (in response to the Court's question whether AUI's position is that "the FAR default provision and the specifically-negotiated default provision in the contract are two sides of the same coin," counsel answered that "[a]ll roads lead to Rome[.]").  The Court rejects the argument for two independent reasons.  First, arguments not raised in an opening brief are waived.  *See Gaines-Tabb*, 160 F.3d at 624.  More importantly, the Court concludes that the plain language of the two default termination provisions leaves no doubt that they are in direct, irreconcilable, and insoluble conflict.

### B. Genuine Fact Questions Prevent AUI from Obtaining Summary Judgment

Having rejected AUI's primary theory that the default termination was wrongful because it violated the FAR, the Court can make relatively short work of what remains of AUI's motion. Consistent with the plain language and meaning of §§ 8.1-8.2, the Court holds that for AUI to have been "actually in default under [the Subcontract] at the time of termination," and therefore liable under the Subcontract for Barlovento's costs of completion, three conditions must be satisfied:

(1) Barlovento must have been of the *opinion* that AUI committed at least one of the enumerated "grounds for default," § 8.1.1;

(2) AUI must have *actually committed* one of the alleged "ground(s) for default," §§ 8.1-8.2;[33] and

(3) upon notice of termination, AUI must have (a) failed to "remedy [such] default in such manner and with such diligence and promptness as may [have been] required by [Barlovento]" and (b) still been committing the alleged "ground(s) for default," §§ 8.1-8.2.

ECFs 99-3 at 4-5 (applicable Subcontract provisions); 88-3 at 1-33 (entire Subcontract).[34]

The parties do not dispute that Barlovento *believed* that AUI committed at least one of the "grounds for default" when it did not place an "acceptable base course." *See* ECFs 88-1 at 11, 14; 93 at 9-12; 93-12 at 1. Regarding the last two conditions, however, and this time construing the

---

[33] Although Barlovento's *opinion* automatically causes AUI to be "deemed in default," such a classification is distinct from a judicial determination that AUI was "actually in default" (i.e., that AUI *actually committed* the alleged "ground(s) for default."). *Id.*

[34] Barlovento asserts that, if AUI actually committed such "ground(s) for default," it would remain in default unless it remedied that default "in such manner" as Barlovento required. *See, e.g.,* Tr. 199-204; ECF 114 at 3-4. The question posed by § 8.2.2, however, is not simply whether AUI complied with *Barlovento's* remedy requirements – but rather whether AUI was "actually in default under [the Subcontract] at the time of termination," i.e., whether AUI was still committing the alleged "ground(s) for default." §§ 8.1-8.2. If, for example, the determination to be made under § 8.2.2 *were* simply whether AUI had complied with Barlovento's perhaps somewhat subjective remedy requirements, that section could have easily repeated the standard in § 8.1.2 (e.g., by simply requiring a determination of whether AUI failed to "remedy the default in such manner . . . as [was] required by [Barlovento]"). Instead, § 8.2.2 expressly used different language (i.e., by requiring a determination of whether AUI was "*actually* in default") to convey a different (and more objective) standard. As Barlovento's counsel acknowledged at oral argument, the decision to be made under § 8.2.2 belongs to the Court on summary judgment review and the jury at trial. *See* ECF 140 at 65-66; 200-01.

evidence in the light most favorable to Barlovento and indulging all reasonable inferences in its favor, the Court discerns genuine disputes of material fact that prevent AUI from obtaining summary judgment.

Each of the fact questions the Court used to illustrate why it was denying Barlovento's motion have the same effect on AUI's motion. *See supra* at 17-19. Because AUI's motion is not limited in scope only to the base course ground for default, however, the Court would add the following to the list of material questions the parties' evidentiary submissions leave unsettled:

(1) Whether and to what extent AUI contributed to the failure of the three concrete test lanes, whether its proposal for an on-site batch plant or to use fixed forms could have cured its contribution, if any, to that failure, and whether AUI bore any factual responsibility in the fall of 2017 to obtain from the Air Force an approved concrete mix design;

(2) Whether AUI failed to meet its own project recovery schedule, delayed the overall project, or jeopardized the project completion date, taking into account all relevant circumstances; and

(3) Whether AUI was "actually in default" as to either of those two alleged grounds at the time of termination.

For these reasons, the Court denies AUI's motion for summary judgment as to Count I of Barlovento's Complaint, as well as its companion request to convert the termination as a matter of law from one for default to one for convenience.

**IT IS THEREFORE ORDERED** that Barlovento's "Motion for Partial Summary Judgment" [ECF 93] is **DENIED IN PART AND GRANTED IN PART** as follows:

(1) **DENIED** as to Count I of Barlovento's Complaint [ECF 93 at 1, 16-20] and Counts I and II of AUI's Counterclaim [ECF 93 at 1, 20-26], and

(2) **GRANTED** as to Count III of AUI's Counterclaim [ECF 93 at 1, 27]. Count III of AUI's Counterclaim [ECF 32] is therefore **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that AUI's "Motion for Summary Judgment on Count I of [Barlovento's] Complaint" [ECF 88] is **DENIED**.

**SO ORDERED.**

THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE
***Presiding by Consent***