**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

BARLOVENTO, LLC,

      Plaintiff/Counter-Defendant,

v.                                              Civ. No. 18-1112 GJF/JHR

AUI, INC.,

      Defendant/Counterclaimant, and

WESTERN SURETY COMPANY,

      Defendant.

**MEMORANDUM OPINION AND ORDER**
**ON DEFENDANTS' MOTION FOR JUDGMENT**

THIS MATTER is before the Court on Defendants' Motion for Judgment [ECF 249] ("Motion"), which was filed during Plaintiff Barlovento, LLC's case-in-chief in the bench trial of this case. The Motion requests that the Court enter judgment against Barlovento by finding that (1) Barlovento partially terminated the Subcontract for convenience and (2) AUI is entitled to payment for this partial termination (and not liable for the terminated work). ECF 249 at 1-4. In addition, Defendants' Reply, which was filed after Barlovento's case-in-chief, requests a finding that—even if Barlovento establishes AUI's liability—no damages be awarded to Barlovento. ECF 253 at 7-10.

After the Motion was fully briefed,[1] the Court advised the parties that it would take the Motion under advisement. *See* ECF 263 (clerk's minutes) at 17. Having concluded the bench trial—and having thoroughly considered the evidence and testimony presented therein, as well as

---

[1] *See* ECFs 251 (Barlovento's response), 253 (Defendants' reply and supplemental argument on Barlovento's damages), 257 (Barlovento's surreply, which addressed only Defendants' supplemental argument on damages), 258 (Defendants' reply to Barlovento's surreply).

the parties' trial briefs and proposed factual findings and legal conclusions—the Court has issued

its Findings of Fact and Conclusions of Law [ECF 279].  Although the factual findings and legal

conclusions in the instant Order are also included in the Court's Findings of Fact and Conclusions

of Law,[2] the Court issues this Order to more fully explain its decision on the issues raised in

Defendants' Motion.  As a result, and as discussed below, the Court will **GRANT** the Motion **IN**

**PART** and **DENY** it **IN PART**.

## I.    BACKGROUND

The Court has formally made the following factual findings:[3]

### A.  Subcontract Formation and Responsibilities

1. On March 10, 2017, the United States Air Force awarded Barlovento a Task Order Contract to renovate Hot Cargo Pad 5 Taxiway at Kirtland Air Force Base, New Mexico.[4]

2. The Task Order included a firm fixed price of $5,521,360.00 to complete the Project and allowed a performance period of six months from the date the Air Force issued a Notice to Proceed for construction.

3. The Task Order was a design-bid-build contract, an arrangement in which the Air Force was responsible for the design, including elevations and as-built drawings.

4. On or about March 17, 2017, Barlovento and AUI executed a firm fixed price Subcontract in the original amount of $3,515,465.45 (Ex. 1).  The Subcontract required AUI to provide labor, materials, and equipment in connection with the removal and replacement of taxiway pavement and base course on the project.

5. Written change orders increased the Subcontract amount to $3,777,962.45.

---

[2] *See* Fed. R. Civ. P. 52(c) (requiring that "[a] judgment on partial findings must be supported by findings of fact and conclusions of law").

[3] Each of the factual findings in this Section are excerpted directly from the Court's Findings of Fact and Conclusions of Law [ECF 279] to help provide context for the instant Order.  (For ease of reference, the Court has included the original lettering and numbering).  Any footnotes associated with the excerpted Findings and Conclusions appear herein as well.

[4] For simplicity, the Court will refer to the Task Order's scope of work as "the Project."

6. The Subcontract was the product of arm's length negotiations and jointly drafted by the parties, both of which were sophisticated operators in the civil engineering and construction industry with substantial experience in contract negotiation.[5]

7. The Subcontract required AUI to perform the vast majority of the construction on the Project. The primary aspects of AUI's scope of work involved: (1) preparing the subgrade, (2) procuring and placing the base course material, and (3) placing the concrete taxiway. These three layers – subgrade, base course, and concrete – comprised the taxiway and were to be placed in that sequence.

**E. Air Force Expresses Concern with Barlovento's Performance**

35. In October 2017, with less than two months remaining in the original project completion period, the Air Force expressed in multiple ways its concern about Barlovento's ability to complete the Task Order. These ways included (a) issuing a Deficient Performance Letter that discussed Barlovento's "neglect in keeping the progress of the project … within the planned schedule" and its failure to "place two concrete test strips" (Ex. 84); (b) criticizing Barlovento's performance for the first seven months of the performance period in a Contractor Performance Assessment Report (CPAR) (Ex. 364); and (c) issuing a Letter of Concern reiterating that the Air Force "remain[ed] highly concerned with Barlovento's ability to achieve an acceptable test section" due to the third concrete test strip failure and also directing that the unsatisfactory base course material be removed (Ex. 22).

37. On October 31, 2017, the Air Force ordered all work on the Project to stop, including the placement of any concrete test lanes, until a suitable base course was successfully placed (Ex. 143).

**G. Barlovento Removes Concrete Phase from AUI's Scope of Work**

51. On December 1, 2017, Barlovento's then-General Construction Manager, Jason Herndon, convened a meeting to discuss Project roles and responsibilities. Representatives from Barlovento, AUI, and Southwest Concrete Paving Co. ("SWCP") attended. AUI had become aware only days before the meeting that Barlovento had been in discussions with SWCP since as early as October about potentially taking over all or some of the remainder of the Project.

52. At the meeting, Herndon announced Barlovento's decision to take the concrete paving work away from AUI and award it to SWCP. Herndon also advised that Barlovento would allow AUI a final opportunity to continue performing the base course phase of the Project. Herndon informed AUI that it would have to provide for submission to the Air Force a complete base course proposal, including a placement plan, no later than December 4, 2017.

---

[5] Consequently, the Court did not construe the Subcontract for or against either party but instead only pursuant to the ordinary meaning of its plain language.

53. Herndon's decision to remove the concrete paving phase of AUI's scope of work was foreshadowed by at least two emails.  The first was an email from Barlovento's project manager, David Beuzekom, to the Air Force contracting officer on November 27, 2017. In that email, Beuzekom explained that "Barlovento has been in contact with AUI to notify them that Barlovento will be descoping *a portion or all* of their work depending on the meeting that will be held on Friday December 1st.  This decision was made at the Barlovento home office."  Ex. 315 (emphasis added).  In addition, in an email sent on November 29, 2017, Herndon himself foreshadowed his decision by advising Barlovento's President, Jane Solomon, that "we are meeting with Southwest Paving this Friday for them to start working." Ex. 290.

54. Subcontract § 8.1.2 granted Barlovento the discretion to decide the "diligence and promptness" of the remedy for any default committed by AUI.  Barlovento used that discretion to require AUI to remedy its base course default by submitting a complete base course proposal, including a placement plan, no later than December 4, 2017.

