UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

BARLOVENTO, LLC,

     Plaintiff/Counter-Defendant,

v.                                      Civ. No. 18-1112 GJF/JHR

AUI, INC.,

     Defendant/Counterclaimant, and

WESTERN SURETY COMPANY,

     Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Over the course of nine days in April 2021, the parties tried this case to the Court. The Court received testimony from 20 witnesses, admitted 313 exhibits, and considered 21 demonstrative exhibits that were used to amplify or explain the testimony of relevant witnesses. At the conclusion of the evidentiary phase, the Court granted the parties several weeks to prepare and file closing arguments and proposed findings of fact and conclusions of law.

The Court listened carefully to the trial testimony, examined each exhibit, and took 61 single-spaced pages of contemporaneous notes to assist its recollection of the evidence. In addition, the Court since has re-read the trial transcript in its entirety. Now having thoroughly considered all of the evidence, the parties' written submissions, and relevant authority, the Court issues its Findings of Fact and Conclusions of Law.

At times herein, the Court has cited to specific exhibits to illustrate certain of its findings but has only rarely chosen to cite to specific testimony. This is because multiple witnesses often testified to the same point or individual witnesses testified more than once to the same point, which

are trial realities that render an accurate cataloguing of their testimony improvident. To the extent

there was conflicting evidence presented as to any fact found by the Court, the Court has credited

the testimony and exhibits supporting the finding and did not credit the contradictory testimony or

exhibits.  The findings and conclusions contained herein are those the Court considered essential

to its Judgment.  No inference should be drawn about the Court's view of any additional findings

or conclusions submitted by the parties not discussed here.  Finally, the Court incorporates by

reference the legal conclusions in each of its pretrial orders and opinions, as well as those in the

Memorandum and Opinion [ECF 278] resolving Defendants' mid-trial Motion for Judgment, to

the extent those conclusions are relevant and not otherwise cited or repeated herein.

## I.    FINDINGS OF FACT

### A.  Subcontract Formation and Responsibilities

1. On March 10, 2017, the United States Air Force awarded Barlovento a Task Order Contract to renovate Hot Cargo Pad 5 Taxiway at Kirtland Air Force Base, New Mexico.[1]

2. The Task Order included a firm fixed price of $5,521,360.00 to complete the Project and allowed a performance period of six months from the date the Air Force issued a Notice to Proceed for construction.

3. The Task Order was a design-bid-build contract, an arrangement in which the Air Force was responsible for the design, including elevations and as-built drawings.

4. On or about March 17, 2017, Barlovento and AUI executed a firm fixed price Subcontract in the original amount of $3,515,465.45 (Ex. 1).  The Subcontract required AUI to provide labor, materials, and equipment in connection with the removal and replacement of taxiway pavement and base course on the project.

5. Written change orders increased the Subcontract amount to $3,777,962.45.

---

[1] For simplicity, the Court will refer to the Task Order's scope of work as "the Project."

6. The Subcontract was the product of arm's length negotiations and jointly drafted by the parties, both of which were sophisticated operators in the civil engineering and construction industry with substantial experience in contract negotiation.[2]

7. The Subcontract required AUI to perform the vast majority of the construction on the Project. The primary aspects of AUI's scope of work involved: (1) preparing the subgrade, (2) procuring and placing the base course material, and (3) placing the concrete taxiway. These three layers – subgrade, base course, and concrete – comprised the taxiway and were to be placed in that sequence.

8. AUI controlled the means and methods of performing its work, including the selection, maintenance, and operation of equipment, performance of labor, selection of its own subcontractors, selection of materials including the base course aggregate material, and selection of the method to place the materials.

**B. Subcontract Performance: Subgrade Preparation**

9. The Air Force issued a Limited Notice to Proceed on the Project on June 21, 2017, which allowed AUI to mill the asphalt pavement and remove the taxiway edge lights (Ex. 298). AUI completed that work on June 27, 2017, and temporarily demobilized pending issuance of the full Notice to Proceed.

10. The Air Force issued a full Notice to Proceed on July 7, 2017 (Ex. 78).

11. AUI successfully completed the subgrade phase of the Subcontract work prior to termination. This phase took AUI longer than expected for multiple reasons, including the presence in the in-situ subgrade of unsuitable soil and soft spots. These infirmities adversely affected the compaction and density of the subgrade fill that AUI used on the Project.

12. On September 29, 2017, AUI submitted a formal Request for Equitable Adjustment ("REA") for the extra costs and time it was incurring due to the unsuitable subgrade soils (Ex. 82).

13. AUI periodically updated its REA through November 2017 to account for continued increases in cost. The final amount requested by AUI's REA was $232,847.98. AUI also requested a time extension (Ex. 421).

14. Barlovento did not submit AUI's REA to the Air Force until March 19, 2019, several months after the Air Force had officially approved and accepted the Project (Ex. 69).

---

[2] Consequently, the Court did not construe the Subcontract for or against either party but instead only pursuant to the ordinary meaning of its plain language.

3

When it did, Barlovento requested $118,874.00 for the extra work caused by the unsuitable soils, just more than half of the amount requested by AUI.

15. The Air Force concurred that Barlovento "encountered [a] Type II Differing Site Condition [] related to soil conditions on the Project" (Ex. 431 at 5) and awarded the full amount ($118,874.00) requested by Barlovento (Ex. 69 at 12; Ex. 309 at 344).

**C. Subcontract Performance: Base Course**

16. Procuring and placing the base course were parts of AUI's scope of work. To that end, on August 10, 2017, the Air Force approved AUI's proposed basalt base course (Submittal No. 66, Ex. 383) and later granted a variance to the Project Specification concerning the amount of base course material that could pass through the -200 sieve (Ex. 401). The variance had the effect of making it easier, rather than more difficult, for AUI to successfully place the base course.

17. Despite the variance, AUI never successfully placed basalt base course in accordance with the Specification. Testing by Western Technology Inc., the Air Force-approved quality control laboratory and testing agent for the Project, demonstrated that although roughly 65% of the post-compaction base course met the adjusted limit for the -200 sieve, the remainder did not.

18. AUI changed its means and methods in attempting to meet the base course Specification. The changes included its decision to discontinue use of a "placer" machine in favor of dumping the base course on site and then using a motorized grader to spread it out. Another change was AUI's decision to blend the basalt material with material not approved by the Air Force.

19. The Air Force directed Barlovento to remove any unsatisfactory material placed on site – including any base course material that did not meet the Specification or that had been blended with unapproved material – and replace it with approved and suitable material.

**D. Subcontract Performance: Concrete Paving**

20. Although the Subcontract assigned responsibility for the concrete mix design to AUI, Barlovento unilaterally took over this responsibility in May 2017. Barlovento retained factual responsibility for the concrete mix design for the remaining duration of AUI's Subcontract. AUI thereafter played no role in the composition of the concrete mix, the cement-to-water ratio, or the addition of any admixtures for any of the test lanes poured during the Project. Barlovento did not terminate or threaten to terminate the Subcontract – or invoke any of its rights or remedies under the Subcontract – with respect to AUI's contractual responsibility to provide an approved concrete mix design.

21. AUI introduced evidence that Specification § 32 13 11, ¶ 2.12.2.3(j) (Ex. 374 at 393-94) forbade any concrete from being placed until the Air Force contracting officer approved the concrete mixture proportions.  Nonetheless, notwithstanding the language of the Specification and even though the test pours preceded approval of the concrete mix design and may have preceded approval of the mixture proportions as well, the Court finds that the Air Force authorized and ratified the placement of test lanes.  The Court's finding in this regard rests on three primary grounds.  First, the Air Force Title II representative was on site for all three test lane pours and criticized AUI's competence in performing them, but never once pointed out that the Specification barred the pours from taking place at all because the mixture proportions had not yet been approved.  Similarly, in the Deficient Performance Letter (Ex. 84) and Letter of Concern (Ex. 22) that she issued to Barlovento in October 2017, the Air Force contracting officer chronicled the failure of all three test lanes but never mentioned that the lanes should not have been poured because she had not yet approved the mixture proportions.  Third, the Court credits the testimony of multiple witnesses called by Barlovento who suggested that one purpose of the test lanes is to test or validate the concrete mix itself.  This "proof of concept" notion squares with the Court's common sense as something the Air Force would demand before authorizing 2,000 feet of taxiway to be paved, particularly when the taxiway was expected to last multiple decades.  Taken together, this evidence convinces the Court that, irrespective whether they were technically authorized under the Specification, the test lanes were factually authorized by the Air Force contracting officer.

22. The Air Force disapproved Barlovento's first two concrete mix designs (Submittals 76 and 76A) on September 26 and December 1, 2017, respectively.  The Air Force did not approve Barlovento's concrete mix design (Submittal 76B) until January 10, 2018, well after Barlovento had terminated AUI's Subcontract.

23. The contract Specification called for a thickness of 12 inches and a width of 12.5 feet of Portland Cement Concrete Pavement.  The Air Force later officially changed those dimensions to 16 inches and 18.75 feet through Modification No. 2, which was issued on April 27, 2018.  The Air Force announced these anticipated changes early in the Project, however, and AUI was aware of the expected changes no later than June 2, 2017.