55. Herndon conveyed the December 4th deadline to AUI only in oral form and did not reduce it to writing.  Nevertheless, the Court specifically finds that Barlovento established that deadline and effectively communicated it to AUI.  Although AUI introduced evidence at trial that Barlovento had not established such a firm and final deadline, the Court does not find that evidence persuasive.  The Court instead is persuaded by the evidence that – in the days and weeks immediately following AUI's termination, when the relevant witnesses' memories would have been sharpest – no AUI employee *ever* disputed that Barlovento had established a December 4th deadline or that it was anything other than firm and final.  The Court finds most persuasive the following:  (a) the silence of AUI's project manager, Marshall Vickers, after receiving an email from Gerald Axford, Barlovento's quality control manager, on December 6, 2017, in which Axford expressed "[his] understanding AUI had Promised [sic] to have ALL the base coarse [sic] data submitted to Barlovento by the end of day Mon 4 Dec at the latest" (Ex. 15); (b) the silence of all AUI personnel in response to Herndon's Notice of Termination in which he specifically mentioned that "AUI was required to provide a revised base course submittal no later than yesterday, December 4, but failed to do so" (Ex. 375 at 2); and (c) the absence of any reference, much less any objection, to the December 4th deadline in a lengthy letter authored on December 29th by AUI's Vice-President Patrick Shaw in which he disputed on other grounds Barlovento's termination of the Subcontract (Ex. 396 at 1-4).

56. AUI clearly understood from the December 1st meeting with Herndon that Barlovento had officially relieved AUI of the concrete phase of the Project (Ex. 185).  Shortly after the meeting, Shaw emailed Stanley Jobe of Jobe Co., a concrete batch plant supplier with whom AUI had been in discussions, that "[AUI] will not be producing the concrete for the Kirtland project after all so there will not be a

need to buy the plants" (Ex. 245).   Shaw also emailed David Defeo of CEI Enterprises that "Barlovento has chosen to not move forward with [AUI] providing the concrete and will pursue another option" (Ex. 244).

57.   David Beuzekom, Barlovento's on-site project manager, shared the same understanding.   On December 1, 2017, following the meeting, Beuzekom emailed the Air Force contracting officer to advise that "Barlovento corporate has made the decision to hire Southwest Concrete to produce and place concrete paving."   Ex. 179.

58.   Herndon testified that he intended to memorialize in a change order his decision to strip AUI of the concrete phase of the project, but Barlovento's default termination of AUI's Subcontract a few days later intervened.   As a result, according to Herndon, Barlovento never issued a written deductive change order related to the concrete scope of work and therefore never officially modified the Subcontract in that regard. The Court does not credit that testimony.   The Court's distinct impression of Herndon's explanation was that it was manufactured *ex post facto* for the purpose of this litigation.   The Court finds that Herndon made the decision to terminate the concrete paving phase even before the December 1st meeting, though he waited until that day to give AUI official notice of it.   In any event, Herndon's decision was final as of the conclusion of the meeting on December 1st – there was nothing inchoate, conditional, or preliminary about it.   Herndon was not relaying what he intended to do *in the future* about the concrete phase, but instead announcing a final and irrevocable decision that carried with it significant contractual implications.[6]

59.   The Court further notes that § 9.2.1 of the Subcontract specifically required both parties to *agree* on a Change Order.   The Court finds that AUI did *not* agree to the drastic reduction in the scope and value of the Subcontract that removing the concrete paving portion represented. AUI instead was prepared to proceed with the concrete paving phase using the same concrete supplier (Vulcan) and fixed forms instead of the slipform paver that had proven so problematic with the test lanes. *See* Ex. 185.  Barlovento's decision to strip the concrete phase away from AUI was entirely unilateral.

60.   … [T]he Court finds that Herndon's words and actions at the December 1st meeting constituted a constructive partial termination of the Subcontract for Barlovento's convenience and without fault by AUI.[7]

---

[6] Barlovento's President Solomon confirmed during her testimony that Barlovento removed the concrete work from AUI's Subcontract on December 1, 2017, and that the default termination a few days later was occasioned solely by AUI's failure to provide a base course submittal.  Trial Tr. Vol. I at 108-09, 136, 152-53.

[7] Whether Barlovento *could have* terminated the Subcontract for default based on AUI's performance with the concrete test lanes is a question the Court no longer needs to answer.  Herndon's trial testimony and Barlovento's trial strategy, *see infra* n.[9], relieved the Court of that obligation.

61. Barlovento terminated AUI for default *only* for its base course-related failure and for no other reason.

62. The concrete phase of the Project represented approximately 47% of the total value of the Subcontract.  Ex. 338 ($1,774,467 (AUI's concrete scope) / $3,777,962.45 (adjusted Subcontract price)).   The concrete phase was substantially more expensive than either the subgrade or base course phases.[8]

63. Consequently, at the time of its termination for default on December 4, 2017, AUI remained contractually responsible only for the Subcontract scope of work leading up to the satisfactory placing of a base course approved by the Air Force.  After December 1, 2017, by virtue of Herndon's decision and his communication of it to AUI and SWCP, AUI was *no longer* contractually responsible for any part of the concrete paving portion of the Subcontract.

## H. AUI Misses Final Deadline, Resulting in Default Termination

64. Despite being given one final opportunity to do so, AUI failed to provide a complete base course submittal, including all required lab reports and a placement plan, by end of day on December 4, 2017.  Indeed, at 8:51 a.m. that day, AUI emailed Barlovento's project manager, David Beuzekom, to advise that the "combined 02 mm test" would not be available until the following day (Ex. 183).  Also still missing from AUI's submittal were tests related to "soundness, LA abrasion (wear), and moisture/density relationship," as well as AUI's process and equipment for blending the new base course material on site and its placement process.  *Id.*

68. On December 4, 2017, after learning that AUI would not provide a complete base course submittal by the end of that day, Barlovento President Jane Solomon and then-General Construction Manager Herndon decided to terminate the Subcontract for default and notified Barlovento's on-site employees of the termination.

73. Barlovento's *sole* basis for terminating the Subcontract was its belief that AUI had failed to provide a complete base course submittal, including a placement/compaction plan, by the December 4, 2017 deadline.[9]

---

[8] As reflected in each of AUI's Pay Applications 1-4 (Exs. 336-39), the subgrade preparation component of the Subcontract was $84,150 and the base course phase was $624,508.00.  The amount for the base course phase is computed by adding lines 7, 14, and 21 of each of the pay applications.

[9] Although Barlovento has previously maintained in this litigation that the default termination *also* was premised on AUI's performance with respect to the concrete test lanes and AUI's inability to produce a revised completion-of-construction schedule, the Court finds and concludes that Barlovento has abandoned those alternative theories and waived its right to proceed on them.  As made clear by the trial testimony of Jason Herndon and its own post-trial briefing, Barlovento is now defending its default termination *solely* on AUI's performance with respect to the base course phase of the project.

76. The Court finds that Barlovento terminated the Subcontract for default on December 4, 2017, and formally communicated the termination to AUI via Herndon's letter issued the afternoon of December 5, 2017.

77. The Court finds that AUI was in default at the time of termination, whether that termination occurred on December 4 or 5, 2017. AUI had not completed the cure of its base course-related default in the manner or with the promptness dictated by Barlovento prior to Barlovento's termination for default of the Subcontract. The Court finds that Barlovento dictated the cure to be completed by December 4, 2017, and AUI failed to do so. AUI did not submit all required lab reports or provide an acceptable base course placement plan by the deadline.

**K.  Barlovento's Request for Damages Arising from Default Termination**

99. Barlovento incurred reprocurement costs and other costs and expenses after it terminated AUI's Subcontract.

100. Subcontract § 8.1.3 identified and defined Barlovento's recoverable costs in the event of a termination for default. This section required Barlovento to introduce evidence of its "costs, expense and reasonable profit" associated with completing the work that remained under AUI's Subcontract at the time of termination – here, the base course phase. This section goes on to provide that "[i]f the costs, expense and reasonable profit of [Barlovento] for completing this work shall exceed the amount due to [AUI], [AUI], shall, upon written demand from [Barlovento], pay the difference immediately."