24. AUI submitted a paving plan to Barlovento explaining that it would use a slipform paver and an offsite batch plant in placing the concrete. AUI was aware of the expected requirement for 16" thick concrete at the time it submitted the paving plan. AUI later sought permission to use an onsite batch plant, but the Air Force rejected the submittal as in violation of the applicable Specification.

25. AUI attempted to place three concrete test lanes at 16" thickness.  These attempts occurred on September 19, September 21-22, and September 26, 2017, AUI never attempted an official test lane at 12" thickness (or any thickness other than 16").

26. The Air Force rejected AUI's three test lane attempts.  The Title II representative, acting as the contracting officer's technical liaison on the Project site, identified AUI's lack of skill and proficiency as among the primary reasons for the test lane failures.

27. By direction of the Air Force, AUI had to postpone additional attempts to place concrete until it successfully placed the base course in accordance with the Specification (Ex. 143).  Because AUI never corrected the base course, however, it was never able to place another test lane using either the fixed form or slipform method.

28. AUI did not raise the issue of using fixed forms instead of slipform until after the third test lane failure.

29. The language of the Specification did not permit Barlovento (or any other party) to alter the concrete mix proportions, other than water.  Only the Air Force had the authority to direct such changes.

30. AUI hired its own subcontractor (Vulcan) to produce concrete at an offsite batch plant.

31. Barlovento was not a party to the AUI-Vulcan subcontract.

32. Former Vulcan Quality Control Manager Guillermo Florentino testified credibly at trial that the batch plant operated as expected during test lane placements.  Although AUI was not denied access to the batch plant during test lane placements, only Western Technology Inc.'s Andrew Cuaderes (pursuant to a subcontract with Barlovento) modified the mix during the batching process.

33. The principal cause of AUI's failure to successfully pour any of the three concrete test lanes was its own means and methods, including its struggles to get sufficient concrete to the site at an appropriate and sustainable rate and its inability to competently operate the slipform paving machine to meet the military airfield paving criteria set forth in the Project Specification.  Although AUI presented evidence that Barlovento's concrete mix designs may also have been at fault, the Court finds AUI's means and methods to have been the primary culprit for each of the failed test lanes.

34. The Court fully credits the testimony of Kim Basham, Ph.D, who testified that the concrete mix design embodied in Submittal 76A should have worked with a slipform paving machine.  The Court was not persuaded by any contrary opinions offered by Benjamin Birch, P.E., or Timothy Martin, P.E.  The Court further credits Dr. Basham's testimony that, though it was disapproved by the Air Force, Submittal 76A was in all important respects indistinguishable from the concrete mix design approved just over a month later (Submittal 76B).

**E. Air Force Expresses Concern with Barlovento's Performance**

35. In October 2017, with less than two months remaining in the original project completion period, the Air Force expressed in multiple ways its concern about Barlovento's ability to complete the Task Order.  These ways included (a) issuing a Deficient Performance Letter that discussed Barlovento's "neglect in keeping the progress of the project … within the planned schedule" and its failure to "place two concrete test strips" (Ex. 84); (b) criticizing Barlovento's performance for the first seven months of the performance period in a Contractor Performance Assessment Report (CPAR) (Ex. 364); and (c) issuing a Letter of Concern reiterating that the Air Force "remain[ed] highly concerned with Barlovento's ability to achieve an acceptable test section" due to the third concrete test strip failure and also directing that the unsatisfactory base course material be removed (Ex. 22).

36. Barlovento's senior executive personnel took the Air Force's concerns very seriously because of their potential impact on Barlovento's ability to obtain future contracts from the Air Force, among its largest customers.  Prior to this Task Order, in its twenty-plus year history, Barlovento had never been threatened with default by the Government nor had Barlovento ever had to default-terminate any of its subcontractors.[3]

37. On October 31, 2017, the Air Force ordered all work on the Project to stop, including the placement of any concrete test lanes, until a suitable base course was successfully placed (Ex. 143).

38. On October 31, 2017, in the wake of the Air Force directive and its own inability to successfully place the basalt base course, AUI abandoned the basalt base course in favor of identifying a new base course material that was less prone to breaking down during placement and compaction.  To use a new base course material, however, AUI needed to provide Barlovento a new base course submittal capable of receiving approval from the Air Force.

**F. Barlovento Invokes Subcontractual Remedies**

39. Subcontract Article 8 sets forth exclusive procedures that govern the parties' rights and remedies with respect to Barlovento's authority to terminate the Subcontract for default or no fault.[4]

40. After receiving the Air Force's Deficient Performance Letter, CPAR Evaluation, and Letter of Concern, Barlovento issued a Notice of Cure (Ex. 43) advising AUI of its

---

[3] For its part, according to its Vice-President Patrick Shaw, AUI has never been terminated from any job other than the one in question in this case.

[4] When referencing the Subcontract, the Court will refer to "Article" for the major subject areas of the Subcontract and "Section" when citing to a particular provision of an Article.

default under the Subcontract.  Transmitted October 31, 2017, the Notice advised AUI that it was in default for (a) failing to place acceptable base course that complied with Specification; (b) failing at three attempts for placing concrete that complied with Specification; and (c) delaying the Project by not meeting AUI's recovery schedule. Invoking the Subcontract, the Notice demanded that AUI "immediately, and in no event longer than (3) three days, remedy the default in such a manner and with such diligence and promptness as may be required by the contractor."

41. AUI responded to the Notice of Cure on November 2, 2017 (Ex. 88). The response advised that AUI was in the process of purchasing alternative base course material, would "push the submittal approval process," and "anticipate[d] having some product within two weeks to start placing." AUI also reminded Barlovento that, as the designer of the concrete mix, Barlovento shared responsibility for the concrete test strip failures. The response stated that AUI could not provide an "accurate recovery schedule" until it had an approved replacement base course. In addition, the response emphasized AUI's reasons why it should be granted additional time to complete its scope of work.

42. Finding AUI's response to the Notice of Cure to be inadequate, Barlovento issued AUI a Notice of Intent to Terminate Subcontract Agreement on November 6, 2017 (Ex. 425). The Notice of Intent explained in detail how AUI's response to the Notice of Cure was deficient. The Notice of Intent demanded that AUI provide within three days "a substantive plan to cure its default" or Barlovento would pursue all available contractual remedies, "including terminating the Subcontract or supplementing AUI's forces (at AUI's expense) in order to complete the project."

43. AUI responded to the Notice of Intent to Terminate on November 9, 2017 (Ex. 153). AUI proposed to cure its default by providing a new and complete base course submittal to Barlovento no later than November 17, 2017, a deadline that AUI itself selected.

44. Barlovento forwarded to AUI a November 15, 2017 email from the Air Force technical representative that mandated a detailed placement/compaction plan as part of a complete base course submittal (Ex. 60 at 4-5). Citing AUI's failure with the basalt base course, the technical representative wrote: "I am going to insist that [AUI] determine the amount of material break down [sic] before placing any base course material on the project. [AUI] should include the amount of breakdown experienced during placing and compaction, at an off site location, prior to delivery and stockpile on the project. This is intended to stop a repeat performance by [AUI]." The technical representative went on to write: "I expect to see the results of testing to determine the quantity of break down [sic] on the submittal. *Include the means and methods used to place the material, bring to grade, and compact.* Should the testing result in a favorable material, the means and methods used during the testing will be followed on the job site. The specification for the base course requires that material be placed with an approved means." *Id.* (emphasis added).

45. Barlovento adopted the Air Force's requirement of a placement/compaction plan as part of the remedy it was demanding for AUI's base course default.

46. Although it provided Barlovento with some information by its self-imposed deadline of November 17th, AUI did not provide a complete base course submittal.

47. On November 20, 2017, Barlovento notified AUI of a series of laboratory tests that AUI would need to have conducted on its new base course proposal (Ex. 211). Barlovento emphasized the requirement that testing be done by an independent laboratory and further explained why certain test results already submitted by AUI were deficient. These testing requirements were in addition to the placement/compaction plan described above.

48. As it attempted to procure a new base course material and prepare the required submittal, AUI continued to struggle with its chosen supplier, lacked test reports from an acceptable outside laboratory, and also lacked test reports that were recent enough to satisfy the Specification requirements. To achieve approval by the Air Force, the submittal required test results by an outside lab and within the last six months.

49. The Air Force denied AUI's request for a variance to the -200 sieve test for the new base course material.

50. Although AUI continued to provide Barlovento with additional information about the new base course material through the end of November 2017, AUI still lacked certain testing results and a base course placement/compaction plan.

## G. Barlovento Removes Concrete Phase from AUI's Scope of Work

51. On December 1, 2017, Barlovento's then-General Construction Manager, Jason Herndon, convened a meeting to discuss Project roles and responsibilities. Representatives from Barlovento, AUI, and Southwest Concrete Paving Co. ("SWCP") attended. AUI had become aware only days before the meeting that Barlovento had been in discussions with SWCP since as early as October about potentially taking over all or some of the remainder of the Project.