101. As documented in Pay Application 2 (Ex. 337), Barlovento had paid AUI $204,000.00 for base course that the Air Force later rejected and ordered removed from the Project site. The Court finds that amount to be a "cost" or "expense" of completion of the base course phase for which AUI is liable under § 8.1.3.

102. Barlovento introduced evidence that it paid SWCP approximately $830,394.55 more than it was to pay AUI for the base course and concrete paving portions of AUI's original Subcontract.

103. Barlovento did not introduce evidence, however, of how much it paid SWCP to complete AUI's scope of work with respect *to the base course phase itself.* Because of Herndon's actions on December 1, 2017, the only portion of AUI's Subcontract that remained uncompleted at the time of default termination was the base course. Barlovento failed to prove that it paid more for SWCP to complete the base course than it had remaining from the balance set aside to pay AUI to complete the base course.

104. To illustrate the shortcomings in Barlovento's damages evidence, the Court will use this table:

    a.   Amount from AUI's Subcontract set aside for base course: $624,508.00

|   |   |   |
|---|---|---|
| b. | Amount that Barlovento had paid AUI for base course: | $204,000.00 |
| c. | Balance remaining: | $420,508.00 |
| d. | Amount that Barlovento paid to SWCP for base course: | ? |
| e. | Difference between lines c and d: | ? |

105. Hypothetically, by way of example only, if Barlovento had introduced evidence that it paid SWCP $700,000.00 to complete the base course phase, the application of § 8.1.3 would entitle Barlovento to recover $279,492.00 in completion costs and expenses. This would be the sum of (1) the difference between the amounts set aside by the two subcontracts for the base course phase ($700,000.00 - $624,508.00 = $75,492.00) and (2) the $204,000.00 that Barlovento had already paid AUI for base course later rejected.

106. Barlovento's evidentiary presentation did not include a separate line item for "reasonable profit."

107. Barlovento introduced evidence suggesting that it incurred $360,338.12 in extended general conditions costs, as identified in its Job Cost Journal, to complete AUI's scope of work. The Court did not find that evidence persuasive, inasmuch as Barlovento did not prove by a preponderance of the evidence that any of those costs arose from or were caused by its termination of the Subcontract for default. The Court finds instead that Barlovento would have incurred those costs regardless of the termination of AUI because the completion of the Project was substantially delayed for reasons separate and apart from AUI's performance. The Court emphasizes that Barlovento did not receive Air Force approval of its concrete mix design until January 2018 and the Air Force did not issue Modification 2 for the expansion of the taxiway until late April 2018, both of which occurred well after Barlovento's termination of AUI's Subcontract. Barlovento did not introduce evidence that completion of the Project was in any way delayed by AUI's performance or failure to perform. The Court therefore finds that Barlovento is entitled to $0.00 in extended general conditions costs as a result of AUI's default.

108. Similarly, Barlovento did not introduce evidence of how much sooner (if at all) the Project would have been completed but for AUI's termination. Given that the Air Force did not issue Modification 2, which substantially increased the depth and breadth of the concrete portion of the taxiway, until April 27, 2018, the Court is unable to find that anything AUI did or did not do contributed to a delay in Project completion. Thus, any costs claimed by Barlovento for "general conditions" or "overhead" or the like because the Project took longer than expected are not attributable to AUI.

109. Barlovento introduced evidence that it incurred $108,561.87 related to what it claimed was AUI's rejected work. The evidence took the form of invoices received from Amec Foster Wheeler, Terra Land Surveys, and WTI. But for one exception, however, the Court did not find that evidence persuasive. The Court accepts the testimony of Robert Freas that AUI should be held responsible for $30,340.00 in re-work costs borne by Barlovento associated with AUI's base course failures. *See*

Trial Tr. Vol. VIII at 178-79.  The Court finds that the remainder of the additional invoices (and the balance of $78,221.87) were related to survey and testing functions that were outside AUI's scope of work, were related to the subgrade phase that AUI successfully completed, or were related to the concrete phase that had been descoped from the Subcontract prior to the termination for default.  The Court therefore finds that Barlovento is entitled to recover as a "cost" or "expense" of completion under § 8.1.3 only $30,340.00 of the money it paid in satisfaction of those invoices.

110. Apart from the $204,000.00 in Factual Finding 101 and the $30,340.00 identified in the immediately preceding finding, Barlovento did not prove by a preponderance of the evidence its entitlement to any other recoverable cost identified in Subcontract § 8.1.3.  Consequently, although the Court finds and concludes that AUI breached the Subcontract by defaulting on the base course phase of the Project, the Court finds that Barlovento is entitled only to $234,340.00 in recoverable costs from AUI associated with that breach. [10]

## L.  The Performance Bond

128. Because the Performance Bond incorporated by reference the Subcontract and its scope of work, and because Herndon's actions on December 1, 2017 constituted a partial termination for Barlovento's convenience of the concrete phase of the Project, the only portion of AUI's Subcontract that remained unperformed and subject to the Performance Bond was the base course phase.

129. For the reasons set forth above finding that Barlovento proved its entitlement only to $234,340.00 in recoverable costs – and only $22,577.25 in net damages – the Court also finds that Barlovento proved by a preponderance of the evidence that Western Surety's breach of its Performance Bond resulted only in the same quantum of damages ($22,577.25).

## M.  AUI's Demands for Payment, Additional Costs, and Additional Time

133. The Court finds that, prior to termination, AUI satisfactorily performed Subcontract work for which it was not paid in the total amount of $211,762.75.  As explained below, this sum is derived from: (a) satisfactory work unrelated to base course as documented in Pay Applications 3 and 4 (Exs. 338-39); (b) amounts held back by Barlovento from Pay Applications 1 and 2 (Exs. 336-37) under the "retainage" provision set forth in Subcontract § 7.11; and (c) AUI's share ($117,789.79) of the REA for unsuitable soils, an amount that all parties to this case agree should be credited to AUI.

---

[10] … [T]his amount is offset under § 8.1.3 by the $211,762.75 that Barlovento owed AUI for satisfactory work completed prior to the termination.  The balance is $22,577.25.

134. In Pay Application 3, which was not paid, AUI sought payment of $33,554.36 for "Unclassified Excavation" and $12,640.00 for "Subgrade Preparation." In Pay Application 4, which was also not paid, AUI sought payment of $15,000.00 for "Subgrade Preparation."[11] Thus, the total amount of satisfactory work documented in those pay applications for which AUI was not paid is $61,194.36.

135. On the issue of retainage, Pay Application 2 (Ex. 337) reflects that a total of $53,178.60 had been retained from the first two pay applications. Included in that figure, however, was $20,400.00 related to retainage for "Base Course Add" later rejected by the Air Force. The remainder of the retainage related to components of the Project that Barlovento does not dispute were satisfactorily completed. Thus, of the $53,178.60, the Court finds that AUI is entitled to $32,778.60.

152. … AUI did not waive, however, its entitlement to being paid for the satisfactory work described in Findings 133-35.