52. At the meeting, Herndon announced Barlovento's decision to take the concrete paving work away from AUI and award it to SWCP. Herndon also advised that Barlovento would allow AUI a final opportunity to continue performing the base course phase of the Project. Herndon informed AUI that it would have to provide for submission to the Air Force a complete base course proposal, including a placement plan, no later than December 4, 2017.

53. Herndon's decision to remove the concrete paving phase of AUI's scope of work was foreshadowed by at least two emails. The first was an email from Barlovento's project manager, David Beuzekom, to the Air Force contracting officer on November 27, 2017.

In that email, Beuzekom explained that "Barlovento has been in contact with AUI to notify them that Barlovento will be descoping *a portion or all* of their work depending on the meeting that will be held on Friday December 1st. This decision was made at the Barlovento home office." Ex. 315 (emphasis added). In addition, in an email sent on November 29, 2017, Herndon himself foreshadowed his decision by advising Barlovento's President, Jane Solomon, that "we are meeting with Southwest Paving this Friday for them to start working." Ex. 290.

54. Subcontract § 8.1.2 granted Barlovento the discretion to decide the "diligence and promptness" of the remedy for any default committed by AUI. Barlovento used that discretion to require AUI to remedy its base course default by submitting a complete base course proposal, including a placement plan, no later than December 4, 2017.

55. Herndon conveyed the December 4th deadline to AUI only in oral form and did not reduce it to writing. Nevertheless, the Court specifically finds that Barlovento established that deadline and effectively communicated it to AUI. Although AUI introduced evidence at trial that Barlovento had not established such a firm and final deadline, the Court does not find that evidence persuasive. The Court instead is persuaded by the evidence that – in the days and weeks immediately following AUI's termination, when the relevant witnesses' memories would have been sharpest – no AUI employee *ever* disputed that Barlovento had established a December 4th deadline or that it was anything other than firm and final. The Court finds most persuasive the following: (a) the silence of AUI's project manager, Marshall Vickers, after receiving an email from Gerald Axford, Barlovento's quality control manager, on December 6, 2017, in which Axford expressed "[his] understanding AUI had Promised [sic] to have ALL the base coarse [sic] data submitted to Barlovento by the end of day Mon 4 Dec at the latest" (Ex. 15); (b) the silence of all AUI personnel in response to Herndon's Notice of Termination in which he specifically mentioned that "AUI was required to provide a revised base course submittal no later than yesterday, December 4, but failed to do so" (Ex. 375 at 2); and (c) the absence of any reference, much less any objection, to the December 4th deadline in a lengthy letter authored on December 29th by AUI's Vice-President Patrick Shaw in which he disputed on other grounds Barlovento's termination of the Subcontract (Ex. 396 at 1-4).

56. AUI clearly understood from the December 1st meeting with Herndon that Barlovento had officially relieved AUI of the concrete phase of the Project (Ex. 185). Shortly after the meeting, Shaw emailed Stanley Jobe of Jobe Co., a concrete batch plant supplier with whom AUI had been in discussions, that "[AUI] will not be producing the concrete for the Kirtland project after all so there will not be a need to buy the plants" (Ex. 245). Shaw also emailed David Defeo of CEI Enterprises that "Barlovento has chosen to not move forward with [AUI] providing the concrete and will pursue another option" (Ex. 244).

57. David Beuzekom, Barlovento's on-site project manager, shared the same understanding. On December 1, 2017, following the meeting, Beuzekom emailed the Air Force contracting officer to advise that "Barlovento corporate has made the decision to hire Southwest Concrete to produce and place concrete paving." Ex. 179.

58. Herndon testified that he intended to memorialize in a change order his decision to strip AUI of the concrete phase of the project, but Barlovento's default termination of AUI's Subcontract a few days later intervened. As a result, according to Herndon, Barlovento never issued a written deductive change order related to the concrete scope of work and therefore never officially modified the Subcontract in that regard. The Court does not credit that testimony. The Court's distinct impression of Herndon's explanation was that it was manufactured *ex post facto* for the purpose of this litigation. The Court finds that Herndon made the decision to terminate the concrete paving phase even before the December 1st meeting, though he waited until that day to give AUI official notice of it. In any event, Herndon's decision was final as of the conclusion of the meeting on December 1st – there was nothing inchoate, conditional, or preliminary about it. Herndon was not relaying what he intended to do *in the future* about the concrete phase, but instead announcing a final and irrevocable decision that carried with it significant contractual implications.[5]

59. The Court further notes that § 9.2.1 of the Subcontract specifically required both parties to *agree* on a Change Order. The Court finds that AUI did *not* agree to the drastic reduction in the scope and value of the Subcontract that removing the concrete paving portion represented. AUI instead was prepared to proceed with the concrete paving phase using the same concrete supplier (Vulcan) and fixed forms instead of the slipform paver that had proven so problematic with the test lanes. *See* Ex. 185. Barlovento's decision to strip the concrete phase away from AUI was entirely unilateral.

60. As further explained in the Conclusions of Law *infra* and its Memorandum Opinion and Order on Defendants' Motion for Judgment filed contemporaneously herewith [ECF 278], the Court finds that Herndon's words and actions at the December 1st meeting constituted a constructive partial termination of the Subcontract for Barlovento's convenience and without fault by AUI.[6]

61. Barlovento terminated AUI for default *only* for its base course-related failure and for no other reason.

---

[5] Barlovento's President Solomon confirmed during her testimony that Barlovento removed the concrete work from AUI's Subcontract on December 1, 2017, and that the default termination a few days later was occasioned solely by AUI's failure to provide a base course submittal. Trial Tr. Vol. I at 108-09, 136, 152-53.

[6] Whether Barlovento *could have* terminated the Subcontract for default based on AUI's performance with the concrete test lanes is a question the Court no longer needs to answer. Herndon's trial testimony and Barlovento's trial strategy, *see infra* n. 11, relieved the Court of that obligation.

62. The concrete phase of the Project represented approximately 47% of the total value of the Subcontract.   Ex. 338 ($1,774,467 (AUI's concrete scope) / $3,777,962.45 (adjusted Subcontract price)).  The concrete phase was substantially more expensive than either the subgrade or base course phases.[7]

63. Consequently, at the time of its termination for default on December 4, 2017, AUI remained contractually responsible only for the Subcontract scope of work leading up to the satisfactory placing of a base course approved by the Air Force.  After December 1, 2017, by virtue of Herndon's decision and his communication of it to AUI and SWCP, AUI was *no longer* contractually responsible for any part of the concrete paving portion of the Subcontract.

## H. AUI Misses Final Deadline, Resulting in Default Termination

64. Despite being given one final opportunity to do so, AUI failed to provide a complete base course submittal, including all required lab reports and a placement plan, by end of day on December 4, 2017.  Indeed, at 8:51 a.m. that day, AUI emailed Barlovento's project manager, David Beuzekom, to advise that the "combined 02 mm test" would not be available until the following day (Ex. 183).  Also still missing from AUI's submittal were tests related to "soundness, LA abrasion (wear), and moisture/density relationship," as well as AUI's process and equipment for blending the new base course material on site and its placement process.  *Id.*

65. AUI provided supplemental laboratory data to Barlovento on December 5, 2017, a day after the expiration of the deadline that Barlovento had established.

66. In addition to the incomplete lab reports, AUI also never submitted an acceptable placement/compaction plan that the Air Force and Barlovento required as part of the base course submittal.[8]

67. Because of the missed deadline and incomplete submittal, Barlovento did not submit AUI's alternative base course proposal to the Air Force for review or approval.

68. On December 4, 2017, after learning that AUI would not provide a complete base course submittal by the end of that day, Barlovento President Jane Solomon and then-

---

[7] As reflected in each of AUI's Pay Applications 1-4 (Exs. 336-39), the subgrade preparation component of the Subcontract was $84,150 and the base course phase was $624,508.00.  The amount for the base course phase is computed by adding lines 7, 14, and 21 of each of the pay applications.

[8] The parties dispute whether either the Specification or the Air Force itself required a placement plan as part of a "complete submittal" of the new base course proposal.  The Court need not resolve that dispute because the Subcontract endowed Barlovento with plenary authority to dictate the manner and timing of any cure.  The Court finds that, in keeping with the demands of the Air Force's technical representative, Barlovento expressly required a placement plan as part of AUI's base course cure.

General Construction Manager Herndon decided to terminate the Subcontract for default and notified Barlovento's on-site employees of the termination.

69. The Subcontract does not specify the precise manner in which Barlovento must make its termination decision or the manner or promptness with which it must communicate the decision to AUI.[9]

70. On December 4, 2017, Barlovento emailed the Air Force (Ex. 181) and another of its subcontractors (Ex. 497) to advise of its decision to terminate AUI's Subcontract. Barlovento also informed SWCP that it was going to be awarded the full scope of the remainder of the Project (Ex. 180).