159. Apart from the $117,789.79 that the parties agree that Barlovento owes to AUI, and the $93,972.96 discussed *supra* in Findings 134-35, the Court finds that AUI did not prove its entitlement to any other unpaid amounts.

160. The Court therefore finds under Subcontract § 8.1.3 that "the amount due to Subcontractor [AUI]" is $211,762.75.

161. Under § 8.1.3, Barlovento's proved recoverable costs of $234,430.00 exceed "the amount due to [AUI]" by $22,577.25. Consequently, the Court finds that § 8.1.3 compels AUI to "pay the difference immediately" by paying $22,577.25 in damages to Barlovento. The Court further finds that AUI and Western Surety jointly and severally owe that amount to Barlovento.

**N. AUI's Request for Compensation for Partial Termination Without Fault**

162. On December 1, 2017, through the words and actions of Jason Herndon, Barlovento relieved AUI of the concrete paving phase of the Project. Herndon provided AUI in-person oral notice that AUI was no longer responsible for the concrete phase of the Project and that Barlovento instead was awarding that phase of the Project to SWCP. … Barlovento's action amounted to a constructive partial termination without fault of the concrete paving portion of the Subcontract.

163. Section 8.2.1 of the Subcontract did not expressly require the termination to be in writing. Instead, it required only that Barlovento provide "notice" to AUI, after which AUI was to "do only that work set forth in the Contractor's notice."[12]

---

[11] Pay Application 4 also included a request by AUI to be paid "$44,000.00 for "Aggregate and/or Graded Aggregate Base Course." Because the Court finds that AUI did not satisfactorily complete the base course work, the Court finds AUI not entitled to this amount.

164. Consequently, as of December 1, 2017, the acquisition and placement of the base course remained the only uncompleted work that remained part of AUI's Subcontract.

165. The termination without fault of the concrete paving phase of the Subcontract conceivably entitled AUI to compensation.[13]   Specifically, § 8.2.1 identified as recoverable damages "the actual value of Subcontract Work satisfactorily performed, to the extent that the actual value of can be substantiated to [Barlovento's] satisfaction and approved by [Barlovento], and any direct costs incurred by [AUI] due to such termination."  Art. 8.2.1.  This provision therefore authorized recovery for either or both of two independent reasons (satisfactory work or direct costs).

166. With respect to work "satisfactorily performed" for which AUI had not been paid as of December 1, 2017, the Court finds that amount to be $211,762.75.   As explained below, this sum is derived from: (a) satisfactory work unrelated to base course as documented in Pay Applications 3 and 4 (Exs. 338-39); (b) amounts held back by Barlovento from Pay Applications 1 and 2 (Exs. 336-37) under the "retainage" provision set forth in Subcontract § 7.11; and (c) AUI's share ($117,789.79) of the REA for unsuitable soils, an amount that all parties to this case agree should be credited to AUI.

167. In Pay Application 3, which was not paid, AUI sought payment of $33,554.36 for "Unclassified Excavation" and $12,640.00 for "Subgrade Preparation."  In Pay Application 4, which was also not paid, AUI sought payment of $15,000.00 for

---

[12] Although Barlovento contends that Section 12.10 of the Subcontract required Herndon's decision to be memorialized in writing, the Court finds and concludes otherwise.  That provision, entitled "AMENDMENTS," specifies that the Subcontract "may not be *changed, altered or amended* in any way except in writing signed by the Parties[.]" § 12.10 (emphasis added).  The plain language of the provision does not speak to how the Subcontract may be *terminated*.  Article 8, which governs terminations, specifies neither the form a termination notice must take nor the manner of its delivery.  And Barlovento has agreed that termination of the Subcontract does not require any particular form of notice.  *See* Pl.'s Post-Trial Br. and Closing Argument, ECF 276 at 19 ("the Subcontract does not require such a formal written notice").  In any event, it was Barlovento, not AUI, that dictated when and how the descoping decision occurred.  And Barlovento chose to eschew putting anything in writing and instead to do it via Herndon's oral announcement on December 1, 2017.

[13] The Court pauses here to emphasize its legal conclusion that Count II of AUI's Counterclaim does *not* include an implied claim for damages associated with a *partial* termination for convenience.  *See* Conclusion of Law No. 39, *infra*.  To the extent that any reviewing court would disagree with that conclusion, however, the Court has included Findings 166-70.  The reader should note that these findings closely track those set forth in Findings 133-35. The Court emphasizes that even under Subcontract § 8.2.1, AUI would be entitled only to the same $211,762.75 for the work it had satisfactorily performed prior to the partial termination for convenience.  Thus, under either §§ 8.1.3 or 8.2.1, the result is the same:  AUI is entitled to credit for $211,762.75 in unpaid and satisfactorily performed Subcontract work.  And again under *either* provision, this amount is and would be used to offset the $234,340.00 in recoverable costs proven by Barlovento, yielding a net balance of 22,577.25 in damages.

"Subgrade Preparation."[14]  Thus, the total amount of satisfactorily-completed work documented in those pay applications for which AUI was not paid is $61,194.36.

168. On the issue of retainage, Pay Application 2 (Ex. 337) reflects that a total of $53,178.60 had been retained from the first two pay applications.  Included in that figure, however, was $20,400.00 related to retainage for "Base Course Add" later rejected by the Air Force.  The remainder of the retainage related to components of the Project that Barlovento does not dispute were satisfactorily completed.  Thus, of the $53,178.60, the Court finds that AUI is entitled to $32,778.60.

169. Apart from these three discrete categories, the Court finds that AUI had not "satisfactorily performed" any other Subcontract Work for which it had not already been paid.

170. With respect to "direct costs incurred by [AUI] due to such termination," the Court finds that AUI did not prove any such costs by a preponderance of the evidence.  The Court recognizes that this would have been a daunting factual challenge, considering that the termination without fault occurred on December 1, 2017, only to be followed *three days later* by the termination for default and AUI's complete dismissal from the Project.  There was virtually no opportunity for AUI to incur or identify any direct costs *due* to the termination of the concrete paving phase during the period of December 1-4, 2017.

171. Although AUI introduced a Job Cost Report showing that its overall direct costs charged to the Project were $1,902,397.47 (Ex. 333), AUI did not attempt to make an evidentiary showing of what fraction of those costs were attributable to the December 1st termination without fault of the concrete paving phase.

## II.  ISSUES

Defendants raise three primary issues:

(1)  whether Jason Herndon partially "terminat[ed] th[e] [Subcontract] without the fault of [AUI]" on December 1, 2017;

(2)  if so, whether AUI is "entitled to payment" for this partial termination and further entitled to judgment that it is not liable for the resulting "descoped" concrete placement work; and

(3)  whether, and to what extent, Barlovento has proven any entitlement to damages.

ECFs 249 at 1-4; 253 at 7-10.

---

[14] Pay Application 4 also included a request by AUI to be paid "$44,000.00 for "Aggregate and/or Graded Aggregate Base Course."  Because the Court finds that AUI did not satisfactorily complete the base course work, the Court finds AUI not entitled to this amount.