71. On December 4, 2017, at 12:54 p.m. MST, Barlovento project manager Beuzekom inadvertently included AUI's project manager, Marshall Vickers, as a recipient on an email to Barlovento executive management and project team personnel. That email (Ex. 252) advised its recipients – including Vickers – that Barlovento intended to take from AUI's possession a list of specific equipment and materials related to the Project. The email indicated that Barlovento's basis for this action arose from Subcontract § 8.1.2, which prescribes certain remedies in the event that AUI failed to cure its default in the manner dictated by Barlovento.

72. Beuzekom did not consider the email to be official communication of Barlovento's decision to terminate as he did not believe he had the authority to do so. Beuzekom believed the authority instead rested with Barlovento's corporate executives in Alabama.[10] Beuzekom did believe, however, that the decision to terminate for default had been made prior to the time he sent the email.

73. Barlovento's *sole* basis for terminating the Subcontract was its belief that AUI had failed to provide a complete base course submittal, including a placement/compaction plan, by the December 4, 2017 deadline.[11]

---

[9] Barlovento agrees that the Subcontract does not require "formal written notice" of termination. *See* Pl.'s Post-Trial Br. and Closing Argument, ECF 276 at 19.

[10] Although Solomon and Herndon both testified that Beuzekom was instructed to send the email to AUI as notice of the termination for default, the Court rejects that testimony. As the author of the email, Beuzekom was in a far better position to testify about whether his decision to include Vickers as a recipient was intentional or inadvertent. The Court accepts Beuzekom's testimony that his inclusion of Vickers was inadvertent.

[11] Although Barlovento has previously maintained in this litigation that the default termination *also* was premised on AUI's performance with respect to the concrete test lanes and AUI's inability to produce a revised completion-of-construction schedule, the Court finds and concludes that Barlovento has abandoned those alternative theories and waived its right to proceed on them. As made clear by the trial testimony of Jason Herndon and its own post-trial briefing, Barlovento is now defending its default termination *solely* on AUI's performance with respect to the base course phase of the project.

74. Vickers responded in writing to Beuzekom's December 4th email approximately two-and-a-half hours later.  Vickers indicated that he understood that Beuzekom "copied [him on] this email for [his] information" (Ex. 255).  Vickers also asked whether the email was AUI's notice or whether Barlovento was "going to issue a formal letter with [its] intention regarding our contract." Vickers copied four senior members of AUI's executive leadership team, including its ownership group, on his response.  Beuzekom did not respond.

75. Barlovento subsequently memorialized its termination decision in a Notice of Termination for Default emailed to AUI on December 5, 2017 at 2:50 PM MST (Ex. 375).  The Notice stated *inter alia* that: "AUI was required to provide a revised base course submittal no later than yesterday, December 4, but failed to do so."

76. The Court finds that Barlovento terminated the Subcontract for default on December 4, 2017, and formally communicated the termination to AUI via Herndon's letter issued the afternoon of December 5, 2017.

77. The Court finds that AUI was in default at the time of termination, whether that termination occurred on December 4 or 5, 2017.  AUI had not completed the cure of its base course-related default in the manner or with the promptness dictated by Barlovento prior to Barlovento's termination for default of the Subcontract.  The Court finds that Barlovento dictated the cure to be completed by December 4, 2017, and AUI failed to do so.  AUI did not submit all required lab reports or provide an acceptable base course placement plan by the deadline.

## I.   Post-Termination Events Related to Project Completion

78. As of the date Barlovento terminated AUI's Subcontract for default, the Air Force had not granted any time extensions on the Prime Contract.

79. The original project completion date specified in the Task Order was December 12, 2017.  On December 13, 2017, however, the Air Force issued a Notice of Forbearance with respect to the Prime Contract.

80. Following its termination of AUI's Subcontract, Barlovento entered into a subcontract with SWCP on December 13, 2017 to complete what remained of the Task Order's scope of work.  SWCP's subcontract was in the amount of $3,965,749.61.  The subcontract consummated negotiations between Barlovento and SWCP that had begun in October 2017.  Barlovento did not inform AUI or Western Surety of its discussions and negotiation with SWCP until November 27, 2017.

81. SWCP's scope of work identified in its subcontract was essentially the unfinished portions of AUI's scope of work as it was structured *prior to* Herndon's partial termination for convenience of the concrete phase of the Subcontract. A major

exception, however, was that SWCP's scope of work included survey work not included in AUI's scope of work. The survey work was expressly valued at $40,000.

82. A second major difference between the subcontracts that Barlovento issued to AUI and SWCP is that SWCP was authorized to install and use an onsite concrete batch plant. This capability greatly increased SWCP's ability to deliver sufficient concrete to the slipform paving machine to sustain the rate of forward progress required by the relevant Specification. The Air Force had denied AUI permission to use an onsite batch plant. The cost of the batch plant was $425,764.97.

83. On June 29, 2018, Barlovento and SWCP completed the Project's scope of work. Barlovento never terminated SWCP's subcontract. The Air Force accepted the work and paid for the Project.

**J.  Laboratory Services and Testing**

84. Western Technologies Inc. (WTI) was the approved quality control laboratory and testing agent for the Project.

85. Barlovento confirmed that WTI's equipment was calibrated at the beginning of the Project.

86. The Air Force, Barlovento, and AUI all relied on WTI's testing on the Project relative to the subgrade and AUI's successful completion of that phase.

87. The Air Force, Barlovento, and AUI also relied on WTI's testing for the base course phase of the Project. Indeed, it was WTI's testing that led the Air Force to approve the placement of AUI's basalt base course that underlaid the three concrete test lanes.

88. AUI raised certain concerns about WTI's method of extracting base course from the ground during post-compaction testing. At Barlovento's direction, WTI changed its method to align with AUI's preferred method. The change in method did not result in changes in the base course testing results.

89. AUI also raised concerns in a letter to Barlovento dated October 28, 2017, regarding WTI's testing methods, including the possibility that WTI's proctor may have been forcing over-compaction of the base course material. In the letter, AUI did not ask Barlovento to take any action relative to these concerns. Instead, AUI addressed its concerns directly with WTI and did not raise any of these issues again prior to voluntarily abandoning the basalt base course material.

90. AUI later engaged WTI to perform testing on a new limestone base course material that AUI was pursuing at the time of the termination of its Subcontract.

91. AUI expressed its disappointment with the quality of the basalt base course provided by its supplier. AUI told its surety, supplier, and Barlovento that its struggles with the basalt base course were caused by the poor quality of the material produced by its supplier.

92. In his December 29, 2017, letter responding and objecting to Barlovento's Notice of Termination, AUI's Shaw made no reference to any concerns about WTI's testing methodology.

93. AUI introduced substantial evidence during the trial that sought to question the validity of WTI's base course testing methodology. The evidence principally took the form of the expert testimony provided by Robert Prindle, who conducted all of his analysis and formed all of his opinions at least a year *after* Barlovento terminated AUI's Subcontract. The Court specifically finds that there was no credible evidence presented at trial that Barlovento knew or should have known *prior* to the time that it terminated AUI's Subcontract that WTI's methodology may not have been reliable.

94. AUI did not put Barlovento on notice prior to termination that, but for WTI's alleged testing errors, AUI's basalt base course as placed on grade would have met the Specification as relaxed by the variance granted by the Air Force.

95. The information that Barlovento knew or should have known at the time of the termination of the Subcontract about WTI's testing methodology was not sufficient to trigger any additional duty of investigation, intervention, or inquiry on the part of Barlovento. Barlovento acted reasonably in response to all information in its possession concerning WTI's testing methodology.

96. The Court specifically finds that the basalt base course as placed on grade did not meet Specification even when relaxed by the variance granted by the Air Force.

97. The Court further finds that WTI's testing methodology, though not immune from scientific criticism, was sufficiently reliable and that its testing results were similarly reliable, Prindle's opinions notwithstanding. The Court notes that the same testing methodology employed by WTI found that AUI had successfully completed the subgrade phase and had successfully placed 65% of the basalt base course, results with which AUI does not take issue. The Court further finds that WTI used the same equipment and testing methodology on the base course that SWCP successfully placed and that the Air Force approved following the termination of AUI's Subcontract.

98. The Court partially credits Prindle's opinion that the limestone base course that AUI proposed immediately prior to termination would have satisfied the Project Specification. The Court credits the opinion to the extent the limestone material likely would have passed the -200 sieve test in its stockpiled form, but AUI's difficulties occurred not with identifying a suitable material but in actually placing the base course in a way that would survive post-compaction testing. After all, the Air Force had earlier

*approved* the basalt base course – and granted a variance to enhance AUI's odds of successfully placing it – only to have AUI's placement method yield disqualifying post-compaction test results. Since the limestone base course was never placed and never compacted on grade, the question of whether it would have met the Specification (for which no variance had been granted) *after* compaction remains in the Court's mind an unanswered question, Prindle's opinion notwithstanding.