### A.  Defendants' Primary Arguments

Defendants argue that Herndon partially terminated the Subcontract for convenience (i.e., "without fault") when "[o]n December 1, 2017, [he] made the decision to terminate the portion of the Subcontract concerning concrete paving placement."  ECF 249 at 3.  Defendants contend that (1) "Barlovento's characterization of Mr. Herndon's decision is irrelevant to the legal implications of what Mr. Herndon did;" (2) concrete paving was a "major, material change [that] necessarily implicate[d] the termination for convenience provision;" (3) "[t]he most reasonable reading of the Subcontract"—one that would not render a portion § 8.2.1 meaningless—includes a *partial* termination for convenience option; and (4) Herndon's decision did not have to be in writing and— if his decision were not a partial termination for convenience—would amount to a material breach of the Subcontract.  ECF 253 at 2-6.

In addition, Defendants posit that, although "two of the three asserted grounds for default"[15] cannot form the basis of a valid default termination, such a scenario "does not prevent the Court from ruling that AUI is entitled to termination for convenience damages."  ECF 253 at 6-7.  Specifically, Defendants argue that, in light of AUI's counterclaim and "[p]ursuant to Section 8.2.2 of the Subcontract, AUI's wrongful termination for default [on concrete and schedule] should be converted to a termination for convenience which entitles AUI [to payment under § 8.2.1]."  *Id.* at 6 (quoting ECF 32 (Counterclaim) at ¶ 65).

Finally, Defendants claim that Barlovento has failed to make a *prima facie* case for damages.  ECF 253 at 7-10.  Defendants argue that (1) "[n]o Barlovento witness with personal

---

[15] *See* Exh. 375 at 1-2 (Barlovento (1) providing notice on December 5, 2017, of its termination for default of the entire "Subcontract Agreement" and (2) relying on both Barlovento's October 31, 2017, Notice of Cure [Exh. 103] and Barlovento's November 6, 2017, Notice of Intent to Terminate [Exh. 425]—both of which assert base course, concrete, and schedule as grounds for default—to "suppl[y] AUI with all the information necessary to support [the] default termination"); *see also* ECF 1 (Complaint) at ¶¶ 18-20 (Barlovento asserting that it terminated the entire Subcontract for default due to the same three grounds for default).

knowledge testified to Barlovento's damages;" (2) "Barlovento provided no way to segregate batch plant costs (which are not compensable) from the rest of Barlovento's alleged concrete placement damages;" (3) "[t]he $118,000 equitable adjustment due to unsuitable soils must be subtracted from any Barlovento damages;" (4) "Barlovento did not meet its burden on extended general conditions;" and (5) "AUI is [not] liable to Barlovento for damages that Barlovento did not pay." *Id.*; ECF 258 at 2-7.

### B.  Barlovento's Primary Arguments

Barlovento begins by disputing that Herndon's actions on December 1, 2017, were tantamount to termination without fault under § 8.2.1.  Barlovento insists that no such termination could have occurred because § 12.10 of the Subcontract requires *any* change, amendment, or addition to be "in writing signed by [Barlovento and AUI]."  ECF 251 at 1, 3-4 (quoting § 12.10).  Barlovento also argues that the Subcontract does not contemplate a partial termination without fault but only a complete termination.  ECF 251 at 5 (citing § 8.2).  In addition, Barlovento asserts that "[its] decision to terminate based on [base course] does not operate to waive all other instances of default."  *Id.* at 5-7.

Barlovento next emphasizes that AUI's counterclaim only requested damages under § 8.2.1 based on the theory of wrongful termination for default of the *entire* Subcontract having occurred on December 5, 2017.  *Id.* at 2, 7-8.  Barlovento contends, in essence, that AUI's counterclaim did not "say enough to give [Barlovento] 'fair notice of [Defendants' claim for § 8.2.1 damages] and the [partial termination for convenience] grounds upon which it rests,'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005)).  *See* ECF 251 at 2, 7-8.  Barlovento therefore urges the Court not to permit AUI

to in effect amend its counterclaim during trial to accommodate its new theory of "partial termination for convenience." *Id.* at 7-8.

Finally, Barlovento asserts that Defendants' damages argument "fails to cite any purported controlling law, mischaracterizes the evidence of record at trial, and constitutes an improper attempt to usurp the Court's role as the finder of fact." ECF 257 at 1-2. Barlovento argues that, because Herndon (under Jane Solomon's direction) collected information on Barlovento's damages, the Court should view Kim Andrews' testimony as "confirm[ing] that the costs and expenses identified by the Project team were actual costs incurred by Barlovento, as directed to be calculated by Solomon and Herndon." *Id.* at 2-3. Barlovento contends that Defendants "mischaracterize Barlovento's damages" and argues that it may include batch plant costs in its damages computation because "Subcontract Article 8.1.3 does not limit the damages … to only work performed using identical means and methods as utilized by [AUI]." *Id.* at 3-4.

## III.  LEGAL STANDARDS

### A.  Rule 52(c) Motions

Federal Rule of Civil Procedure 52(c) provides that if a party has been fully heard on an issue during a bench trial, the Court may at any time enter judgment against that party on that issue:

> If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of the evidence. A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

In assessing the "factual and legal sufficiency of the district court's [Rule 52(c)] determinations," the Tenth Circuit "review[s] the district court's fact findings for clear error and its legal conclusions de novo." *Nieto v. Kapoor*, 268 F.3d 1208, 1217 (10th Cir. 2001). "If the district

court's view of the evidence is plausible in light of the entire record, an appellate court may not reverse even if it is convinced that it would have weighed the evidence differently in the first instance." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2349 (2021); *see also Cooper v. Harris*, 137 S. Ct. 1455, 1474 (2017) (observing that appellate courts "give singular deference to a trial court's judgments about the credibility of witnesses" and that such courts may reverse "only when left with the definite and firm conviction that a mistake has been committed" (quotations marks and citation omitted)). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Brnovich*, 141 S. Ct. at 2349 (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985)).

### B.  General Principles of Contract Law

"In cases arising under diversity jurisdiction, the federal court's task is . . . simply to 'ascertain and apply the state law.'" *Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 665 (10th Cir. 2007) (quoting *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003)) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)).  Specifically, the federal court must "apply the substantive laws of the forum state," *New York Life Ins. Co. v. K N Energy, Inc.*, 80 F.3d 405, 409 (10th Cir. 1996), by "follow[ing] the most recent decisions of the state's highest court." *Wade*, 483 F.3d at 665-66 (citing *Wankier*, 353 F.3d at 866).  And "[w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do." *Id.* at 666 (quoting *Wankier*, 353 F.3d at 866).

The New Mexico Supreme Court has emphasized, however, that "New Mexico respects party autonomy" and that "the law to be applied to a particular dispute may be chosen by the parties through a contractual choice-of-law provision." *Strausberg v. Laurel Healthcare Providers*, LLC, 304 P.3d 409, 416 (N.M. 2013) (quoting *Fiser v. Dell Computer Corp.*, 188 P.3d 1215, 1218 (N.M.