### K. Barlovento's Request for Damages Arising from Default Termination

99. Barlovento incurred reprocurement costs and other costs and expenses after it terminated AUI's Subcontract.

100. Subcontract § 8.1.3 identified and defined Barlovento's recoverable costs in the event of a termination for default. This section required Barlovento to introduce evidence of its "costs, expense and reasonable profit" associated with completing the work that remained under AUI's Subcontract at the time of termination – here, the base course phase. This section goes on to provide that "[i]f the costs, expense and reasonable profit of [Barlovento] for completing this work shall exceed the amount due to [AUI], [AUI], shall, upon written demand from [Barlovento], pay the difference immediately."

101. As documented in Pay Application 2 (Ex. 337), Barlovento had paid AUI $204,000.00 for base course that the Air Force later rejected and ordered removed from the Project site. The Court finds that amount to be a "cost" or "expense" of completion of the base course phase for which AUI is liable under § 8.1.3.

102. Barlovento introduced evidence that it paid SWCP approximately $830,394.55 more than it was to pay AUI for the base course and concrete paving portions of AUI's original Subcontract.

103. Barlovento did not introduce evidence, however, of how much it paid SWCP to complete AUI's scope of work with respect *to the base course phase itself*. Because of Herndon's actions on December 1, 2017, the only portion of AUI's Subcontract that remained uncompleted at the time of default termination was the base course. Barlovento failed to prove that it paid more for SWCP to complete the base course than it had remaining from the balance set aside to pay AUI to complete the base course.

104. To illustrate the shortcomings in Barlovento's damages evidence, the Court will use this table:

|   | | |
|---|---|---|
| a. | Amount from AUI's Subcontract set aside for base course: | $624,508.00 |
| b. | Amount that Barlovento had paid AUI for base course: | $204,000.00 |
| c. | Balance remaining: | $420,508.00 |
| d. | Amount that Barlovento paid to SWCP for base course: | ? |
| e. | Difference between lines c and d: | ? |

105. Hypothetically, by way of example only, if Barlovento had introduced evidence that it paid SWCP $700,000.00 to complete the base course phase, the application of § 8.1.3 would entitle Barlovento to recover $279,492.00 in completion costs and expenses. This would be the sum of (1) the difference between the amounts set aside by the two subcontracts for the base course phase ($700,000.00 - $624,508.00 = $75,492.00) and (2) the $204,000.00 that Barlovento had already paid AUI for base course later rejected.

106. Barlovento's evidentiary presentation did not include a separate line item for "reasonable profit."

107. Barlovento introduced evidence suggesting that it incurred $360,338.12 in extended general conditions costs, as identified in its Job Cost Journal, to complete AUI's scope of work. The Court did not find that evidence persuasive, inasmuch as Barlovento did not prove by a preponderance of the evidence that any of those costs arose from or were caused by its termination of the Subcontract for default. The Court finds instead that Barlovento would have incurred those costs regardless of the termination of AUI because the completion of the Project was substantially delayed for reasons separate and apart from AUI's performance. The Court emphasizes that Barlovento did not receive Air Force approval of its concrete mix design until January 2018 and the Air Force did not issue Modification 2 for the expansion of the taxiway until late April 2018, both of which occurred well after Barlovento's termination of AUI's Subcontract. Barlovento did not introduce evidence that completion of the Project was in any way delayed by AUI's performance or failure to perform. The Court therefore finds that Barlovento is entitled to $0.00 in extended general conditions costs as a result of AUI's default.

108. Similarly, Barlovento did not introduce evidence of how much sooner (if at all) the Project would have been completed but for AUI's termination. Given that the Air Force did not issue Modification 2, which substantially increased the depth and breadth of the concrete portion of the taxiway, until April 27, 2018, the Court is unable to find that anything AUI did or did not do contributed to a delay in Project completion. Thus, any costs claimed by Barlovento for "general conditions" or "overhead" or the like because the Project took longer than expected are not attributable to AUI.

109. Barlovento introduced evidence that it incurred $108,561.87 related to what it claimed was AUI's rejected work. The evidence took the form of invoices received from Amec Foster Wheeler, Terra Land Surveys, and WTI. But for one exception, however, the Court did not find that evidence persuasive. The Court accepts the testimony of Robert Freas that AUI should be held responsible for $30,340.00 in re-work costs borne by Barlovento associated with AUI's base course failures. *See* Trial Tr. Vol. VIII at 178-79. The Court finds that the remainder of the additional invoices (and the balance of $78,221.87) were related to survey and testing functions that were outside AUI's scope of work, were related to the subgrade phase that AUI successfully completed, or were related to the concrete phase that had been descoped from the Subcontract prior to the

termination for default. The Court therefore finds that Barlovento is entitled to recover as a "cost" or "expense" of completion under § 8.1.3 only $30,340.00 of the money it paid in satisfaction of those invoices.

110. Apart from the $204,000.00 in Factual Finding 101 and the $30,340.00 identified in the immediately preceding finding, Barlovento did not prove by a preponderance of the evidence its entitlement to any other recoverable cost identified in Subcontract § 8.1.3. Consequently, although the Court finds and concludes that AUI breached the Subcontract by defaulting on the base course phase of the Project, the Court finds that Barlovento is entitled only to $234,340.00 in recoverable costs from AUI associated with that breach.[12]

## L.  The Performance Bond

111. On or about March 24, 2017, Western Surety issued a Performance Bond in connection with the Subcontract and the Project, on behalf of AUI as its principal (Ex. 389).

112. The penal sum of the Performance Bond was $3,515,465.45.

113. The Performance Bond identified Barlovento as the Obligee.

114. Barlovento first placed Western Surety on notice of AUI's performance issues on October 20, 2017 (Ex. 86). Western Surety acknowledged the notice on October 26, 2017 (Ex. 91).

115. On October 31, 2017, Barlovento sent a second notice, this time attaching a version of the Notice of Cure that Barlovento had sent to AUI the same day.

116. Barlovento again notified Western Surety of its concerns about AUI's performance and impending termination by emailing Western Surety its Notice of Intent to Terminate the AUI Subcontract (Ex. 440) and its Notice of Termination for Default dated December 5, 2017 (Ex. 375).

117. In addition, Barlovento's counsel emailed Western Surety's representative Lisa DeSantis on December 4, 2017, at 9:48 p.m. CST (Ex. 189). The email noted counsel's unsuccessful attempt to reach Ms. DeSantis by telephone earlier that afternoon. The email also requested an urgent phone conference to discuss next steps.

118. Ms. DeSantis spoke with Barlovento's counsel by phone on December 5, 2017, at 11:37 AM CST. Barlovento's counsel made it manifestly clear that Barlovento was uninterested in Western Surety's input in identifying and selecting a completion subcontractor. Barlovento's counsel explained that Barlovento had already selected a

---

[12]As explained *infra*, this amount is offset under § 8.1.3 by the $211,762.75 that Barlovento owed AUI for satisfactory work completed prior to the termination. The balance is $22,577.25.

completion subcontractor and did not have time for whatever process Western Surety might pursue to assist in finding one. Nevertheless, the Court finds that neither Barlovento nor its counsel actually prevented, nullified, or frustrated Western Surety's ability to provide such input, to include nominating suitable completion subcontractors. While Barlovento and its counsel were anything but cooperative in this regard, Western Surety still retained the full authority and ability to discharge its duties under the performance bond.

119. At no point, including in response to the Notice of Termination for Default, did Western Surety send a consultant to the Project site, solicit any bids, or tender a completion contractor. Western Surety instead took no affirmative step to honor its obligations under the Performance Bond.

120. Western Surety knew that Barlovento was under the threat of termination itself by the Air Force.

121. Given the scope and complexity of the work remaining on the Project, Barlovento would have incurred substantial further delay had it waited until it terminated AUI's Subcontract to solicit bids for a replacement subcontractor. Such delay would have disserved Barlovento's effort to regain the confidence of the Air Force and remain on the Project.

122. Upon receiving notice of the termination of its principal, Western Surety reminded Barlovento of its responsibility to mitigate its damages.

123. Western Surety did not introduce evidence that Barlovento failed to mitigate its damages in selecting SWCP or that SWCP's subcontract price was higher than that of any other competent and competitive bidder.

124. Barlovento filed a Notice of Claim with Western Surety on January 15, 2018, after which Western Surety informed Barlovento that it was conducting an investigation into the matter. Until this litigation began, Western Surety never advised Barlovento that Western Surety considered its obligations to have been discharged or that it would take no action.

125. Barlovento adequately performed its obligations under the Performance Bond so as to trigger Western Surety's obligations under the Bond.

126. Western Surety's obligations under the Bond were not discharged by any action taken or refused by Barlovento.

127. Western Surety refused to pay any of the costs that Barlovento incurred in completing AUI's portion of the Project.

128. Because the Performance Bond incorporated by reference the Subcontract and its scope of work, and because Herndon's actions on December 1, 2017 constituted a partial termination for Barlovento's convenience of the concrete phase of the Project, the only portion of AUI's Subcontract that remained unperformed and subject to the Performance Bond was the base course phase.

129. For the reasons set forth above finding that Barlovento proved its entitlement only to $234,340.00 in recoverable costs – and only $22,577.25 in net damages – the Court also finds that Barlovento proved by a preponderance of the evidence that Western Surety's breach of its Performance Bond resulted only in the same quantum of damages ($22,577.25).