2008)).  Here, the Subcontract provides that its "validity, interpretation and performance … shall be governed in accordance with the federal law of government contracts including, but not limited to, decisions enunciated by federal judicial bodies, boards of contract appeals and quasi-judicial agencies of the federal government."  Ex. 1 (Subcontract) at § 10.8.  But "[t]o the extent that the federal law of government contracts is not dispositive, the laws of the State of New Mexico shall apply."  *Id.*

Under the federal law of government contracts,[16] "[c]ontract interpretation begins with the plain language of the written agreement," and "the plain and unambiguous meaning of a written agreement controls."  *Hercules Inc. v. United States*, 292 F.3d 1378, 1380 (Fed. Cir. 2002) (citations and internal quotation marks omitted).  In addition, "[t]he contract must be construed to effectuate its spirit and purpose giving reasonable meaning to all parts of the contract."  *Id.* (citation omitted).  Thus, "[t]he purpose of contract interpretation is to crystalize the parties' objectively manifested intent, and this may involve the interpretation of specific language or terms, explanation of ambiguities, risk allocation, and sometimes the consideration of extrinsic evidence for limited purposes."  *Conoco, Inc. v. United States*, 35 Fed. Cl. 309, 321 (Fed. Cl. 1996).[17] Finally, "[t]he proper construction of a contract . . . is a question of law."  *SOLIDFX, LLC v.*

---

[16] *See MACTEC, Inc. v. Bechtel Jacobs Co., LLC*, 346 Fed. Appx. 59, 83 (6th Cir. 2009) (unpublished) (citing cases from the United States Court of Appeals for the Federal Circuit and the United States Court of Federal Claims as sources for "the federal law of government contracts"); *Solitron Devices, Inc. v. Honeywell, Inc.*, 842 F.2d 274, 277 & n.3 (11th Cir. 1988) (citing to what is now the United States Court of Federal Claims as a source of "the federal law of government contracts").

[17] *See also Omni Corp. v. United States*, 41 Fed. Cl. 585, 591 (Fed. Cl. 1998) (observing that "[i]t is a familiar principle of contract law that the parties' contemporaneous construction of an agreement, before it has become the subject of a dispute, is entitled to great weight in its interpretation" because "how the parties act under the arrangement, before the advent of controversy, is often more revealing than the dry language of the written agreement by itself" (citations and internal quotation marks omitted)).

*Jeppesen Sanderson, Inc.*, 841 F.3d 827, 833 (10th Cir. 2016); *Teg-Paradigm Envtl., Inc. v. United States*, 465 F.3d 1329, 1336 (Fed. Cir. 2006).

Under both the federal law of government contracts and New Mexico law, the elements of breach of contract claim are: "(1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." *Oliva v. United States*, 961 F.3d 1359, 1362 (Fed. Cir. 2020) (quoting *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989)); *Flemma v. Halliburton Energy Servs.*, 303 P.3d 814, 822-23 (N.M. 2013).

### C.  Judging between a Change and a Termination

"[T]he question of whether a modification of a contract is a 'change' or 'termination' requires a construction of the contract provisions, and is, therefore, a question of law." *J. W. Bateson Co. v. United States*, 308 F.2d 510, 514 (5th Cir. 1962).  "[A] construction of the terms of the contract and a comparison of these contractual terms with the *magnitude of the elimination* of [a portion of the contract work]" may "indicate[] that the … contract was 'partially terminated' and not merely 'changed[:]'"

> [Although] there can be no hard and fast line between a "termination" and a "change" . . . . [,] [a]nybody would readily agree that when a contract for 430 buildings is cut down to 81 buildings, there has been a partial termination, and there would be the same unanimity in saying that the use of a shingle roof in place of a composition roof on a house would be a change rather than a termination, yet if a contract for a dwelling and basement has the basement eliminated, there would be a borderline picture, and that fairly could be called a change as readily as a partial termination.  The long and short of it is that the proper yardstick in judging between a change and a termination in projects of this magnitude would best be found by thinking in terms of major and minor variations in the plans.

*Id.* at 513 (emphasis added) (quotation marks and citation omitted); *see also Universal Fiberglass Corp. v. United States*, 210 Ct. Cl. 220, 226 (Ct. Cl. 1976) (stating that "it seems clear that [an]

amendment … which so profoundly changed the basic specifications … amounted to a constructive partial termination" (citing *J. W. Bateson*, 308 F.2d 510)).

In addition, "the *deletion* of work" may "result[] in a termination for convenience." *Praecomm, Inc. v. United States*, 78 Fed. Cl. 5, 12 (Fed. Cl. 2007) (emphasis added); *see also id.*at 11-12 (observing that (1) "[a] constructive *change* occurs where a contractor *performs work* beyond the contract requirements without a formal order;" (2) "a cardinal *change* represents *a large increase in the contract burdens* either through more work or increased costs;" and (3) no such *changes* occurred because "no additional work was performed, [the contractors'] costs were not increased, and its contractual burdens were not enlarged" (emphasis added) (quotations and brackets omitted)); *JKB Solutions & Servs., LLC v. United States*, 150 Fed. Cl. 252, 257 (Fed. Cl. 2020) ("constructively invok[ing] the termination for convenience clause"—based on the "same principle[]" that "the deletion of work" may "result[] in a constructive termination for convenience"—and observing that federal government contracts "may be partially terminated for convenience" (quotation and brackets omitted)); *G.C. Casebolt Co. v. United States*, 421 F.2d 710, 712 (Ct. Cl. 1970) (stating that "where the contract embodies [an applicable] convenience-termination provision," a "directive to end performance of the work" will be considered "a convenience termination"—even if such a directive is "wrongly call[ed]" or treated as something else).[18]

## D.  Damages for Breach of Contract

The federal law of government contracts requires claimants to "show[] by a preponderance of the evidence" that they are "entitled to the amount claimed."  *Meridian Eng'g Co. v. United*

---

[18] In addition, "[t]he label placed on the deletion by one party or the other is of no significance, and the characterization of the deletion is evaluated on the basis of its materiality to the contract."  5 Phillip L. Bruner & Patrick J. O'Connor, Jr., *Bruner and O'Connor on Construction Law*, § 18:48 & n.5 (2021) (citing cases).

*States*, 885 F.3d 1351, 1366 (Fed. Cir. 2018).[19]  "To the extent that the federal law of government contracts is not dispositive, the laws of the State of New Mexico," Subcontract § 10.8, similarly provide that claimants have "the burden of proving the fact of damage by a preponderance of the evidence."  *Camino Real Mobile Home Park P'ship v. Wolfe*, 891 P.2d 1190 (N.M. 1995), *overruled on other grounds by Sunnyland Farms, Inc. v. Cent. N.M. Elec. Coop., Inc.*, 301 P.3d 387 (N.M. 2013).[20]

"One of the basic principles of contract damages is that 'damages for breach of contract shall place the wronged party in as good a position as it would have been in, had the breaching party fully performed its obligation.'"  *Bluebonnet Sav. Bank, F.S.B. v. United States*, 339 F.3d 1341, 1344-45 (Fed. Cir. 2003) (quoting *Mass. Bay Transp. Auth. v. United States*, 129 F.3d 1226, 1232 (Fed. Cir. 1997)).  This principle is "[t]he *primary objective* of damages for breach of contract."  *White v. Delta Constr. Int'l, Inc.*, 285 F.3d 1040, 1043 (Fed. Cir. 2002) (emphasis added).  "Thus, the non-breaching party should not be placed in a better position through the award

---

[19] Under this standard, "it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision."  *San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d 1557, 1563 (Fed. Cir. 1997) (quotation omitted).  Nevertheless, "contract law precludes recovery for speculative damages."  *Id.* Furthermore, "[a] plaintiff must show that but for the breach, the damages alleged would not have been suffered."  *Id.* (citing, *inter alia*, *United Indus. Syndicate, Inc. v. Western Auto Supply Co.*, 686 F.2d 1312, 1316 (8th Cir. 1982) (declaring that "[t]he fundamental measure of contract damages is that which places the nonbreaching party in the position it would have been but for the breach")); *see also Englewood Terrace Ltd. P'ship v. United States*, 629 Fed. Appx. 977, 980 (Fed. Cir. 2015) (unpublished) (observing that "the plaintiff must establish by a preponderance of the evidence that a sufficient basis exists for estimating the amount of lost profits with reasonable certainty"—particularly by "establish[ing] both the costs that [the plaintiff] incurred and the costs that it avoided as a result of [the] breach" (quoting *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1324-25 (Fed. Cir. 2002); *Bos. Edison Co. v. United States*, 658 F.3d 1361, 1369 (Fed. Cir. 2011)) (alterations omitted)).