**M. AUI's Demands for Payment, Additional Costs, and Additional Time**

130. Subcontract Article 7 includes mandatory payment procedures that govern the terms and conditions of how AUI was to be paid for performing the Subcontract work.

131. AUI submitted four Payment Applications in connection with its work on the Subcontract.  Barlovento paid a total of $478,607.39 for Payment Application Nos. 1 and 2 (Exs. 336, 337, 266).

132. Barlovento rejected AUI Payment Application Nos. 3 and 4 because of errors and notified AUI of the reasons for the rejections.  AUI did not resubmit revised versions of Payment Application Nos. 3 and 4.

133. The Court finds that, prior to termination, AUI satisfactorily performed Subcontract work for which it was not paid in the total amount of $211,762.75.  As explained below, this sum is derived from: (a) satisfactory work unrelated to base course as documented in Pay Applications 3 and 4 (Exs. 338-39); (b) amounts held back by Barlovento from Pay Applications 1 and 2 (Exs. 336-37) under the "retainage" provision set forth in Subcontract § 7.11; and (c) AUI's share ($117,789.79) of the REA for unsuitable soils, an amount that all parties to this case agree should be credited to AUI.

134. In Pay Application 3, which was not paid, AUI sought payment of $33,554.36 for "Unclassified Excavation" and $12,640.00 for "Subgrade Preparation."  In Pay Application 4, which was also not paid, AUI sought payment of $15,000.00 for "Subgrade Preparation."[13]  Thus, the total amount of satisfactory work documented in those pay applications for which AUI was not paid is $61,194.36.

135. On the issue of retainage, Pay Application 2 (Ex. 337) reflects that a total of $53,178.60 had been retained from the first two pay applications.  Included in that

---

[13] Pay Application 4 also included a request by AUI to be paid "$44,000.00 for "Aggregate and/or Graded Aggregate Base Course."  Because the Court finds that AUI did not satisfactorily complete the base course work, the Court finds AUI not entitled to this amount.

figure, however, was $20,400.00 related to retainage for "Base Course Add" later rejected by the Air Force. The remainder of the retainage related to components of the Project that Barlovento does not dispute were satisfactorily completed. Thus, of the $53,178.60, the Court finds that AUI is entitled to $32,778.60.

136. The Subcontract does not include a duty or obligation for Barlovento to provide AUI with specific schedule updates. AUI did not identify any other source for such duty at trial.

137. As of November 2, 2017, AUI advised Barlovento that it could not provide an accurate recovery schedule for the Project until it procured a new base course material.

138. Subcontract Article 10 includes express provisions governing claims for additional time and costs.

139. Subcontract § 10.2.3 includes an exclusive procedure for dealing with changes to the work and other disputes that may arise during performance. The Subcontract provides that the procedure is "an absolute condition precedent" to recovering claims for additional time or costs under the Subcontract.

140. With respect to claims against the Air Force, Subcontract § 10.5 expressly limits any recovery by AUI to the same extent of Barlovento's recovery from the Air Force. In other words, that provision ties any remedy for AUI to what Barlovento received from the Air Force in connection with a claim against the Project Owner.

141. AUI submitted only one REA claiming additional time and costs on the Project. The REA sought additional costs and time for differing site conditions related to soil conditions encountered during the subgrade scope of work.

142. Barlovento, in turn, submitted the portions of the REA that it believed it could substantiate as part of its own REA to the Air Force. The Air Force awarded $118,874.00 to Barlovento for the differing site conditions.[14]

143. Barlovento did not unreasonably minimize the soil-related REA, but rather requested the amount that it believed in good faith it could substantiate to the Air Force. Furthermore, AUI did not introduce evidence that was sufficiently probative to persuade the Court that the Air Force *would have* granted a larger request for additional costs than the request that was submitted.

144. AUI submitted no other REAs or claims for additional time or costs in accordance with the Subcontract's mandatory procedures set forth in Article 10.

---

[14] As found in Finding 133, all parties agree that AUI is entitled to $117,789.79 of the REA amount.

145. Barlovento did not fail or refuse to forward to the Air Force any properly submitted request by AUI for extension of time or payment of additional costs.

146. The Subcontract does not include a duty or obligation for Barlovento to grant AUI any extensions of time separate and apart from any such extensions granted by the Air Force. AUI did not identify any other source for such duty at trial.

147. Barlovento was under no duty to conduct a time-impact analysis or an excusable time analysis before terminating the Subcontract for default.

148. AUI submitted change order proposals (COP) related to Modification 1. Barlovento included the COPs in its Modification 1 proposal. The Air Force issued a deductive modification and did not grant any additional time in connection with Modification 1 (i.e., the Contract Completion Date remained December 12, 2017).

149. AUI did not submit an REA for the placement of the three test lanes on the Project, or claims or REAs for any other alleged entitlement to time and costs – other than the September 29, 2017 REA related to differing site conditions encountered during subgrade prep.

150. The Subcontract does not include a duty or obligation for Barlovento to provide AUI with as-built drawings not provided to Barlovento by the Air Force. AUI did not identify any other source for such duty at trial.

151. The Project is a design-bid-build, meaning *inter alia* that the Air Force is responsible for alleged defects in the design.

152. AUI executed two Interim Waiver and Release of All Liens and Claims that waived any additional time or money up through and including July 20, 2017. AUI did not waive, however, its entitlement to being paid for the satisfactory work described in Findings 133-35.

153. AUI submitted an RFI identifying the locations of the underground utilities and existing conditions it discovered and identified as "unknown." A change order proposal was submitted to the Air Force as part of Modification 1.

154. AUI did not submit any other REAs or claims for additional time or costs in accordance with the Subcontract's mandatory procedures related to as-built drawings or underground utilities.

155. Neither Barlovento nor its employees intentionally caused harm to AUI or interfered with AUI's performance.

156. Barlovento did not prevent AUI from completing its cure or interfere with AUI's ability to do so.

23

157. Barlovento reinitiated contact and resumed discussions with SWCP in October 2017 only after AUI failed to successfully place the basalt base course and the concrete test lanes and only after the Air Force memorialized in writing its concerns about Barlovento's ability to complete the Project.  Barlovento's resumption of contact with SWCP was neither a breach of the Subcontract nor a breach of the implied duty of good faith and fair dealing.

158. AUI's Job Cost Report included some costs for labor, equipment, and materials related to work that was not accepted by the Air Force.  The Job Cost Report did not distinguish which costs applied to work accepted by the Air Force as opposed to that work which was not.

159. Apart from the $117,789.79 that the parties agree that Barlovento owes to AUI, and the $93,972.96 discussed *supra* in Findings 134-35, the Court finds that AUI did not prove its entitlement to any other unpaid amounts.

160. The Court therefore finds under Subcontract § 8.1.3 that "the amount due to Subcontractor [AUI]" is $211,762.75.

161. Under § 8.1.3, Barlovento's proved recoverable costs of $234,430.00 exceed "the amount due to [AUI]" by $22,577.25.  Consequently, the Court finds that § 8.1.3 compels AUI to "pay the difference immediately" by paying $22,577.25 in damages to Barlovento.  The Court further finds that AUI and Western Surety jointly and severally owe that amount to Barlovento.

## N.  AUI's Request for Compensation for Partial Termination Without Fault

162. On December 1, 2017, through the words and actions of Jason Herndon, Barlovento relieved AUI of the concrete paving phase of the Project.  Herndon provided AUI in-person oral notice that AUI was no longer responsible for the concrete phase of the Project and that Barlovento instead was awarding that phase of the Project to SWCP.  As the Court has concluded elsewhere, *supra* at Finding 60, *infra* at Conclusions 20-23, Barlovento's action amounted to a constructive partial termination without fault of the concrete paving portion of the Subcontract.

163. Section 8.2.1 of the Subcontract did not expressly require the termination to be in writing.  Instead, it required only that Barlovento provide "notice" to AUI, after which AUI was to "do only that work set forth in the Contractor's notice."[15]

---

[15] Although Barlovento contends that Section 12.10 of the Subcontract required Herndon's decision to be memorialized in writing, the Court finds and concludes otherwise.  That provision, entitled "AMENDMENTS," specifies that the Subcontract "may not be *changed, altered or amended* in any way except in writing signed by the Parties[.]" § 12.10 (emphasis added).  The plain language of the provision does not speak to how the Subcontract may be *terminated*.  Article 8, which governs terminations, specifies neither the form a termination notice must take nor the manner of its delivery.  And Barlovento has agreed that termination of the Subcontract does not require any

164. Consequently, as of December 1, 2017, the acquisition and placement of the base course remained the only uncompleted work that remained part of AUI's Subcontract.

165. The termination without fault of the concrete paving phase of the Subcontract conceivably entitled AUI to compensation.[16]   Specifically, § 8.2.1 identified as recoverable damages "the actual value of Subcontract Work satisfactorily performed, to the extent that the actual value of can be substantiated to [Barlovento's] satisfaction and approved by [Barlovento], and any direct costs incurred by [AUI] due to such termination."   Art. 8.2.1.   This provision therefore authorized recovery for either or both of two independent reasons (satisfactory work or direct costs).