[20] In New Mexico, "the amount of damages need not be proven with mathematical certainty, [but] neither can it be based on surmise, conjecture, or speculation."  *Id.* (emphasis added).  *See also Mascarenas v. Kennedy*, 397 P.2d 312, 314 (N.M. 1964) (observing that "a claimant [has] the burden of establishing his right to compensation by a preponderance of the evidence" and that a court cannot "award compensation where the requisite proof is absent"); *First Nat'l Bank in Albuquerque v. Sanchez*, 815 P.2d 613, 619 (N.M. 1991) (stating that "when it is possible to present accurate evidence on the amount of damages, the party upon whom the burden rests to prove damages must present such evidence"); *Camino Real*, 891 P.2d at 1197 (observing that "the party who fails to perform the agreement is justly responsible for all damages flowing naturally from the breach" and that the "aim of [an] award of damages for breach of contract is to put the injured party in as good a position as he would have had if performance had been rendered as promised" (quotation omitted)).

of damages than if there had been no breach." *Bluebonnet*, 339 F.3d at 1345; *see also White*, 285 F.3d at 1043 (reiterating the rule that "the non-breaching party 'should *on no account* get more than would have accrued if the contract had been performed'" (emphasis added) (quoting *DPJ Co. v. FDIC*, 30 F.3d 247, 250 (1st Cir. 1994))); *c.f.* 48 C.F.R. § 52.249-10 (providing that a government contractor who is terminated for default is "liable for any *damage* to the Government *resulting from* the Contractor's … failure to complete the work" (emphasis added)).

## IV.  ANALYSIS

As set forth below, the Court holds that Herndon partially terminated the Subcontract without fault on December 1, 2017, when he announced Barlovento's decision to remove the concrete paving phase of the project from AUI and award it to a third party.  The Court further finds and concludes, however, that AUI's Counterclaim did not expressly or impliedly contain an allegation for partial termination without fault.  Alternatively, the Court finds and concludes that the same damages that AUI proved were caused by the partial termination are already properly credited to AUI as an offset to costs recoverable by Barlovento.  Finally, consistent with its Findings and Conclusions, the Court awards Barlovento only $22,577.25.00 in damages from its default termination of the remaining portion of the Subcontract.

### A.  Herndon Partially Terminated the Subcontract without Fault

The Court concludes that, on December 1, 2017, then-General Construction Manager Jason Herndon partially "terminat[ed] th[e] [Subcontract] without the fault of [AUI]."  Subcontract § 8.2.1.  This "termination without fault," as set forth in § 8.2, specifically occurred on December 1, 2017, when Herndon announced Barlovento's decision to take the concrete paving work away from AUI and award it to SWCP—a decision Herndon clearly communicated to both AUI and SWCP.  The Court finds that this decision was finalized and effective as of December 1, 2017.

Factual Findings (FFs) 51-53, 56-59.   In other words, on December 1, 2017, Herndon had completely descoped the concrete paving portion of the Subcontract by taking it away from AUI and announcing that he was awarding it to SWCP.   *Id.*  Aside from the paperwork catching up with these decisions to memorialize them, there was nothing more that needed to be done (Trial Tr. Vol. II at 142).

The Court further finds and concludes that Herndon's announcement qualified as a "termination" under § 8.2 of the Subcontract—and not a mere "change" under § 9.2—for several reasons.  First, such a termination did not have to be in writing, as Herndon merely had to provide "notice" of the partial termination, which he unequivocally did on December 1, 2017.  § 8.2.1; *see* FFs 51-53, 56-59.[21]  Indeed, Barlovento itself agrees that the Subcontract does not require "formal written notice" of termination.  *See* Pl.'s Post Trial Br. and Closing Argument [ECF 276] at 19. Second, any (non-minor) "change" is expressly required to be sought through a "written order," §§ 9.2.1–9.2.3—which was unnecessary and inapposite because Herndon's "decision to strip the concrete phase away from AUI was *entirely unilateral*."  FF 59 (emphasis added).[22]  Third, the *magnitude* of this alteration strongly suggests that it is a termination.  *See J. W. Bateson*, 308 F.2d at 513; *Universal Fiberglass*, 210 Ct. Cl. at 226; ECF 253 at 4 (AUI observing that "concrete was approximately 47% of the total scope of work" (citing Ex. 338)); Ex. 388 (reflecting that AUI's concrete scope of work was $1,774,467 and that the total value of the Subcontract was $3,777,962.45); FF 62 (same).  Fourth, the fact that this alteration did not require "additional

---

[21] *C.f. Patton v. United States*, 74 Fed. Cl. 110, 118 (Fed. Cl. 2006) (observing that even "[c]lauses requiring [a] contract termination to be *in writing* have not been uniformly treated as determinative" and that whether the contract at issue was orally terminated, despite a clause requiring written notice, was "a question of fact" to be addressed under "general principles of contract law" (emphasis added) (quotation omitted)).

[22] *C.f. Boarhog LLC v. United States*, 129 Fed. Cl. 130, 134 (Fed. Cl. 2016) (observing that "[t]he Government has *considerable latitude* to terminate a contract for convenience and may exercise its right to do so *unilaterally*" (emphasis added)).

work"—but rather terminated nearly half the work that AUI had contracted to perform, FF 62—further suggests that it was a termination. *See Praecomm*, 78 Fed. Cl. at 12; *JKB Solutions & Servs.*, 150 Fed. Cl. at 257; *G.C. Casebolt*, 421 F.2d at 712.

In addition, the Court finds that Herndon's December 1, 2017, verbalized decision also qualified as a *partial* termination. To be sure, § 8.2 (Termination Without Fault) does not expressly use the phrase "part" or "partial." *C.f.* § 8.1 (Termination for Default) (containing § 8.1.3 (Payment), which uses the phrase "[u]pon termination of this [Subcontract], in whole or in *part* by [Barlovento]" (emphasis added)). Nevertheless, the language of § 8.2 clearly contemplates that AUI may still perform Subcontract work—indeed *any* work set forth in Barlovento's notice—*after* AUI is terminated without fault. *See* § 8.2.1 (stating that "[u]pon receipt of notice from [Barlovento] of the termination, [AUI] shall do only that work set forth in [Barlovento's] notice"). In other words, the Subcontract permits Barlovento to terminate only *part* of AUI's Subcontract work, while still requiring AUI to perform other Subcontract work. *See id.* (also containing no language precluding such a termination); *see also Hercules*, 292 F.3d at 1380 (requiring a contract to be construed in a manner that "effectuate[s] its spirit and purpose giving reasonable meaning to all parts of the contract"). Thus, § 8.2 clearly contemplates—in substance—the concept of a *partial* termination without fault.