166. With respect to work "satisfactorily performed" for which AUI had not been paid as of December 1, 2017, the Court finds that amount to be $211,762.75.   As explained below, this sum is derived from: (a) satisfactory work unrelated to base course as documented in Pay Applications 3 and 4 (Exs. 338-39); (b) amounts held back by Barlovento from Pay Applications 1 and 2 (Exs. 336-37) under the "retainage" provision set forth in Subcontract § 7.11; and (c) AUI's share ($117,789.79) of the REA for unsuitable soils, an amount that all parties to this case agree should be credited to AUI.

167. In Pay Application 3, which was not paid, AUI sought payment of $33,554.36 for "Unclassified Excavation" and $12,640.00 for "Subgrade Preparation."   In Pay Application 4, which was also not paid, AUI sought payment of $15,000.00 for "Subgrade Preparation."[17]   Thus, the total amount of satisfactorily-completed work documented in those pay applications for which AUI was not paid is $61,194.36.

168. On the issue of retainage, Pay Application 2 (Ex. 337) reflects that a total of $53,178.60 had been retained from the first two pay applications.   Included in that

---

particular form of notice.   *See* Pl.'s Post-Trial Br. and Closing Argument, ECF 276 at 19 ("the Subcontract does not require such a formal written notice").   In any event, it was Barlovento, not AUI, that dictated when and how the descoping decision occurred.   And Barlovento chose to eschew putting anything in writing and instead to do it via Herndon's oral announcement on December 1, 2017.

[16] The Court pauses here to emphasize its legal conclusion that Count II of AUI's Counterclaim does *not* include an implied claim for damages associated with a *partial* termination for convenience.   *See* Conclusion of Law No. 39, *infra*.   To the extent that any reviewing court would disagree with that conclusion, however, the Court has included Findings 166-70.   The reader should note that these findings closely track those set forth in Findings 133-35.   The Court emphasizes that even under Subcontract § 8.2.1, AUI would be entitled only to the same $211,762.75 for the work it had satisfactorily performed prior to the partial termination for convenience.   Thus, under either §§ 8.1.3 or 8.2.1, the result is the same:   AUI is entitled to credit for $211,762.75 in unpaid and satisfactorily performed Subcontract work.   And again under *either* provision, this amount is and would be used to offset the $234,340.00 in recoverable costs proven by Barlovento, yielding a net balance of 22,577.25 in damages.

[17] Pay Application 4 also included a request by AUI to be paid "$44,000.00 for "Aggregate and/or Graded Aggregate Base Course."   Because the Court finds that AUI did not satisfactorily complete the base course work, the Court finds AUI not entitled to this amount.

figure, however, was $20,400.00 related to retainage for "Base Course Add" later rejected by the Air Force. The remainder of the retainage related to components of the Project that Barlovento does not dispute were satisfactorily completed. Thus, of the $53,178.60, the Court finds that AUI is entitled to $32,778.60.

169. Apart from these three discrete categories, the Court finds that AUI had not "satisfactorily performed" any other Subcontract Work for which it had not already been paid.

170. With respect to "direct costs incurred by [AUI] due to such termination," the Court finds that AUI did not prove any such costs by a preponderance of the evidence. The Court recognizes that this would have been a daunting factual challenge, considering that the termination without fault occurred on December 1, 2017, only to be followed *three days later* by the termination for default and AUI's complete dismissal from the Project. There was virtually no opportunity for AUI to incur or identify any direct costs *due* to the termination of the concrete paving phase during the period of December 1-4, 2017.

171. Although AUI introduced a Job Cost Report showing that its overall direct costs charged to the Project were $1,902,397.47 (Ex. 333), AUI did not attempt to make an evidentiary showing of what fraction of those costs were attributable to the December 1st termination without fault of the concrete paving phase.

## II.   CONCLUSIONS OF LAW

1. The validity, interpretation and performance of the Subcontract are governed by the federal law of government contracts including, but not limited to, decisions enunciated by federal judicial bodies, boards of contract appeals and quasi-judicial agencies of the federal government. To the extent that the federal law of government contracts is not dispositive, the laws of the State of New Mexico shall apply. *See* Subcontract, § 10.8; *see also* Jt. Proposed Findings of Fact and Conclusions of Law, ECF 236, B1.

2. The federal law of government contracts and New Mexico law agree that, whether express or not, every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement. A party breaches the contract when it fails to abide by this duty, which includes the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract. This duty is thus limited by the original bargain; it prevents a party's acts or omissions that, though not proscribed by the contract expressly, are inconsistent with the contract's purpose and deprive the other party of the contemplated value. *See, e.g., Dobyns v. United States*, 915 F.3d 733, 739 (Fed. Cir. 2019); *Bradley v. Chiron Corp.*, 136 F.3d 1317, 1326 (Fed. Cir. 1998); *Salas v. Mt. States Mut. Cas. Co.*, 202 P.3d 801, 805 (N.M. 2009); *see also* Jt. Proposed Findings of Fact and Conclusions of Law, ECF 236, B2.

3. Under both the federal law of government contracts and New Mexico law, the elements of a breach of contract claim are: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach. *See, e.g., Oliva v. United States*, 961 F.3d 1359, 1362 (Fed. Cir. 2020); *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989); *Flemma v. Halliburton Energy Servs.*, 303 P.3d 814, 822-23 (N.M. 2013); *see also* Jt. Proposed Findings of Fact and Conclusions of Law, ECF 236, B3.

4. Under the federal law of government contracts and the law of New Mexico, contract interpretation begins with the plain language of the written agreement, and the plain and unambiguous meaning of a written agreement controls. *See, e.g., Hercules Inc. v. United States*, 292 F.3d 1378, 1380 (Fed. Cir. 2002); *ConocoPhillips Co. v. Lyons*, 299 P.3d 844, 852 (N.M. 2012); *see also* Jt. Proposed Findings of Fact and Conclusions of Law, ECF 236, B4.

5. Because the Subcontract was jointly drafted by the parties, the Court did not construe its language for or against either party but instead only pursuant to the ordinary meaning of its plain language.

6. In conducting a post hoc review of the reasonableness of a terminating party's actions, the Court considers what the terminating party either knew or should have known at the time the action was taken. *See McDonnell Douglas Corp. v. United States*, 323 F.3d 1006, 1019 (Fed. Cir. 2003); *Gilbane Fed. v. United Infrastructure Projects FZCO*, 777 F. App'x 873, 875 (9th Cir. 2019); Jt. Proposed Findings of Fact and Conclusions of Law, ECF 236, B5; *Order on Pl.'s Mot. in Limine #2*, ECF 216, at 7-8. In conducting a post hoc review of the reasonableness of a terminating party's belief that its subcontractor could not timely perform the subcontract work, the Court conducts an objective inquiry that does not turn on the terminating party's subjective beliefs. *Aptus Co. v. United States*, 61 Fed. Cl. 638, 651-52 (Fed. Cl. 2004) *reconsideration denied*, 62 Fed. Cl. 808 (Fed. Cl. 2004), *aff'd sub nom. Lin v. United States*, 159 Fed. Appx. 186 (Fed. Cir. 2005) (unpublished); *Lin*, 159 Fed. Appx. at 187-88; *McDonnell Douglas*, 323 F.3d at 1014-16; *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987).

7. The evidentiary standard in a default termination is a preponderance of the evidence. *See, e.g., Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 764 (Fed. Cir. 1987); *BMY Combat Systems Div. of Harsco Corp. v. United States*, 38 Fed.Cl. 109, 116 (1997) "In civil actions, the presumed burden of proof is a preponderance of the evidence.").

8. The law of government contracts requires Barlovento and AUI to abide by the express terms and conditions of the Subcontract. *See, e.g., Hercules Inc. v. United States*, 292 F.3d 1378, 1380 (Fed. Cir. 2002).

27

9. FAR 52.249-10 and 49.402-3 do not apply as a matter of law to the Subcontract. *See Mem. Op. and Order on Pl.'s Mot. for Partial Summ. J. and [AUI's] Mot. for Summ. J. in Ct. I of Cmpl.*, ECF 224, at 22-25; *see also* Jt. Proposed Findings of Fact and Conclusions of Law, ECF 236, B6.

10. Subcontract § 8.1 did not require a schedule analysis, a time-impact analysis, or an excusable delay analysis as a precondition to terminate for default. *See* Order on Pl.'s Mot. in Limine #4, ECF 215 at 2-3; *see also* Jt. Proposed Findings of Fact and Conclusions of Law, ECF 236, B6.