At trial and in its post-trial briefing, Barlovento took the position that Herndon's decision was a legal nullity because it had not yet been memorialized in writing before Barlovento default-terminated the remainder of the Subcontract. While the Court understands Barlovento's motivation to minimize the legal significance of Herndon's action, the Court views the matter quite differently. To permit Barlovento to carry out the act of descoping the largest component of the original Subcontract on December 1, 2017, but then recover hundreds of thousands of dollars in

damages as if the descoping had not occurred *at all* would be to reward Barlovento for delaying the purely ministerial task of memorializing the descoping in writing.  This course of action is compelled neither by the federal law of government contracts nor New Mexico law, nor is it one this Court is willing to endorse.

### B.  Even if AUI Had Stated a Valid Claim for a Partial Termination for Convenience, Defendants Would Still Owe Barlovento $22,577.25

AUI's Counterclaim did not state a claim for a partial termination for convenience.  But even if it did, Defendants would still be required to pay Barlovento $22,577.25 in light of (1) the $234,340.00 in recoverable costs incurred by Barlovento from AUI defaulting on the base course, FF 110, and (2) the $211,762.75 in Subcontract work that AUI satisfactorily performed for which it was not paid, FF 133-35, 166-69.

### 1.  AUI Has Not Stated a Valid Claim for a Partial Termination for Convenience

AUI's Counterclaim does not "contain a short and plain statement [or indeed *any* statement] showing that [AUI] is entitled to relief" for a partial termination for convenience associated with Herndon's decision on December 1, 2017.  Fed. R. Civ. P. 8(a)(2); *see* ECF 32 at 18 (AUI's Counterclaim for Conversion of Wrongful Termination for Default).  In other words, AUI's Counterclaim does not give "fair notice of [such a claim] and the grounds upon which it rests."  *Tellabs*, 551 U.S. at 319; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (observing that a claimant has an "obligation to provide the grounds of his entitlement to relief" (quotations and alteration omitted)); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (observing that "a complaint must contain sufficient factual matter . . . . [to] allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged").

The Court construes AUI's Counterclaim to be a request for relief based on the following grounds: (1) a "*wrongful termination for default*" of the *entire* Subcontract, formally

communicated in writing on December 5, 2017, and (2) Section 8.2.2, which allows such a termination be *converted* to a termination for convenience. ECF 32 at ¶ 65 (emphasis added). The Court will not permit AUI to in effect amend its Counterclaim during trial to essentially request relief on the following grounds: (1) a *valid termination for convenience* of a *portion* of the Subcontract, communicated verbally on December 1, 2017, and (2) Section 8.2.1, which *directly* provides for termination for convenience damages.[23]

### 2.   Defendants Are Required to Pay Barlovento $22,577.25

Even if the Counterclaim adequately stated a claim for relief based on a valid partial termination for convenience, Defendants would still be required to pay Barlovento $22,577.25. The Subcontract's termination for convenience provision only entitled AUI to receive such damages for "the actual value of Subcontract Work satisfactorily performed … and any direct costs incurred by [AUI] due to such termination." § 8.2.1. And the Court has already found that AUI "had not 'satisfactorily performed' any other Subcontract Work [beyond this $211,762.75] for which it had not already been paid." FF 133-35, 166-69. In addition, the Court has already found that "AUI did not prove any such [direct] costs by a preponderance of the evidence." *Id.* at 170-71. Thus, even if AUI were entitled to partial termination for convenience damages, such damages would be *entirely duplicative* of the $211,762.75 that is already being credited to Defendants. Consequently—after accounting for the $234,340.00 that Defendants owe Barlovento for its recoverable costs stemming from AUI's defaulting on the base course, *see* FF 110; *infra* Section C—Defendants would still be required to pay Barlovento $22,577.25 in damages under § 8.1.3.

---

[23] The Court notes that AUI's Counterclaim is altogether silent on (1) any meeting between Herndon, AUI, and SWCP on December 1, 2017; (2) any decision Herndon may have announced and executed that day; or (3) the legal effects of any such decision.

### C.  Barlovento Is Entitled to $22,577.25 in Damages from AUI

Consistent with its Findings and Conclusions, the Court will award Barlovento a total of $22,577.25 in damages from its default termination of what remained of the original Subcontract after Herndon partially terminated it for Barlovento's convenience and without fault of AUI.

After thoroughly and meticulously reviewing the evidence of damages, the Court concludes that Barlovento is entitled to recoverable costs in the amount of $234,340.00—and that any amount beyond this for such costs would be purely "speculative." *San Carlos Irrigation*, 111 F.3d at 1563.   As the Court's Factual Findings make abundantly clear, the issue is not that Barlovento has simply fallen short of establishing the "absolute exactness or mathematical precision," *San Carlos Irrigation*, 111 F.3d at 1563, of any of its recoverable costs.  *See* FFs 99-110.  The issue is that Barlovento simply did not introduce *any* evidence of (1) "how much it paid SWCP to complete AUI's scope of work with respect *to the base course*," *id.* at 103 (emphasis in original); (2) other costs or expenses of completing the remaining base course work, such as evidence that "completion of the Project was in any way delayed by AUI's performance or failure to perform," *id.* at 107-08; or (3) further lost profit due to completing the base course work with SWCP, *id.* at 99-110.  The Court therefore concludes that Barlovento has not "establish[ed] by a preponderance of the evidence that a sufficient basis exists for estimating … with reasonable certainty," *Energy Capital*, 302 F.3d at 1324-25, any recoverable costs beyond $234,340.00 for completing the remaining base course scope of work.

Consequently, the Court will award Barlovento $22,577.25 in damages under § 8.1.3—i.e.,

Barlovento's recoverable costs ($234,340.00) minus the amount due to AUI ($211,762.75)—for

Barlovento's valid default termination of the remaining portion of the Subcontract.[24]

## V.   CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' Motion is **GRANTED IN PART** in

that:

(1) Barlovento is not entitled to damages for a default termination of the entire original Subcontract.  Instead, Barlovento's damages are limited to those resulting from its default termination of *what remained* of the original Subcontract after Herndon partially terminated it for convenience.

(2) The Court **AWARDS** Barlovento $22,577.25 in default termination damages.

**IT IS FURTHER ORDERED** that Defendants' Motion is **DENIED IN PART** in that:

(1) AUI is not entitled to damages for Herndon's partial termination of the Subcontract for convenience.

(2) Any additional findings or relief requested by Defendants' Motion that are not otherwise granted by this Order or the Court's Findings and Conclusions are **DENIED**.

**SO ORDERED.**

THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE
***Presiding by Consent***

---

[24]  This Court has been presented with no evidence, or even argument, that crediting Barlovento $234,340.00 for recoverable costs would ultimately cause it to have "more than [it] would have accrued," *White*, 285 F.3d at 1043, had AUI performed the Subcontract.  Furthermore, the Court concludes that the parties have each established by a preponderance of the evidence that "a sufficient basis exists for estimating … with *reasonable certainty*," *Energy Capital*, 302 F.3d at 1324-25 (emphasis added), that (1) Barlovento is entitled to recoverable costs in the amount of $234,340.00 in connection with its default termination of the remaining portion of the Subcontract and (2) AUI satisfactorily performed $211,762.75 in Subcontract work for which it was not paid.