11. As the defaulted subcontractor, AUI has the burden of proving that its nonperformance was excusable or that it otherwise was not in default under the terms and conditions of the Subcontract. *See, e.g., Christopher Village, L.P. v. United States*, 360 F.3d 1319, 1334 (Fed. Cir. 2004).[18]

12. The plaintiff (or counter-plaintiff) in a contract action has the burden of proving damages by a preponderance of the evidence. *See, e.g., Meridian Eng'g Co. v. United States*, 885 F.3d 1351, 1366 (Fed. Cir. 2018); *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1324-25 (Fed. Cir. 2002); *Camino Real Mobile Home Park P'ship v. Wolfe*, 891 P.2d 1190 (N.M. 1995), *overruled on other grounds by Sunnyland Farms, Inc. v. Cent. N.M. Elec. Coop., Inc.*, 301 P.3d 387 (N.M. 2013); *Mascarenas v. Kennedy*, 397 P.2d 312, 314 (N.M. 1964).

13. The Subcontract between the parties was valid and binding.

14. AUI materially breached the Subcontract by defaulting with respect to its base course scope of work under the Subcontract. AUI failed to prosecute that phase of the Subontract "in a diligent, timely, workmanlike, skillful, cooperative, safe or careful manner" and "fail[ed] to supply a sufficient, skilled workforce or necessary materials," as these phrases are used in § 8.1.1 of the Subcontract.

15. AUI remained in default at the time of termination because it had not submitted a complete base course proposal in the manner and with the diligence and promptness required by Barlovento. *See* Subcontract, § 8.1.2.

16. As provided by § 8.1.1 of the Subcontract, every instance of default constituted a material breach.

17. Barlovento properly terminated the downsized Subcontract for default in accordance with the terms and conditions of the Subcontract, including Article 8.

---

[18] To the extent that the law is unsettled as to which party bore the burden of proof on this issue, the Court alternatively finds and concludes that Barlovento proved by a preponderance of the evidence that – with respect to its obligation to successfully place an approved base course – AUI materially defaulted and remained in default at the time of termination.

18. Barlovento is entitled to recover costs of reprocurement and other costs and damages identified in § 8.1.3 of the Subcontract.  Because Barlovento properly terminated AUI for default, AUI is liable for all expenses of completing the Subcontract work.  *See* Jt. Proposed Findings of Fact and Conclusions of Law, ECF 236, B8.  AUI's liability, however, is limited to the scope of the Subcontract as it existed at the time of termination on December 4, 2017.

19. AUI's contractual duty regarding the concrete scope of work was removed from the Subcontract and otherwise discharged by Barlovento's Jason Herndon during the meeting he convened with AUI and SWCP on December 1, 2017.

20. Herndon's actions on December 1, 2017, constituted a constructive partial termination for convenience without fault under Subcontract § 8.2.1.[19]

21. That section of the Subcontract endowed Barlovento with the authority to partially terminate the Subcontract without fault.

22. Consequently, at the time of its termination for default on December 4, 2017, AUI remained contractually responsible only for the Subcontract scope of work leading up to the satisfactory placing of a base course approved by the Air Force.  After December 1, 2017, by virtue of Herndon's decision and his communication of it to AUI and SWCP, AUI was *no longer* contractually responsible for any part of the concrete paving portion of the Subcontract.

23. As against AUI, Barlovento is entitled to $22,577.25 in damages associated with costs and expenses it incurred as a result of AUI's base course-related performance failures. This is the net difference between the damages proved by Barlovento and the amount that was due and owing to AUI at the time of the termination, a computation dictated by Subcontract § 8.1.3.

24. AUI is not entitled to convert the default termination of the Subcontract to a termination without fault under Subcontract § 8.2.2.  AUI failed to carry its burden to prove that AUI was not "actually in default . . . at the time of termination."  Instead, the Court has found and concluded that AUI remained in default on the base course phase at the time of the default termination.

25. Barlovento did not breach the Subcontract or its duty of good faith and fair dealing.

---

[19] The Court finds and concludes that Herndon's decision was *not* an oral change order under Subcontract § 9.2.  That provision required the parties to the Subcontract to *agree* to "the scope of the change in the Subcontract Work; the amount of adjustment, if any, to the Subcontract Price; and, the extent of the adjustment, if any, to the times for the completion of the Subcontract Work."  § 9.2.1.  The Court finds that AUI did not agree and would not have agreed to the removal of the concrete paving phase of the Subcontract.

26. Barlovento did not prevent AUI's cure with respect to AUI's base course-related performance failures.

27. If the surety tenders complete or partial performance of the surety's obligation and the obligee unreasonably refuses such tender; the surety's obligation is discharged to the extent that refusal of such tender causes the surety a loss. *See* Mem. Op. and Order on Def. Western Surety's Mot. for Summ. J., ECF 221, at 4.

28. A "tender" is a valid and sufficient offer of performance, i.e., one that is to the proper person at the proper time and is unconditional. *See id.* at 4-5.

29. Even if a formal "tender" of performance has not been made, if the obligee otherwise impairs the surety's right to perform its obligation, the surety is discharged from its duties pursuant to the surety's obligation to the extent that such impairment would otherwise cause the surety a loss. *See id.* at 5.

30. Barlovento adequately performed its obligations under the Performance Bond so as to trigger Western Surety's obligations under the Bond.

31. Western Surety's obligations under the Performance Bond were not discharged.

32. Western Surety materially breached the Performance Bond by failing to take any meaningful action to remedy the default of its principal, AUI, or to compensate its obligee, Barlovento, for expenses incurred due to the termination.

33. Western Surety's Performance Bond obligation, however, was coterminous with the scope of the Subcontract. Consequently, when Herndon relieved AUI of responsibility for completing the concrete paving phase of the Subcontract, he similarly reduced the scope of Western Surety's bonding obligation.

34. As against Western Surety, therefore, Barlovento is entitled to $22,577.25 in damages associated with expenses it incurred due to AUI's base course-related performance failures.

35. The $22,577.25 that AUI and Western Surety owe to Barlovento is owed jointly and severally.

36. Under Subcontract §§ 9.3 and 10.2, AUI's failure to utilize the Subcontract's mandatory dispute resolution procedures to present claims for alleged entitlement to additional time and costs results in the waiver of those claims. *See, e.g., Greg Opinski Constr. v. City of Oakdale*, 199 Cal. App. 4th 1107, 1117-18 (2011).

37. The Subcontract does not include a duty or obligation for Barlovento to grant AUI any extensions of time separate and apart from any such extensions granted by the Air Force. AUI did not identify any other source for such duty at trial.

38. The Subcontract does not include a duty or obligation for Barlovento to provide AUI with as-built drawings not provided to Barlovento by the Air Force.  AUI did not identify any other source for such duty at trial.

39. AUI's Counterclaim does not include – either expressly or implicitly – a claim that Barlovento's actions on December 1, 2017 constituted a *partial* termination of the Subcontract without fault.  Indeed, that incident is not mentioned at all in AUI's Counterclaim.  To read such a claim into its Counterclaim, therefore, would require the Court to permit AUI *sub silentio* to amend its Counterclaim during trial.  The Court instead construes Count II of AUI's Counterclaim to be a request that the *entire* termination for default be converted to one of convenience.[20]

40. Although § 8.1.3 of the Subcontract ostensibly allowed Barlovento to seek payment of its attorneys' fees that were "associated with" the default termination, Barlovento introduced no evidence of any such fees.  In particular, the Court notes that there was no mention either in Exhibit 197 (Barlovento's Job Cost Journal) or the testimony of Barlovento's comptroller, Kim Andrews, about any claim for attorneys' fees. The Court therefore concludes that AUI and Western Surety have no obligation to pay any portion of Barlovento's attorneys' fees.

41. The Subcontract did not identify prejudgment interest as recoverable in any action arising under the Subcontract.  Instead, the only mention of interest appears in § 7.13, which merely provides that "[i]nterest due under this Agreement, *if any*, shall be computed on the basis of the Federal Cost of Money Rate (Renegotiation Rate) in accordance with 31 U.S.C. Section 3802(a)."  Subcontract, § 7.13 (emphasis added).  Since the parties did not agree that prejudgment interest would be recoverable, since 28 U.S.C. § 1961 is silent on prejudgment interest, and since New Mexico law does not require the award of prejudgment interest in a contract dispute in which the contract is silent on the matter, the Court in its discretion will not award prejudgment interest to Barlovento or AUI.

42. Barlovento is entitled to post-judgment interest pursuant to 28 U.S.C. § 1961.  That section provides in relevant part that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court."  § 1961(a).  Such post-judgment interest shall (1) "be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding[] the date of the judgment;"  (2) "be computed daily to the date of payment;"

---

[20] In its briefing on the mid-trial Motion for Judgment and in its post-trial closing argument, AUI summarily asserted – without citation to any authority – that a claim for partial termination for convenience is "necessarily subsumed" within its counterclaim demanding that the default termination of the *entire* Subcontract be converted to one of convenience.  ECF 273 at 58.  The Court's own research disclosed no such authority either, and the Court remains convinced that AUI's Counterclaim is not nearly as elastic as AUI insists it is.

and (3) "be compounded annually."  § 1961(a)-(b).  In its written Judgment, the Court will order AUI and Western Surety to include an additional amount for post-judgment interest computed in accordance with this statutory command.

**SO ORDERED.**

THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE
*Presiding by Consent*